**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MEDPOINTE HEALTHCARE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 06-164 (SLR) |
| v. | ) | |
| | ) | |
| APOTEX INC. and APOTEX CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**APOTEX'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE APOTEX'S
JURY DEMAND, STRIKE APOTEX'S AFFIRMATIVE DEFENSE OF
UNENFORCEABILITY, DISMISS APOTEX'S
COUNTERCLAIM OF UNENFORCEABILITY, AND STRIKE APOTEX'S
<u>AFFIRMATIVE DEFENSE OF MISUSE</u>**

OF COUNSEL:

A. Sidney Katz
Robert B. Breisblatt
Steven E. Feldman
Michael A. Krol
Brian J. Sodikoff
WELSH & KATZ, LTD.
120 S. Riverside Plaza, 22nd Floor
Chicago, IL  60606
Tel:  (312) 655-1500
Fax:  (312) 655-1501
askatz@welshkatz.com
rbbreisblatt@welshkatz.com
sefeldman@welshkatz.com
makrol@welshkatz.com
bjsodikoff@welshkatz.com

Dated: May 18, 2006

Richard L. Horwitz (No. 2246)
Kenneth L. Dorsney (No. 3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

*Counsel for Defendants
Apotex Inc. and Apotex Corp.*

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT..............................................................................................1

ARGUMENT...................................................................................................................1

I.      MEDPOINTE'S MOTION TO STRIKE APOTEX'S JURY DEMAND
        IS PREMATURE AND SHOULD BE DENIED....................................................1

II.     MEDPOINTE'S MOTION TO STRIKE APOTEX'S AFFIRMATIVE
        DEFENSES AND DISMISS ITS COUNTERCLAIMS SHOULD BE
        DENIED ................................................................................................................4

III.    APOTEX'S INEQUITABLE CONDUCT DEFENSE  AND
        COUNTERCLAIMS SATISFY RULE 9(b)PLEADING
        REQUIREMENTS .................................................................................................5

IV.     MEDPOINTE'S MOTION TO STRIKE APOTEX'S AFFIRMATIVE
        DEFENSE OF PATENT MISUSE IS PREMATURE AND SHOULD
        BE DENIED BECAUSE APOTEX'S PLEADING GIVES
        MEDPOINTE FAIR NOTICE OF ITS DEFENSE...............................................10

V.      MEDPOINTE'S CONDUCT IS NOT PROTECTED BY 35 U.S.C.
        271(d)(3) OR NOEER-PENNINGTON .................................................................12

# TABLE OF AUTHORITIES

### CASES

Page(s)

*Advanced Cardiovascular Sys. v. Scimed Sys.,*
  1996 U.S. Dist. LEXIS 11702 (N.D. Cal. July 24, 1996)...............................................10

*Affymetrix, Inc. v. PE Corp.,*
  219 F. Supp. 2d 390 (S.D.N.Y. 2002) ..........................................................................11

*Agere Sys. Guardian Corp. v. Proxim, Inc.,*
  190 F.Supp.2d 726 (D. Del. 2002)..................................................................................5

*Amgen, Inc. v. Chugai Pharm. Co.,*
  706 F. Supp. 94 (D. Mass. 1989) ..................................................................................11

*Arcade, Inc. v. Minnesota Mining & Mfg. Co.,*
  1991 U.S. Dist. LEXIS 19768 (E.D. Tenn. July 2, 1991) .............................................11

*Astra Aktiebolag v. Kremers Urban Dev. Co.,*
   2001 U.S. Dist. LEXIS 23879 (S.D.N.Y. Oct. 26, 2001) ............................................11

*Beacon Theatres v. Westover,*
  359 U.S. 500 (1959).................................................................................................1, 2, 4

*C.R. Bard Inc. v. M3 Systems, Inc.,*
  157 F.3d 1340 (Fed. Cir. 1998) ..............................................................................12, 13

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,*
  494 U.S. 558 (1990)........................................................................................................2

*Curtis v. Loether,*
  415 U.S. 189 (1974).......................................................................................................4

*Dimick v. Schiedt,*
  293 U.S. 474 (1935).......................................................................................................2

*Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega
  Systems, LLC,* 350 F.3d 1327 (Fed. Cir. 2003)........................................................4, 5

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply,*
  45 F.3d 1550 (Fed. Cir. 1995) .........................................................................10, 12, 13

*Hoffman La Roche Inc. v. Genpharm Inc.,*
  50 F. Supp. 2d 367 (D.N.J. 1999)..............................................................................11, 13

*In re Independent Serv. Orgs. Antitrust Litig.,*
  964 F. Supp. 1479 (D. Kan. 1997)................................................................................13

*Item Development AB, Astellas US LLC v. Sicor, Inc.*,
    2006 U.S. Dist. LEXIS 15386 (D. Del. Mar. 31, 2006) ...................................................5

*Lee Pharmaceuticals v. Mishler*,
    526 F.2d 1115 (2d Cir. 1975) ....................................................................................4

*McKesson Information Solutions, LLC v. The Trizetto Group, Inc.*,
    2005 U.S. Dist. LEXIS 6733 (D. Del. Apr. 20, 2005)...........................................*passim*

*Minnesota Mining and Manufacturing Company v. Alphapharm Pty, Ltd.*,
    2002 U.S. Dist. LEXIS 16961 (D. Minn. Mar. 20, 2002) ...............................................3

*Norton v. Curtiss*,
    433 F.2d 779 (C.C.P.A. 1970) ................................................................................7, 8

*Novelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998) ..................................................................................8

*Parsons v. Bedford*,
    3 Pet. 433, 447 (1830).............................................................................................2

*Salcer v. Envicon Equities, Corp.*,
    744 F.2d 935 (2d Cir. 1984) ....................................................................................5

*Tull v. United States,*
    481 U.S. 412 ...........................................................................................................2

## STATUTES

15 U.S.C. § 2.............................................................................................................12

21 U.S.C. § 355(j)(4)(B)(iii)(I)-(III) ..............................................................................3

21 U.S.C. § 355(j)(5)(B)(iii) .......................................................................................11

35 U.S.C. § 271(d)(3)............................................................................................12, 13

35 U.S.C. § 271(e)(4)(C) .............................................................................................3

## RULES

Fed. R. Civ. P. 38(a) ...................................................................................................3

## TREATISES

Charles A. Wright & Arthur R. Miller,
    Federal Practice and Procedure, §1274 (1990) .............................................................10

## SUMMARY OF ARGUMENT

MedPointe's motion to strike Apotex's jury demand is premature. Apotex has timely pleaded its jury demand to preserve its right to a jury trial in the event that claims for damages arise prior to resolution of this litigation. MedPointe will have the opportunity to object to Apotex's request in the event the parties are prepared to go to trial and MedPointe has no claims for money damages against Apotex. Because "curtailment of the right to a jury trial should be scrutinized with the utmost care", the Court should deny MedPointe's motion to strike as premature. *Beacon Theatres v. Westover*, 359 U.S. 500, 501 (1959).

MedPointe's motion to strike Apotex's affirmative defenses and dismiss its counterclaims should also be denied. This Court disfavors motions to dismiss affirmative defenses and will not grant a motion to strike "unless it appears to a certainty that … [the movant] would succeed despite any state of facts, which could be proved in support of the defense." *McKesson Information Solutions, LLC v. The Trizetto Group, Inc.*, 2005 U.S. Dist. LEXIS 6733, at *3 (D. Del. Apr. 20, 2005). Apotex's defenses and counterclaims are sufficiently pleaded under the Federal Rules of Civil Procedure to provide MedPointe with fair notice of the nature and substance of Apotex's claims and the defenses and counterclaims allege facts that if proven are cognizable at law. Therefore, MedPointe's motion should be denied in its entirety.

## ARGUMENT

## I.  MEDPOINTE'S MOTION TO STRIKE APOTEX'S JURY DEMAND IS PREMATURE AND SHOULD BE DENIED

Article VII of the United States Constitution provides:  "In suits at common law, where the value in controversy shall exceed 20 dollars, the right of trial by jury shall be

preserved." The importance of this constitutional right is reflected in the Federal Rules of Civil Procedure. Fed. R. Civ. P. 38(a) provides that: "The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by statute of the United States shall be preserved to the parties inviolate." As the Supreme Court stated in *Parsons v. Bedford,* 28 U.S. 433 (1830):

> The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy.....As soon as the constitution was adopted, this right was secured by the seventh amendment of the constitution proposed by congress; and which received an assent of the people so general, as to establish its importance as a fundamental guarantee of the rights and liberties of the people....

*See also Beacon Theatres*, 359 U.S. at 501 ("[M]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence…any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.") (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935); *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990)).

The phrase "suits at common law" as used in the seventh amendment "refers to 'suits in which legal rights [are] to be ascertained and determined…'" *Id.* at 564 (quoting *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830)). To determine whether a particular action will resolve legal rights, and thus come within the Seventh Amendment's guarantee of the right to jury trial, courts examine both the nature of the issues involved and the remedy sought. *Chauffers,* 494 U.S. at 565; *Tull v. United States,* 481 U.S. 412, 417-418 ("First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy

sought and determine whether it is legal or equitable in nature.")    (internal citations omitted)

In the instant case, MedPointe has alleged infringement under § 271(e)(2) and therefore "damages or other monetary relief may be awarded against an infringer only if there has been a commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug."    35 U.S.C. § 271(e)(4)(C).  Apotex has not yet engaged in such activities and thus recognizes that at this stage of the proceedings there is no claim for damages.  However, Apotex has timely pleaded its jury demand to preserve its constitutional right to a jury trial in the event that claims for damages should arise later in the litigation.

At the present time, pursuant to 21 U.S.C. § 355(j)(4)(B)(iii)(I)-(III), the approval of Apotex's ANDA has been suspended for thirty months, or until the court rules.  If a trial takes place after thirty months has expired, Apotex's ANDA may be approved and Apotex would be in a position to begin to manufacture, market or sell Azelastine prior to trial.  If this situation arises  MedPointe would seek damages and Apotex would be entitled to a jury trial.  *See Minnesota Mining and Manufacturing Company v. Alphapharm Pty, Ltd.,* 2002 U.S. Dist. LEXIS 16961, at *9-10 (D. Minn. Mar. 20, 2002) ("In this case, Alphapharm has received approval from the FDA to market its generic, therefore this case has transformed into a typical patent infringement case involving both legal and equitable claims.  Accordingly, Alphapharm has a constitutional right to a jury trial with regard to the legal claims raised in its counterclaims.")

While Apotex is interested in seeking a swift resolution of this matter, it is possible that it will be prejudiced in its efforts if the need for discovery from foreign

entities becomes cumbersome and drawn out in Hague Convention procedures. In addition, discovery in this case has not even begun. As discovery develops, Apotex may uncover facts which will require Apotex to seek leave of the Court to amend its answer to include additional counterclaims for anti-trust violations and tortious interference. These additional claims, if alleged, would also entitle Apotex to a jury trial. *See Beacon Theatres*, 359 U.S. at 504; *Curtis v. Loether*, 415 U.S. 189, 196, n.11 (1974); *Lee Pharmaceuticals v. Mishler*, 526 F.2d 1115, 1116 (2d Cir. 1975). MedPointe has not alleged that it would suffer any prejudice if the Court withholds ruling on the jury demand issue until after the parties have had a chance for discovery and have focused and refined their claims (particularly since Apotex's demand is specifically restricted to those claims for which a jury trial would be appropriate). Accordingly, at this stage of the proceedings there is no need for the Court to decide the jury demand issue and MedPointe's motion to strike the jury demand should be denied.[1]

## II.  MEDPOINTE'S MOTION TO STRIKE APOTEX'S AFFIRMATIVE DEFENSES AND DISMISS ITS COUNTERCLAIMS SHOULD BE DENIED

The law of the Circuit in which the Court resides is applied to motions to dismiss. *Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003) ("This court reviews the dismissal of a claim under Rule 12(b)(6), a matter of procedure, by applying the law of the regional circuit.")[2]  This Court has held that "[m]otions to dismiss affirmative defenses … are disfavored." *McKesson*, 2005 U.S. Dist. LEXIS 6733, *3. In fact, "unless it appears to a

---

[1] Apotex is concerned claims for damages by MedPointe may begin to accrue after the thirty-month stay has expired if the current action has not been resolved. Apotex therefore respectfully requests in the alternative that if the jury demand is stricken at this time, Apotex be given leave to re-file its jury demand in the event damages begin to accrue.

[2] MedPointe's use of 9th, 5th, and 4th Circuit law is inapposite to its motion to dismiss.

4

certainty that … [the movant] would succeed despite any state of the facts, which could be proved in support of the defense," this Court prefers not to grant a motion to strike. *Id.* (quoting *Salcer v. Envicon Equities, Corp.*, 744 F.2d 935, 939 (2d Cir. 1984)).  The Court applies the same standard with respect to counterclaims.  *Item Development AB, Astellas US LLC v. Sicor, Inc.*, 2006 U.S. Dist. LEXIS 15386, *2-3 (D. Del. Mar. 31, 2006) (giving the standard the court applies to a defendant's motion to dismiss plaintiff's claims).  Counterclaims must be construed in favor of the complainant and the party moving for dismissal has the burden of persuasion.  *Id.*  (For simplicity, Apotex will be referred to as the "claimant" although it is understood that MedPointe's motion applies to both Apotex's affirmative defenses and corresponding counterclaims).

### III.  APOTEX'S INEQUITABLE CONDUCT DEFENSE  AND COUNTERCLAIMS SATISFY RULE 9(b) PLEADING REQUIREMENTS

Inequitable conduct claims must be pleaded with particularity. *McKesson,* 2005 U.S. Dist. LEXIS 6733;  *see also Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003).  The purpose of the Rule 9(b) requirement is to ensure the accused is on notice of the misconduct alleged to constitute inequitable conduct. *See e.g. McKesson,* 2005 U.S. Dist. LEXIS 6733, at *8 (Denying plaintiff's motion to dismiss defendant's inequitable conduct claim because it was "on notice of the misconduct alleged").  The notice requirement is met, for example, where the claimant specifies either "the time, place, and content of any alleged misrepresentations made to the PTO or otherwise give[s] the defendant[ ] notice of the precise misconduct alleged." *Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F.Supp.2d 726, 733-34 (D. Del. 2002) (internal quotations omitted).  In the appropriate circumstance, "pleadings that disclose the name of the relevant prior art and disclose the

acts of the alleged fraud fulfill the requirements of Rule 9(b)." *McKesson,* 2005 U.S. Dist. LEXIS 6733, at *7-8 (internal quotations omitted).

Apotex has apprised MedPointe of the "time, place, and conduct" alleged to constitute inequitable conduct. Apotex has argued that while prosecuting the application resulting in the '194 patent, the applicant made "affirmative misrepresentation[s] regarding the benefits of azelastine administered as a nasal spray." Answer of Apotex Inc, and Apotex Corp to Plaintiff's Amended Complaint, Affirmative Defenses and Counterclaims ("Apotex's Answer"), at p. 9, 15 (D. I. 11). Specifically, Apotex alleges the applicant's statements that "the azelastine formulations of the '194 patent cause neither somnolence nor the bitter taste side effects of previous azelastine formulations" was a material misrepresentation. Apotex's Answer, at p. 10, 15; *see* U.S. Pat. No. 5,164,194 (Ex. 1 hereto) at col. 1, ln. 63-66 ("It was surprisingly found in trial subjects that this bitter taste was no longer in evidence when the azelastine formulations of the invention were sprayed into the nose.") MedPointe now admits in its product insert for Astelin brand azelastine nasal spray that bitter taste and somnolence are major side effects of azelastine formulations. Apotex's Answer at Exhibit A (D. I. 12). While not demonstrative of applicant's knowledge during prosecution of the '194 patent, these admissions provide a strong inference that testing used to support applicant's statements would have revealed these major side effects. However, because discovery in this case has yet to begin Apotex is unable to ascertain what the applicant's test data in fact showed. MedPointe, not Apotex is in the exclusive control of this information. It would be inappropriate for the Court to dismiss Apotex's well founded allegations merely because MedPointe is in the exclusive control of development data necessary for Apotex

to prove its claim. In fact, this Court has held that for similar reasons "[i]n complex litigation, such as cases involving patent infringement, it is through the discovery process that the parties refine and focus their claims" such that motions to dismiss are disfavored. *McKesson,* 2005 U.S. Dist. LEXIS 6733 (refusing to strike affirmative defenses until adequate discovery has been completed).

Apotex's inequitable conduct arguments do not rest alone on the applicant's misrepresentations of the benefits of the azelastine nasal spray formulations. Apotex has also alleged the applicants committed inequitable conduct in seeking to overcome a *prima facie* case of obviousness by comparing the azelastine compound to a prior art compound it knew was not the closest prior art to azelastine.[3] Apotex's Answer at p. 10 ("[D]uring prosecution, the applicant's argued, as an indicium of nonobviousness, that azelastine more effectively inhibited liberation of histamine compared with the prior art, the compound of Example 1 of United States Patent No. 4,704,387 even though Example 4 was closer to azelastine."); *see, e.g.*, Prosecution History of U.S. Pat. No. 5,164,194 (Ex. 2 hereto), Dec. 26, 1989 Request for Reconsideration). It is established law that comparative results submitted to overcome obviousness rejections are material representations. *Norton v. Curtiss*, 433 F.2d 779, 794 (C.C.P.A. 1970) ("Where, as here, an applicant attempts to overcome a rejection by submitting comparative showing of

---

[3] MedPointe complains that Apotex has "[f]ail[ed] to reference any evidence from the relevant time – *before* the '194 patent issued – that was available to applicants which might contradict statements in the specification or file history[.]" See MedPointe's Motion to Dismiss at p. 22 (emphasis in original) (D. I. 17). MedPointe ignores Apotex's identification of United States Patent No. 4,704,387 as relevant to Apotex's inequitable conduct claims. The '387 patent is indisputably prior art to the '194 patent. In fact, on the cover of the '194 patent the '387 patent is identified as relevant prior art cited during prosecution of the '194 patent. Ex. 1. MedPointe's complaint that Apotex has failed to reference "any evidence from the relevant time" is simply untrue.

properties, the very act of submitting that showing, apart from what is represented therein, must also be regarded as a representation.")[4]   An applicant who submits comparative results with compounds that are not the closest prior art to its claimed compound must inform the PTO or be subject to a claim of inequitable conduct. *Id.*   This is because in giving comparative results to overcome a rejection "an applicant must be held to be representing that his showing includes a fair and accurate demonstration of the closest prior art of which he is aware." *Id.* at 794.   In *Norton*, the C.C.P.A. stated that "[s]ince the most relevant, meaningful comparison would necessarily have to have been between [applicant's claimed product and the closest prior art, applicant's] statements must be considered as an implied representation that, as far as he knew, he was making such a comparison." *Id.* at 796.   Applying *Norton* to this case, since the "most relevant, meaningful comparison" would have been between azelastine and the nearest prior art compound, the applicant's comparison between Example 1 of the '384 patent and azelastine was an implied representation that it was comparing azelastine to the nearest prior art.   Because applicant's failure to notify the PTO that it was **not** comparing its compound with the closest "most relevant" and "meaningful" prior art, its arguments constitute false misrepresentation giving rise to a claim of inequitable conduct.

Finally, MedPointe admits in its reply to Apotex's counterclaim that it is on notice of specific conduct alleged by Apotex to give rise to a claim of inequitable conduct.   In response to Apotex's allegations that it misrepresented the benefits of azelastine nasal spray MedPointe admits specific statements made to the PTO alleged by Apotex to be

---

[4] C.C.P.A. decisions are binding precedent in this matter.  The Federal Circuit has also explicitly approved of *Norton* in *Novelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998).

material misrepresentations. *See* Corrected Plaintiff's Reply to Defendants' Counterclaims to Amend Complaint ("MedPointe's Reply") at p. 17 (quoting patent) (D. I. 18). These representations were made, at least, as early as November 9, 1988 when the applicants submitted the application resulting in the '194 patent. Ex. 2. MedPointe further admits the date and substance of at least one specific representation alleged by Apotex to be a violation of its duty to inform the PTO that it was not comparing azelastine to the closest prior art. *See* MedPointe's Reply, p. 18 (identifying applicants December 26, 1989 request for reconsideration of an obviousness rejection wherein applicants compared azelastine to Example 1 of the '384 patent). MedPointe also generally admits other instances of alleged misrepresentation. *Id*. at p. 19 ("MedPointe further admits that two declarations relating to these experiments were subsequently submitted to the PTO.") MedPointe therefore admits in its reply to Apotex's counterclaim that it is fully apprised of specific statements made to the PTO, and the relevant dates of the same, giving rise to Apotex's inequitable conduct claims.

Apotex's inequitable conduct allegations are pleaded with particularity sufficient to satisfy Rule 9(b) and put MedPointe on notice of the specific misconduct alleged to constitute inequitable conduct. MedPointe admits as much in its reply to Apotex's counterclaim. MedPointe's motion to dismiss Apotex's allegations of inequitable conduct must therefore be denied.[5]

---

[5] In the event the Court finds Apotex's allegations infirm in any way, Apotex respectfully requests that the motion be granted without prejudice to Apotex being able to amend its pleadings to provide additional facts, either immediately or as discovery progresses, depending on the nature of the Court's ruling.

## IV. MEDPOINTE'S MOTION TO STRIKE APOTEX'S AFFIRMATIVE DEFENSE OF PATENT MISUSE IS PREMATURE AND SHOULD BE DENIED BECAUSE APOTEX'S PLEADING GIVES MEDPOINTE FAIR NOTICE OF ITS DEFENSE

MedPointe's motion to strike Apotex's affirmative defense of patent misuse should be denied because Apotex's pleading gives MedPointe fair notice of its defense and because MedPointe's motion is premature as discovery in this case has not even begun. *See* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, §1274 (1990) ("An affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion to strike, as long as it gives plaintiffs fair notice of the nature of the defense"); *See McKesson*, 2005 U S Dist LEXIS 6733, at *5 (declining to strike defendant's affirmative defense of patent misuse until adequate discovery has been completed).

Apotex's patent misuse defense is premised on MedPointe's bad faith enforcement of a patent it knew or should have known was invalid or unenforceable. To establish patent misuse in this context, the party alleging the misuse must show "a patentee's bad faith in alleging infringement and an anti-competitive effect or purpose behind the allegation." *McKesson*, 2005 U S Dist LEXIS 6733, at *4, n2 (citing *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply,* 45 F.3d 1550, 1558 (Fed. Cir. 1995) and *Advanced Cardiovascular Sys. v. Scimed Sys.,* 1996 U.S. Dist. LEXIS 11702, at *4 (N.D. Cal. July 24, 1996)).

A reasonable opportunity for further investigation or discovery is likely to provide evidentiary support that despite MedPointe's knowledge that U.S. Patent No. 5,164,194 ("'194 patent") was invalid and/or unenforceable, it brought this suit against Apotex in bad faith and for the purpose of maintaining its monopoly over the market for Alezastine

Nasal Spray. This conduct supports a claim of patent misuse which renders MedPointe's patent unenforceable. *Arcade, Inc. v. Minnesota Mining & Mfg. Co*., 1991 U.S. Dist. LEXIS 19768, at * 48 (E.D. Tenn. July 2, 1991) ("Patent misuse occurs when a patentee enforces its patent knowing that it is either invalid or unenforceable or beyond the scope of the patent's legal monopoly."); *Affymetrix, Inc. v. PE Corp*., 219 F. Supp. 2d 390, 397 (S.D.N.Y. 2002); *Amgen, Inc. v. Chugai Pharm. Co*., 706 F. Supp. 94, 105 (D. Mass. 1989), and cases cited therein.

Furthermore, MedPointe's listing of the '194 patent in the F.D.A. orange book forces ANDA applicants to submit a paragraph IV certification. This certification in turn allows MedPointe to bring suit and prohibit the FDA from approving any applications for the listed drug until a judicial resolution of the infringement suit, a judicial determination that the patent is invalid or unenforceable, or thirty months from the patentee's receipt of notice, whichever is earliest. 21 U.S.C. § 355(j)(5)(B)(iii). Discovery is likely to reveal that MedPointe caused the '194 patent to be listed in the orange book with full knowledge of its invalidity and/or unenforceability, thereby illegally restraining trade by prohibiting any competition in the market for azelstine nasal spray. This conduct further supports a finding of patent misuse. *Astra Aktiebolag v. Kremers Urban Dev. Co.*, 2001 U.S. Dist. LEXIS 23879, at *3 (S.D.N.Y. Oct.26, 2001) (Finding allegations that a false FDA certification forced defendants to file a paragraph IV certification sufficient to state a claim of patent misuse).

Patent misuse claims are supported where a court finds "bad faith and improper purpose in bringing the suit, in implementation of an illegal restraint of trade." *Hoffman La Roche Inc. v. Genpharm Inc.*, 50 F. Supp. 2d 367, 379 (D.N.J. 1999) ("Because

Genpharm has alleged that plaintiffs initiated a baseless suit to enforce invalid patents and patents which they knew or should have known were not infringed for anticompetitive purposes to maintain a monopoly over the market for ticlopidine hydrochloride, Genpharm has stated a claim for patent misuse in violation of the Sherman Act, *15 U.S.C. § 2.*") (citing *C.R. Bard Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1368 (Fed. Cir. 1998)*; and Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1558 (Fed. Cir. 1995)).   Apotex's patent misuse defense is premised on MedPointe's bad faith enforcement of a patent it knew or should have known was invalid or unenforceable.   MedPointe's motion to strike this defense is premature as discovery in this case has not yet begun.   A reasonable opportunity for further investigation is likely to provide evidentiary support for Apotex's defense.   Apotex's pleading gives MedPointe fair notice.   Therefore, MedPointe's motion to strike Apotex's affirmative defense of patent misuse should be denied.[6]

## V.  MEDPOINTE'S CONDUCT IS NOT PROTECTED BY 35 U.S.C. 271(d)(3) OR NOEER-PENNINGTON

MedPointe asserts that its "commencement of this action cannot constitute patent misuse, as a matter of law…" Plaintiff's Motion to Strike, p. 23.   In support of this proposition MedPointe relies on 35 U.S.C. § 271(d)(3).   This reliance is misplaced.   35 U.S.C. § 271(d)(3) provides:

> "No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: . . . (3) sought to enforce his

---

[6] To the extent that the facts plead with regard to the claims of inequitable conduct and fraud are insufficient, Apotex respectfully requests that the motion be granted without prejudice to Apotex being able to amend its pleadings to provide additional facts, either immediately or as discovery progresses, depending on the nature of the Court's ruling.

> patent rights against infringement or contributory infringement."

35 U.S.C. § 271(d)(3). Thus, this provision generally precludes a finding of patent misuse where a patentee seeks to enforce a valid patent. However, a finding of misuse is precluded **only if** the patent infringement is brought in good faith. *In re Independent Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1479, 1484 (D. Kan. 1997) (citing *Glaverbel,* 45 F.3d at 1558-59). Thus MedPointe's bad faith enforcement of a patent it knows to be invalid or unenforceable is not protected under 35 U.S.C. § 271(d)(3). Nor is MedPointe's conduct protected under the Noerr-Pennington doctrine. *Hoffman La Roche Inc.,* 50 F. Supp. 2d at 379-380 ("Where a litigant brings a suit for anticompetitive purposes to enforce a patent with the knowledge that the patent is invalid or not infringed, the antitrust immunity of Noerr-Pennington and California Motor Transp. does not apply.") (citing *C.R. Bard, Inc.*, 157 F.3d at 1368).

For the above stated reasons, MedPointe's motion to strike Apotex's affirmative defense of patent misuse should be denied.

**CONCLUSION**

For the reasons stated herein, MedPointe's Motion to Strike Apotex's Jury Demand, Strike Apotex's Affirmative Defense of Unenforceability, Dismiss Apotex's Counterclaim of Unenforceability, and Strike Apotex's Affirmative Defense of Misuse should be denied.

OF COUNSEL:                                        POTTER ANDERSON & CORROON LLP

A. Sidney Katz
Robert B. Breisblatt                               By:      /s/ Richard L. Horwitz
Steven E. Feldman                                           Richard J. Horwitz (#2246)
Michael A. Krol                                             Kenneth L. Dorsney (No. 3726)
Brian J. Sodikoff                                           Hercules Plaza, 6th Floor
Welsh & Katz, Ltd.                                          1313 N. Market Street
120 S. Riverside Plaza, 22nd Floor                          P.O. Box 951
Chicago, IL 60606                                           Wilmington, DE 19801
Tel: (312) 655-1500                                         Tel: (302) 984-6000
Fax: (312) 655-1501                                         rhorwitz@potteranderson.com
askatz@welshkatz.com                                        kdorsney@potteranderson.com
rbbreisblatt@welshkatz.com
sefeldman@welshkatz.com                            *Counsel for Defendants*
makrol@welshkatz.com                               *Apotex Inc. and Apotex Corp.*
bjsodikoff@welshkatz.com

Dated: May 18, 2006

732914

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on May 18, 2006, the attached

document was hand delivered on the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Alyssa M. Schwartz
Matthew W. King
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

I hereby certify that on May 18, 2006, I have Electronically Mailed the foregoing

document(s) to the following non-registered participants:

John M. Desmarais
Peter J. Armenio
Maxine Y. Graham
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022
jdesmarais@kirkland.com
parmenio@kirkland.com
mgraham@kirkland.com

                                    /s/ Richard L. Horwitz
                                    Richard L. Horwitz
                                    Kenneth L. Dorsney
                                    Potter Anderson & Corroon LLP
                                    Hercules Plaza — Sixth Floor
                                    1313 North Market Street
                                    Wilmington, DE  19801
                                    (302) 984-6000
                                    rhorwitz@potteranderson.com
                                    kdorsney@potteranderson.com

# EXHIBIT 1



US005164194A

# United States Patent [19]

## Hettche

[11] Patent Number: 5,164,194

[45] Date of Patent: Nov. 17, 1992

[54] AZELASTINE CONTAINING MEDICAMENTS

[75] Inventor: Helmut Hettche, Dietzenbach, Fed. Rep. of Germany

[73] Assignee: Asta Pharma AG, Fed. Rep. of Germany

[21] Appl. No.: 551,644

[22] Filed: Jul. 12, 1990

### Related U.S. Application Data

[63] Continuation of Ser. No. 268,772, Nov. 9, 1988, abandoned

[30] Foreign Application Priority Data

Nov. 13, 1987 [DE] Fed. Rep. of Germany ...... 3738681

[51] Int. Cl.⁵ ................. A61K 9/14; A61K 31/55
[52] U.S. Cl. ............................ 424/489; 424/43;
424/45; 424/464; 424/422; 514/212
[58] Field of Search ........... 424/43, 464, 422, 45,
424/489; 514/212; 222/394; 141/24; 239/302;
248/108

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 158,564 | 1/1875 | Barnes | 141/24 |
| 2,119,643 | 6/1938 | Mendl | 222/394 |
| 2,136,940 | 11/1938 | Ehbrecht | 222/394 |
| 2,457,024 | 12/1948 | Arp | 248/108 |
| 2,995,308 | 8/1961 | Ashkencz | 239/302 |
| 3,813,384 | 5/1974 | Vogelsang | 546/133 |
| 4,704,387 | 11/1987 | Engel et al. | 514/212 |
| 4,769,369 | 9/1988 | Thomas et al. | 514/234.5 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2164058 | 7/1972 | Fed. Rep. of Germany | 546/133 |
| 3530793 | 3/1986 | Fed. Rep. of Germany | 514/212 |
| 1377231 | 1/1972 | United Kingdom | |

#### OTHER PUBLICATIONS

Negwer, Organic-Chemicals, Drugs and Their Synonyms, vol. II, (1987) p. 1145.

European Search Report.

Org.-Chem. drugs and their synonyms, vol. III, No. 6496 (1987).

Arzneimittel, Fortschritte 1972–1985, pp. 936 and 939 (1977).

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Neil S. Levy
*Attorney, Agent, or Firm*—Cushman, Darby & Cushman

[57] ABSTRACT

A medicament for nasal use or for use in the eye which contains as active ingredient azelastine or a physiologically acceptable salt.

12 Claims, No Drawings

5,164,194

1

# AZELASTINE CONTAINING MEDICAMENTS

This is a continuation of application Ser. No. 07/268,72, filed Nov. 9, 1988, now abandoned.

The present invention relates to the treatment of nasal and eye tissues with azelastine.

## BACKGROUND OF THE INVENTION

Azelastine is a phthalazinone derivative having the following structural formula:



The chemical designation is: 4-(4-chlorobenzyl)-2-(perhydro-1-methyl-azepine-4-yl)-1-(2H)phthalazinone. Azelastine is used in particular for prophylactic treatment of asthma. Azelastine also has anti-allergic and antihistamine properties, see German Patent No. 21 64 058.

## SUMMARY OF THE INVENTION

It has now been found that azelastine and its physiologically acceptable salts display particularly advantageous and surprising effects when the corresponding formulations are applied directly in the nose and/or to the conjunctival sac of the eye.

Elimination or marked relief has been achieved not only in allergy-related rhinitis, but also in the normal common cold (caused, for example, by rhino viruses) as well as in the vasomotor cold and the symptoms of illness triggered thereby.

It is surprising in this context that local nasal application also has a favorable effect on the mucous membrane of the eye (elimination or relief of reddening of the eye and of eye irritation) so that the additional use of eye drops is frequently superfluous.

Other indications for the application/use of the invention are, for example: non-specific conjunctivitis, allergy-related conjunctivitis, allergic blepharoedema, catarrhal conditions in the eye or nose, coryza.

Surprisingly, in addition, none of the tiredness that arises with other applications was observed with use according to the invention.

Furthermore the invention provides a way to overcome problems which arise because of azelastine's exceptionally penetrating, bitter taste. The degree of the bitter taste is so intense that it is even found to be unpleasant in a dilution of 1 : 706. This problem has hitherto prevented oral application of azelastine solutions, since patients refuse to take such azelastine solutions or suspensions. It wa surprisingly found in trial subjects that this bitter taste was no longer in evidence when the azelastine formulations of the invention were sprayed into the nose. As a result, it is possible in this manner to apply solutions or suspensions of azelastine and its salts nasally without taste impairment. Moreover the bitter

2

taste is barely perceptible when the sprayed azelastine solution or suspension runs down into the pharynx.

Therefore, the object of the present invention is to provide a well tolerated and improved remedy based on azelastine or its salts for the treatment both of the allergy-related and vasomotor-related conditions as well as rhino virus-related cold and its accompanying symptoms.

A further object of the present invention is to provide medical formulations which are adapted to direct application to nasal and eye tissues.

The preferred embodiment of the invention is a sterile and stable aqueous solution of azelastine or one or more of its salts which can be used in the form of drops, ointments, creams, gels, insufflatable powders or, in a particularly preferred embodiment, in the form of a spray (preferably a nasal spray). The spray can be formed by the use of a conventional spray-squeeze bottle or a pump vaporizer. In addition, it is also possible to use compressed gas aerosols. For example 0.03 to 3 mg of azelastine base should be released per individual actuation.

Through the use of nasal drops or a nasal spray, the dosage of azelastine required for the treatment of the cold is lowered approximately tenfold and hence the incidence of the appearance of side effects is considerably lower than in the case of the application of azelastine in orally taken dosage forms such as tablets or syrups which distribute the active substance throughout the entire body. In the treatment of a banal illness such as a cold, a low incidence of side effects is particularly important and thus represents a considerable medical advance.

Solvents which may preferably be used for the formulations of the invention are: water, saturated aliphatic mono and polyvalent alcohols which contain 2-3 carbon atoms (for example ethanol, isopropanol, 1,2-propylene glycol, glycerine), liquid polyglycols (molecular weight 200 to 600).

The solvent used is preferably water or mixtures of water with other physiologically acceptable solvents (for example those mentioned above). Preferably, the amount of the latter solvent in the aqueous mixture should not exceed 15% by weight.

The solutions or formulations preferably contain preservatives and stabilizers. These include, for example: ethylene diamine tetra-acetic acid (edetic acid) and their alkali salts (for example dialkali salts such as disodium salt, calcium salt, calcium-sodium salt), lower alkyl p-hydroxybenzoates, chlorohexidine (for example in the form of the acetate or gluconate), phenyl mercury borate. Furthermore, it is possible, for example, to use sodium-(2-    ethylmercurithio)-benzoate    generally known as "thimerosal" which may be present in an amount of 0.001 to 0.05, preferably from 0.005 to 0.02, for example 0.01% (weight/volume in liquid formulations, otherwise weight/weight). Other suitable preservatives are: pharmaceutically useful quaternary ammonium compounds, for example cetylpyridinium chloride, tetradecyltrimethyl ammonium bromide, generally known as "cetrimide", benzyldimethyl-[2-[2-[p-(1,1,3,3-tetramethyl- butyl)]phenoxy]ethoxy]-ammonium chloride, generally known as "benzethonium chloride" and myristyl-γ-picolinium chloride. Each of these compounds may be used in a concentration of 0.002 to 0 05, for example 0.02% (weight/volume in liquid formulations, otherwise weight/weight). Preferred preserva-

5,164,194

tives among the quaternary ammonium compounds are, however, alkylbenzyl dimethyl ammonium chloride and mixtures thereof, for example the compounds generally known as "benzalkonium chloride". These latter consist of a mixture of the compounds of formula,

$$\left[ \begin{array}{c} CH_3 \\ | \\ -CH_2-N-R \\ | \\ CH_3 \end{array} \right]^{+} Cl^{-}$$

in which R represents an alkyl group having the formula $C_nH_{2n+1}$, wherein n represents a whole number from 8 to 18. The use of a mixture of compounds in which n represents 10 to 14 is particularly preferred and in particular the special compound in which $R=C_{12}H_{25}$ "Benzalkonium chloride" and the compounds of the above formula can be used in concentrations of 0.005 to 0.10, preferably of 0.005 to 0.05, for example 0.01% (weight/volume for liquid formulations, otherwise weight/weight) and they may optionally be used in combination with 0.2 to 2.0, for example 0.4% (weight/ volume) of 2-phenylethanol.

The formulations of the invention (solutions, suspensions as well as oily solutions or suspensions, ointments, emulsions, creams, gels, dosage aerosols) contain 0.0005 to 2, preferably 0.001 to 1, in particular 0.003 to 0.5% (weight/weight) of azelastine (related to the free azelastine base). Should the azelastine be present-as a salt, the amounts should be recalculated as necessary to give the amounts of azelastine itself mentioned above. In the case of the eye drops, the same azelastine concentrations apply as in the case of the nasal forms.

In the case of powders, the concentration of azelastine base is 0.0005 to 2 percent by weight related to the solid carrier substances.

In the case of solutions, the dosage per nostril is, for example, 0.01 to 0.2 ml, in particular 0.05 to 0.15 ml. Such a dosage should be applied once to several times, preferably 1 to 5 times daily (optionally also hourly).

In the case of use at the eye (eye drops) the dosage is for example 1 drop (about 0.05 ml) of the solution or corresponding amounts of the semi-solid formulation forms

Possible acid components for azelastine salts are, for example: hydrohalic acids (HCl, HBr), sulphuric acid, phosphoric acids ($H_3PO_4$, metaphosphoric acid, polyphosphoric acids), nitric acid, organic mono-, di- or tricarboxylic acids of aliphatic, alicyclic, aromatic or heterocyclic organic acids (embonic acid, citric acid, tartaric acid), aliphatic and aromatic sulfonic acids (for example camphorsulfonic acid)

The total amounts of preservatives in the formulations (solutions, ointments, etc.) is between 0.001 to 0.10, preferably 0.01 g per 100 ml of solution/suspension or 100 g of formulation

In the case of preservatives, the following amounts of individual substances can, for example, be used:
thimero sal 0.002–0.02%;
benzalkonium chlorie 0.002 to 0.02% (in combination with thimero sal the amount of thimero sal is, for example =0.002 to 0.005%;);
chlorhexidine acetate or gluconate 0.01 to 0.02%;
phenyl mercuric/nitrate, borate, acetate 0.002–0.004%;

p-hydroxybenzoic acid ester (for example a mixture of the methyl ester and propyl ester 7 : 3): 0.05–0.15, preferably 0.1%.

The preservative used is preferably a combination of edetic acid (for example as the disodium salt) and benzalkonium chloride. In this combination, the edetic acid is used in a concentration of 0.05 to 0.1%, benzalkonium chloride being used in a concentration of 0.005 to 0.05%, preferably 0.01%.

In the case of solutions/suspensions reference is always made to percent by weight/volume, in the case of solid or semi-solid formulations to percent by weight/weight of the formulation.

Further auxiliary substances which may, for example, be used for the formulations of the invention are: polyvinyl pyrrolidone, sorbitan fatty acid esters such as sorbitan trioleate, polyethoxylated sorbitan fatty acid esters (for example polyethoxylated sorbitan trioleate), sorbimacrogol oleate, synthetic amphotensides (tritons), ethylene oxide ethers of octylphenolformaldehyde condensation products, phosphatides such as lecithin, polyethoxylated fats, polyethoxylated oleotriglycerides, polyethoxylated fatty alcohols. In this context, polyethoxylated means that the relevant substances contain polyoxyethylene chains, the degree of polymerization of which is generally between 2 to 40, in particular between 10 to 20. These substances are preferably used to improve the solubility of the azelastine components.

In the case of dosage forms containing water, it is optionally possible to use additional isotonization agents. Isotonization agents which may, for example, be used are: saccharose, glucose, glycerine, sorbitol, 1,2-propylene glycol, NaCl

The isotonization agents adjust the osmotic pressure of the formulations to the same osmotic pressure as nasal secretion. For this purpose these substances are in each case to be used in such amount that, for example, in the case of a solution, a reduction in the freezing point of 0.50° to 0.56° C. is attained in comparison to pure water. In Example 1, for instance, such substances would be used in such an amount which is iso-osmotic with 68 g of sodium chloride (0.68%)

In Example 1, it is possible to use instead of NaCl per 100 ml of solution, for example:

Glucose $1H_2O$ 3.81 g ; saccharose 6.35 g ; glycerine 2.2 g ; 1,2-propylene glycol 1.617 g ; sorbitol 3.84 g (in the case of mixtures of these substances correspondingly less may optionally be used).

Moreover, it is possible to add thickening agents to the solutions to prevent the solution from flowing out of the nose too quickly and to give the solution a viscosity of about 1.5 to 3, preferably 2 mPa.s. Such thickening agents may, for example, be: cellulose derivatives (for example cellulose ether) in which the cellulose-hydroxy groups are partially etherified with lower unsaturated aliphatic alcohols and/or lower unsaturated aliphatic oxyalcohols (for example methyl cellulose, carboxymethyl cellulose, hydroxypropylmethylcellulose), gelatin, polyvinylpyrrolidone, tragacanth, ethoxse (water soluble binding and thickening agents on the basis of ethyl cellulose), alginic acid, polyvinyl alcohol, polyacrylic acid, pectin and equivalent agents Should these substances contain acid groups, the corresponding physiologically acceptable salts may also be used.

In the event of the use of hydroxypropyl cellulose, 0.1% by weight are, for example, used for this purpose.

5,164,194

5

It is also possible to add to the formulations buffer substances such as citric acid / sodium hydrogensulphate borate buffer, phosphates (sodium hydrogenorthophosphate, disodium hydrogenphosphate), tromethamol or equivalent conventional buffers in order, for example, to adjust the formulation to a pH value of 6 to 7.5, preferably 6.5 to 7.1.

The amount of citric acid is, for example, 0.01 to 0.14, preferably 0.04 to 0.05 g, the amount of disodium hydrogenphosphate 0.1 to 0.5, preferably 0.2 to 0.3 g per 100 ml of solution. The weights given relate in each case to the anhydrous substances.

In the case of solutions and suspensions, the maximum total concentration of active agent and buffer should be less than 5%, in particular less than 2% (weight-/volume).

For the nasal application a solution or suspension is preferably used which is applied as an aerosol, i.e. in the form of a fine dispersion in air or in another conventional carrier gas, for example by means of a conventional pump vaporizer.

Application as a dosage aerosol is, however, also possible. Dosage aerosols are defined as being pressure packings which contain the azelastine or its salts in the form of a solution or suspension in a so-called propellant. Propellants are pressurized liquid chlorinated, fluorinated hydrocarbons or mixtures of various chlorinated, fluorinated hydrocarbons as well as propane, butane, isobutane or mixtures of these among themselves or with chlorinated, fluorinated hydrocarbons which are gaseous at atmospheric pressure and room temperature. The pressure packing has a dosage valve which, on actuation, releases a defined amount of the solution or suspension of the medicament. The subsequent very sudden vaporization of the propellant tears the solution or suspension of azelastine into the finest droplets or minute particles which can be sprayed into the nose or which are available for inspiration into the nose. Certain plastic applicators are used to actuate the valve and to convey the sprayed suspension into the nose. Propellants that may, however, also be used are: $CO_2$, nitrous oxide and compressed air.

In the case of application as an aerosol, it is also possible to use a conventional adapter.

When suspensions are used, the maximum particle size of the solid substances (azelastine + auxiliary substances) should not exceed 30 μm.

In the case of use in the form of an insufflatable powder, the maximum particle size of the substances should not be greater than 20 μm.

What occurs is, for example, a vaporizing of solid azelastine or its salts. In this case the azelastine or its salt is, for example, mixed with inert carrier substances or drawn up onto inert carrier substances. Carrier substances which may, for example, be used are: sugars such as glucose, saccharose, lactose and fructose. Also starches or starch derivatives, oligosaccharides such as dextrins, cyclodextrins and their derivatives, polyvinylpyrrolidone, alginic acid, tylose, silicic acid, cellulose, cellulose derivatives (for example cellulose ether), sugar alcohols such as mannitol or sorbitol, calcium carbonate, calcium phosphate. The concentration of azelastine is 1 part by weight of azelastine to 50 to 200,000 parts by weight of carrier substance (0.0005 to 2% of azelastine)

6

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention is illustrated by the following examples.

### EXAMPLE 1

Nasal spray or nasal drops or eye drops with 0.1% azelastine hydrochloride as active ingredient

The following are dissolved, in the following order, into 9.00 kg of water: 10 g of azelastine hydrochloride, 5 g of edetic acid disodium salt. 2 $H_2O$, 68 g of sodium chloride, 1.25 g of alkyl-benzyldimethylammonium chloride (benzalkonium chloride), 4.38 g of citric acid, 64.8 g of sodium monohydrogen-phosphate. 12 $H_2O$ as well as 10 g of hydroxypropylmethyl cellulose.[1]
[1] Commercially available product, for example methocel E4M premium

The solution obtained is diluted to 10.05 kg = 10 liters with water. The solution is filtered through a membrane filter of pore size 0.2 μm after careful mixing, the first 500 ml of filtrate being discarded. The filtrate has a pH value of 6.8 ±0.3. This is filled into plastic bottles which are closed with a conventional spray insert or into plastic or glass bottles which are closed with a conventional pump sprayer. In the latter case, pumps with nasal spray inserts are, for example used, which spray about 0.14 ml of solution per actuation. In this manner, 0.14 mg of azelastine hydrochloride are sprayed into the nose per actuation in the form of the solution.

If the above obtained filtrate is filled into the bottles with dropper pipettes conventionally used for nasal drops or eye drops, the solution can be dripped into the nose or eye using a dropper pipette.

### EXAMPLE 2

Nasal ointment with 0.1% of azelastine hydrochloride

5 kg of polyoxyethylene stearate[2], 8 kg of cetylstearyl alcohol (Lanette 0), 20 kg of white Vaseline, 15 kg of liquid paraffin and 0.5 kg of silicon oil are melted together in a heatable vessel. 126 g of p-hydroxybenzoic acid methyl ester and 53 g of p-hydroxybenzoic acid propyl ester are dissolved in the melt (temperature of the melt 80° C.). Subsequently, a solution heated to 70° C. of 0.1 kg of azelastine hydrochloride, 140 g of p-hydroxybenzoic acid methyl ester and 60 g of p-hydroxybenzoic acid propyl ester in 51.021 kg of purified water are emulsified with the aid of a high speed stirrer and the emulsion obtained is stirred until cold and repeatedly homogenized at regular time intervals.
[2] Polyoxyethylene-40-stearate, solid, white to cream-colored mass, D 25 ca. 1.1. F. 40°–44° C. Solidification point ca. 41° C.

The ointment is filled into tubes which have a tubular extension beyond the thread and are thus particularly suitable for applying the ointment into the nose.

### EXAMPLE 3

Dosage aerosol giving off 0.5 mg of azelastine hydrochloride per stroke

About 8.0 kg of a mixture of 70 parts by weight of difluorodichloromethane and 30 parts by weight of 1,2dichlorotetrafluoroethane are cooled to about −55° C. in an appropriate cooling vessel. A mixture of 0.086 kg of precooled sorbitantrioleate and 0.8600 kg of precooled trichlorofluoromethane are dissolved with stirring into this mixture at −55° C. 0.0688 kg of micronized azelastine hydrochloride and 0.0688 kg of micron-

5,164,194

7

ized lactose are then incorporated in portions into the solution thereby obtained with intensive stirring. The total weight of the suspension thereby obtained is made up to 9.547 kg through addition of more of the mixture of 70 parts by weight of difluorodichloromethane and 30 parts by weight of 1,2-dichlorotetrafluoroethane cooled to about −55° C.

Following closure of the cooling vessel the suspension is again cooled to about −55° C. under intensive stirring. It is then ready to be filled.

With continued stirring the suspension is filled into the conventional suitable aluminum monobloc tins. The monobloc tins are closed immediately after the suspension has been filled using conventional dosage valves which release 0.05 ml of suspension per valve actuation. Actuation of the valve thus releases 0.5 mg of azelastine hydrochloride. Presentation is effected in conjunction with a conventional applicator which permits introduction of the active substance into the nose of the patient.

EXAMPLE 4

Eye drops with 0.05% of azelastine hydrochloride

140 g of polyvinylalcohol (trade name for example: Mowiol 26–88 / Hoechst AG, Frankfurt 80) are stirred into 4 liters of cold water for injection purposes, the suspension is heated to 90° C. and left at this temperature for 45 minutes. After cooling, the solution obtained is mixed with the following solutions:

5 g of azelastine hydrochloride in 1 liter of water for injection purposes, 0.2 g of phenyl mercuric nitrate in 2 liters of water for injection purposes, 70 g of sodium chloride in 1 liter of water for injection purposes

The mixture is adjusted to a pH value of 6.8 through addition of 0.1 N sodium hydroxide solution, mixed with a solution of 15 g of sodium dihydrogen phosphate.2 $H_2O$ and 21 g of disodium hydrogen phosphate.2 $H_2O$ in 1 liter of water for injection purposes and filled up to 10 liters with water for injection purposes.

Following careful mixing the solution is filtered through a membrane filter of pore size 0.2 $\mu m$ with glass fiber pre-filter and filled into sterile eye drop bottles under aseptic conditions after discarding a first 500 ml of filtrate.

What is claimed is:

8

1. A method for the treatment of irritation or disorders of the nose and eye which comprises applying directly to nasal tissues or to the conjunctival sac of the eyes a medicament which contains a member selected from the group consisting of azelastine and its physiologically acceptable salts.

2. A method as set forth in claim 1 in which the medicament contains 0.0005 to 2% (weight/weight) of azelastine or an amount of a physiologically acceptable salt of azelastine which contains 0.0005 to 2% (weight/-weight) azelastine.

3. A method as set forth in claim 2 in which the medicament contains 0.001 to 1% (weight/weight) of azelastine or an amount of a physiologically acceptable salt of azelastine which contains 0.001 to 1% (weight/weight) azelastine.

4. A method as set forth in claim 1 in which the medicament contains 0.003 to 0.5% (weight/weight) of azelastine or an amount of a physiologically acceptable salt of azelastine which contains 0.003 to 0.5% (weight/weight) azelastine.

5. A method as set forth in claim 1 in which the medicament contains a pharmaceutically usable preservative in an amount of 0.001 to 0.1%.

6. A method as set forth in claim 1 in which the medicament is a solution.

7. A method as set forth in claim 1 in which the medicament is an aqueous solution.

8. A method as set forth in claim 1 in which the medicament is a solution which contains 0.001 to 0.05% (weight/volume of solution) of sodium-2-(ethylmercurithio)-benzoate or 0.001 to 0.1% (weight/volume of solution) of alkylbenzyldimethyl ammonium chloride.

9. A method as set forth in claim 1 in which the medicament is applied by spraying.

10. A method as set forth in claim 1 in which the medicament is applied as drops.

11. A method as set forth in claim 1 in which the medicament is a powder.

12. A method for the treatment of a patient suffering from allergy-related, or vasomotor or rhino-related colds or symptoms which comprises applying directly to the patient's nasal tissues or to the conjunctival sac of the patient's eye a medicament which contains a member selected from the group consisting of azelastine and its physiologically acceptable salts.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE EXTENDING PATENT TERM
### UNDER 35 U.S.C. § 156

PATENT NO.        :        5,164,194

ISSUED        :        November 17, 1992

INVENTOR(S)        :        Helmut Hettche

PATENT OWNER    :        Asta Medica, AG

This is to certify that there has been presented to the

### COMMISSIONER OF PATENTS AND TRADEMARKS

an application under 35 U.S.C. § 156 for an extension of the patent term.  Since it
appears that the requirements of the law have been met, this certificate extends the term of
the patent for the period of

### 349 days

from November 17, 2009, the original expiration date of the patent, subject to the payment
of maintenance fees as provided by law, with all rights pertaining thereto as provided by
35 U.S.C. § 156(b).



I have caused the seal of the Patent and Trademark
Office to be affixed this 27th day of February 1998.

Bruce A. Lehman
Assistant Secretary of Commerce and
   Commissioner of Patents and

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE EXTENDING PATENT TERM
### UNDER 35 U.S.C. § 156

PATENT NO.        :        5,164,194

ISSUED            :        November 17, 1992

INVENTOR(S)       :        Helmut Hettche

PATENT OWNER   :        Asta Medica, AG

This is to certify that there has been presented to the

### COMMISSIONER OF PATENTS AND TRADEMARKS

an application under 35 U.S.C. § 156 for an extension of the patent term. Since it
appears that the requirements of the law have been met, this certificate extends the term of
the patent for the period of

### 349 days

from November 17, 2009, the original expiration date of the patent, subject to the payment
of maintenance fees as provided by law, with all rights pertaining thereto as provided by
35 U.S.C. § 156(b).



I have caused the seal of the Patent and Trademark
Office to be affixed this 27th day of February 1998.

Bruce A. Lehman
Assistant Secretary of Commerce and
    Commissioner of Patents and

# EXHIBIT 2

5164194

*5164194*

PATENT DATE  NOV 17 1992   PATENT NUMBER

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 07/551,644 | 07/12/90 | 424 | 043 | 152 | Prato |

HELMUT HETTCHE, DIETZENBACH, FE. REP GERMANY.

**CONTINUING DATA************************
VERIFIED        THIS APPLN         4 OF 07/268,772 11/09/88 ABN
N.L

**FOREIGN/PCT APPLICATIONS****************
VERIFIED    FED REP GERMANY    P3738681   11/13/87
N.L    DEX

| Foreign priority claimed | ☑yes ☐no | | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|---|
| 35 USC 119 conditions met | ☑yes ☐no | | | | | | | | |
| Verified and Acknowledged | Examiner's initials | | | DEX | 0 | 18 | 1 | $ 514.00 | 62748/87217P |

Cushman, Darby & Cushman
Ninth Floor
1100 New York Avenue, N.W.
Washington, D.C. 20005-3918

AZELASTINE CONTAINING MEDICAMENTS

U.S. DEPT. of COMM—Pat. & TM Office—PTO-436L (rev. 10-78)

PARTS OF APPLICATION
FILED SEPARATELY

MP0001

| NOTICE OF ALLOWANCE MAILED | PREPARED FOR ISSUE | CLAIMS ALLOWED | |
|---|---|---|---|
| June 30, 1992 | Neil S. Levy  Assistant Examiner | Total Claims | Print Claim |
| ISSUE FEE | THURMAN K. PAGE  SUPERVISORY PATENT EXAMINER  ART UNIT 152 | 12 | 1 |
| Amt. Due | Date Paid | | DRAWING | |
| 300.00 | 8/31/92 | Primary Examiner | Sheets Drwg. | Figs. Drwg. | Print Fig. |

| | ISSUE CLASSIFICATION | ISSUE BATCH NUMBER |
|---|---|---|
| Label Area | Class 424  Subclass 489 | E21 |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

REQUEST FOR FILING NATIONAL PATENT APPLICATION WITH SIGNED DECLARATION
(Not for PCT cases)

The Commissioner of Patents and Trademarks
Washington, D.C. 20231

268772                    PATENT
                          APPLICATION

Sir:

(Our Deposit Account No. 03-3975

Herewith is the PATENT APPLICATION of
Inventor(s): HETTCHE, Helmut

Atty. Dkt.    69931    / 87 217 PH

Title:    AZELASTINE CONTAINING MEDICAMENTS

including:

Date: November 9, 1988

1.   Specification: 16   pages (only spec. and claims)  2.[ ] Specification in non-English language
3.   [x] Declaration      [x] Abstract    1   page(s),        18   numbered claims
4.   [ ] Drawings:    sheet(s) per set :    [ ] 1 set informal; [ ] formal of size   [ ] A4 [ ] 14"
5.   This is a signed [ ] Reissue of USP _____ [ ] CIP   [ ] DIV   [ ] CONT
     [ ] SUBSTITUTE Application (MPEP 201.09)   of Serial No. 0 /    Filed
6.   [ ] Attached is an assignment to
7.   [x] Priority is claimed under 35 USC 119 based on filing in (country)    GERMANY
8.       Application No.        Filing Date              Application No.      Filing Date
     (1) P37 38 681.6   Nov. 13, 1987     (4)
     (2)                                  (5)
     (3)                                  (6)
9.   1    (No.) Certified copy (copies) [X] attached; [ ] previously filed (date)
     in U.S. Application, Serial No. _____ , filed on
10.  [ ] Attached: ___ (No.) Verified Statement(s) establishing "small entity" status under Rules 9 & 27.
11.  [ ] Attached:

12.  [ ] Preliminary Amendment:

THE FOLLOWING FILING FEE IS BASED ON CLAIMS AS FILED LESS ANY ABOVE CANCELLED

| | | | | | |
|---|---|---|---|---|---|
| 13. | Basic Filing Fee ($340.00) | | | | $ 340.00 |
| 14. | Total Effective Claims | 18 | minus 20 = * – | x $12.00 = | + |
| 15. | Independent Claims | 7 | minus 3 = * 4 | x $34.00 = | + 136.00 |
| 16. | *If answer is zero or less, enter "0" | | | | |
| 17. | If any proper multiple dependent claim (ignore improper) is present, add $110.00 | | | | + |
| 18. | | | | Subtotal = | 476.00 |
| 19. | If "small entity" box 10 is X'd, enter half (1/2) of subtotal & subtract | | | | |
| 20. | | | TOTAL FILING FEE ENCLOSED | = | 476.00 |
| 21. | If "non-English" box 2 is X'd, add Rule 17(k) processing fee ($26.00) | | | | + |
| 22. | If "assignment" box 6 is X'd, add recording fee ($7.00) | | | | + |
| 23. | [ ] Attached is a Rule 47 Petition and Petition Fee ($140.00 per Rule 17(h)) | | | | + |
| | | | TOTAL FEE ENCLOSED | $ | 476.00 |

The Commissioner is hereby authorized to charge any fee specifically authorized hereafter, or any
missing or insufficient fee(s) filed, or asserted to be filed, or which should have been filed herewith or
concerning any paper filed hereafter, and which may be required under Rules 16-18 (missing or
insufficient fee only) now or hereafter relative to this application and the resulting Official document
under Rule 20, or credit any overpayment, to our Account/Order Nos. shown in the heading hereof for
which purpose a duplicate copy of this sheet is attached.  This statement does not authorize charge of
the issue fee until/unless an issue fee transmittal form is filed.

1615 L Street N.W.
Eleventh Floor
Washington, D.C. 20036-5601
Tel: 861-3000
Atty/Sec:  LAH:mhn
CDC-102 (UTILITY APPLN.)  8/88(1)

CUSHMAN, DARBY & CUSHMAN
By Atty: Lawrence A. Hymo            Reg. No.  19057

Sig:                                 Tel.: 861– 3015

MP0008



APPLICATION FOR UNITED STATES PATENT

Inventor(s): Helmut Hettche

Invention: AZELASTINE CONTAINING MEDICAMENTS

Cushman, Darby & Cushman
1615 L. Street N.W.
Washington, D.C. 20036
Attorneys
Telephone: (202) 861-3000

SPECIFICATION

MP0009

268772

## ABSTRACT OF THE DISCLOSURE

A medicament for nasal use or for use in the eye which contains as active ingredient azelastine or a physiologically acceptable salt.

MP0010

# AZELASTINE-CONTAINING MEDICAMENTS

The present invention relates to the treatment of nasal and eye tissues with azelastine.

### BACKGROUND OF THE INVENTION

Azelastine is a phthalazinone derivative having the following structural formula:



The chemical designation is: 4-(4-chlorobenzyl)-2-(perhydro-1-methyl-azepine-4-yl)-1-(2H)phthalazinone. Azelastine is used in particular for prophylactic treatment of asthma.  Azelastine also has anti-allergic and antihistamine properties, see German Patent No. 21 64 058.

### SUMMARY OF THE INVENTION

It has now been found that azelastine and its physiologically acceptable salts display particularly advantageous and surprising effects when the corresponding formulations are applied directly in the nose and/or to the conjunctival sac of the eye.

Elimination or marked relief has thus been achieved not only in allergy-related rhinitis, but also in the normal common cold (caused, for example, by rhino viruses) as well as in the vasomotor cold and the symptoms of illness triggered thereby.

It is surprising in this context that local nasal application also has a favorable effect on the mucous membrane of the eye (elimination or relief of reddening of the eye

-1-

MP0011

and of eye irritation) so that the additional use of eye drops is frequently superfluous.

Other indications for the application/use of the invention are, for example: non-specific conjunctivitis, allergy-related conjunctivitis, allergic blepharoedema, catarrhal conditions in the eye or nose, coryza.

Surprisingly, in addition, none of the tiredness that arises with other applications was observed with use according to the invention.

Furthermore the invention provides a way to overcome problems which arise because of azelastine's exceptionally penetrating, bitter taste. The degree of the bitter taste is so intense that it is even found to be unpleasant in a dilution of 1 : ~~106~~ $10^6$. This problem has hitherto prevented oral application of azelastine solutions, since patients refuse to take such azelastine solutions or suspensions. It was surprisingly found in trial subjects that this bitter taste was no longer in evidence when the azelastine formulations of the invention were sprayed into the nose. As a result, it is possible in this manner to apply solutions or suspensions of azelastine and its salts nasally without taste impairment. Moreover the bitter taste is barely perceptible when the sprayed azelastine solution or suspension runs down into the pharynx.

Therefore, the object of the present invention is to provide a well tolerated and improved remedy based on azelastine or its salts for the treatment both of the allergy-related and vasomotor-related conditions as well as rhino virus-related cold and its accompanying symptoms.

A further object of the present invention is to provide medical formulations which are adapted to direct application to nasal and eye tissues.

MP0012

The preferred embodiment of the invention is a sterile and stable aqueous solution of azelastine or one or more of its salts which can be used in the form of drops, ointments, creams, gels, insufflatable powders or, in a particularly preferred embodiment, in the form of a spray (preferably a nasal spray). The spray can be formed by the use of a conventional spray-squeeze bottle or a pump vaporizer. In addition, it is also possible to use compressed gas aerosols. For example 0.03 to 3 mg of azelastine base should be released per individual actuation.

Through the use of nasal drops or a nasal spray, the dosage of azelastine required for the treatment of the cold is lowered approximately tenfold and hence the incidence of the appearance of side effects is considerably lower than in the case of the application of azelastine in orally taken dosage forms such as tablets or ~~juices~~ *syrups* which distribute the active substance throughout the entire body. In the treatment of a banal illness such as a cold, a low incidence of side effects is particularly important and thus represents a considerable medical advance.

Solvents which may preferably be used for the formulations of the invention are: water, saturated aliphatic mono and polyvalent alcohols which contain 2-3 carbon atoms (for example ethanol, isopropanol, 1,2-propylene glycol, glycerine), liquid polyglycols (molecular weight 200 to 600).

The solvent used is preferably water or mixtures of water with other physiologically acceptable solvents (for example those mentioned above). Preferably, the amount of the latter solvent in the aqueous mixture should not exceed 15% by weight.

MP0013

-3-

The solutions or formulations preferably contain preservatives and stabilizers. These include, for example: ethylene diamine tetra-acetic acid (edetic acid) and their alkali salts (for example dialkali salts such as disodium salt, calcium salt, calcium-sodium salt), lower alkyl p-hydroxybenzoates, chlorohexidine (for example in the form of the acetate or gluconate), phenyl mercury borate. Furthermore, it is possible, for example, to use sodium-(2-ethylmercurithio)-benzoate generally known as "thiomersal" which may be present in an amount of 0.001 to 0.05, preferably from 0.005 to 0.02, for example 0.01% (weight/volume in liquid formulations, otherwise weight/weight). Other suitable preservatives are: pharmaceutically useful quaternary ammonium compounds, for example cetylpyridinium chloride, tetradecyltrimethyl ammonium bromide, generally known as "cetrimide", benzyldimethyl-[2-[2-[p-(1,1,3,3-tetramethyl- butyl)]- phenoxy] ethoxy]-ammonium chloride, generally known as "benzethonium chloride" and myristyl-r-picolinium chloride. Each of these compounds may be used in a concentration of 0.002 to 0.05, for example 0.02% (weight/volume in liquid formulations, otherwise weight/weight). Preferred preservatives among the quaternary ammonium compounds are, however, alkylbenzyl dimethyl ammonium chloride and mixtures thereof, for example the compounds generally known as "benzalkonium chloride". These latter consist of a mixture of the compounds of formula,

MP0014

-4-

$$\left[ \phantom{x}\bigcirc\!\!-\!CH_2\!-\!\underset{CH_3}{\overset{CH_3}{N}}\!-\!R \right]^{+} \qquad Cl^{-}$$

in which R represents an alkyl group having the formula $C_nH_{2n+1}$, wherein n represents a whole number from 8 to 18. The use of a mixture of compounds in which n represents 10 to 14 is particularly preferred and in particular the special compound in which R = $C_{12}H_{25}$. "Benzalkonium chloride" and the compounds of the above formula can be used in concentrations of 0.005 to 0.10, preferably of 0.005 to 0.05, for example of 0.01% (weight/volume for liquid formulations, otherwise weight/weight) and they may optionally be used in combination with 0.2 to 2.0, for example 0.4% (weight/volume) of 2-phenylethanol.

The formulations of the invention (solutions, suspensions as well as oily solutions or suspensions, ointments, emulsions, creams, gels, dosage aerosols) contain 0.0005 to 2, preferably 0.001 to 1, in particular 0.003 to 0.5% (weight/weight) of azelastine (related to the free azelastine base). Should the azelastine be present as a salt, the amounts should be recalculated as necessary to give the amounts of azelastine itself mentioned above. In the case of the eye drops, the same azelastine concentrations apply as in the case of the nasal forms.

In the case of powders, the concentration of azelastine base is 0.0005 to 2 percent by weight related to the solid carrier substances.

MP0015

In the case of solutions, the dosage per nostril is, for example, 0.01 to 0.2 ml, in particular 0.05 to 0.15 ml. Such a dosage should be applied once to several times, preferably 1 to 5 times daily (optionally also hourly).

In the case of use at the eye (eye drops) the dosage is for example 1 drop (about 0.05 ml) of the solution or corresponding amounts of the semi-solid formulation forms.

Possible acid components for azelastine salts are, for example: hydrohalic acids (HCl, HBr), sulphuric acid, phosphoric acids ($H_3PO_4$, metaphosphoric acid, polyphosphoric acids), nitric acid, organic mono-, di- or tricarboxylic acids of aliphatic, alicyclic, aromatic or heterocyclic organic acids (embonic acid, citric acid, tartaric acid), aliphatic and aromatic sulfonic acids (for example camphor-sulfonic acid).

The total amounts of preservatives in the formulations (solutions, ointments, etc.) is between 0.001 to 0.10, preferably 0.01 g per 100 ml of solution/suspension or 100 g of formulation.

In the case of preservatives, the following amounts of individual substances can, for example, be used:

thiomer sal 0.002 - 0.02%;

benzalkonium chloride 0.002 to 0.02% (in combination with thiomer sal the amount of thiomer sal is, for example = 0.002 to 0.005%;);

chlorhexidine acetate or gluconate 0.01 to 0.02%;

phenyl mercury silver/nitrate, borate, acetate 0.002 - 0.004%;

p-hydroxybenzoic acid ester (for example a mixture of the methyl ester and propyl ester 7 : 3): 0.05 - 0.15, preferably 0.1%.

MP0016

-6-

The preservative used is preferably a combination of edetic acid (for example as the disodium salt) and benzalkonium chloride. In this combination, the edetic acid is used in a concentration of 0.05 to 0.1%, benzalkonium chloride being used in a concentration of 0.005 to 0.05%, preferably 0.01%.

In the case of solutions/suspensions reference is always made to percent by weight/volume, in the case of solid or semi-solid formulations to percent by weight/weight of the formulation.

Further auxiliary substances which may, for example, be used for the formulations of the invention are: polyvinyl pyrrolidone, sorbitan fatty acid esters such as sorbitan trioleate, polyethoxylated, sorbitan fatty acid esters (for example polyethoxylated sorbitan trioleate), sorbimacrogol oleate, synthetic amphotensides (tritons), ethylene oxide ethers of octylphenolformaldehyde condensation products, phosphatides such as lecithin, polyethoxylated fats, polyethoxylated oleotriglycerides, polyethoxylated fatty alcohols. In this context, polyethoxylated means that the relevant substances contain polyoxyethylene chains, the degree of polymerization of which is generally between 2 to 40, in particular between 10 to 20. These substances are preferably used to improve the solubility of the azelastine components.

In the case of dosage forms containing water, it is optionally possible to use additional isotonization agents. Isotonization agents which may, for example, be used are: saccharose, glucose, glycerine, sorbitol, 1,2-propylene glycol, NaCl.

The isotonization agents adjust the osmotic pressure of the formulations to the same osmotic pressure as nasal

MP0017

secretion. For this purpose these substances are in each case to be used in such amount that, for example, in the case of a solution, a reduction in the freezing point of 0.50 to 0.56°C is attained in comparison to pure water. In Example 1, for instance, such substances would be used in such an amount which is iso-osmotic with 68 g of sodium chloride (0.68%).

In Example 1, it is possible to use instead of NaCl per 100 ml of solution, for example:

Glucose $1H_2O$ 3.81 g ; saccharose 6.35 g ; glycerine 2.2 g; 1,2-propylene glycol 1.617 g ; sorbitol 3.84 g (in the case of mixtures of these substances correspondingly less may optionally be used).

Moreover, it is possible to add thickening agents to the solutions to prevent the solution from flowing out of the nose too quickly and to give the solution a viscosity of about 1.5 to 3, preferably 2 mPa.s. Such thickening agents may, for example, be: cellulose derivatives (for example cellulose ether) in which the cellulose-hydroxy groups are partially etherified with lower unsaturated aliphatic al-cohols and/or lower unsaturated aliphatic oxyalcohols (for example methyl cellulose, carboxymethyl cellulose, hydroxypropylmethylcellulose), gelatin, polyvinylpyr-rolidone, tragacanth, ethoxose (water soluble binding and thickening agents on the basis of ethyl cellulose), alginic acid, polyvinyl alcohol, polyacrylic acid, pectin and equi-valent agents. Should these substances contain acid groups, the corresponding physiologically acceptable salts may also be used.

In the event of the use of hydroxypropyl cellulose, 0.1% by weight are, for example, used for this purpose.

MP0018

-8-

It is also possible to add to the formulations buffer substances such as citric acid / sodium hydrogensulphate borate buffer, phosphates (sodium hydrogenorthophosphate, disodium hydrogenphosphate), tromethamol or equivalent conventional buffers in order, for example, to adjust the formulation to a pH value of 6 to 7.5, preferably 6.5 to 7.1.

The amount of citric acid is, for example, 0.01 to 0.14, preferably 0.04 to 0.05 g, the amount of disodium hydrogenphosphate 0.1 to 0.5, preferably 0.2 to 0.3 g per 100 ml of solution. The weights given relate in each case to the anhydrous substances.

In the case of solutions and suspensions, the maximum total concentration of active agent and buffer should be less than 5%, in particular less than 2% (weight/volume).

For the nasal application a solution or suspension is preferably used which is applied as an aerosol, i.e. in the form of a fine dispersion in air or in another conventional carrier gas, for example by means of a conventional pump vaporizer.

Application as a dosage aerosol is, however, also possible. Dosage aerosols are defined as being pressure packings which contain the azelastine or its salts in the form of a solution or suspension in a so-called propellant. Propellants are pressurized liquid chlorinated, fluorinated hydrocarbons or mixtures of various chlorinated, fluorinated hydrocarbons as well as propane, butane, isobutane or mixtures of these among themselves or with chlorinated, fluorinated hydrocarbons which are gaseous at atmospheric pressure and room temperature. The pressure packing has a dosage valve which, on actuation, releases a defined amount of the solution or suspension of the medicament. The sub-

MP0019

-9-

sequent very sudden vaporization of the propellant tears the
solution or suspension of azelastine into the finest
droplets or minute particles which can be sprayed into the
nose or which are available for inspiration into the nose.
Certain plastic applicators are used to actuate the valve
and to convey the sprayed suspension into the nose. Propel-
lants that may, however, also be used are: $CO_2$, nitrous
oxide and compressed air.

In the case of application as an aerosol, it is also
possible to use a conventional adapter.

When suspensions are used, the maximum particle size of
the solid substances (azelastine + auxiliary substances)
should not exceed 30 $\mu$m.

In the case of use in the form of an insufflatable pow-
der, the maximum particle size of the substances should not
be greater than 20 $\mu$m.

What occurs is, for example, a vaporizing of solid
azelastine or its salts. In this case the azelastine or its
salt is, for example, mixed with inert carrier substances or
drawn up onto inert carrier substances. Carrier substances
which may, for example, be used are: sugars such as glucose,
saccharose, lactose and fructose. Also starches or starch
derivatives, oligosaccharides such as dextrins, cyclodex-
trins and their derivatives, polyvinylpyrrolidone, alginic
acid, tylose, silicic acid, cellulose, cellulose derivatives
(for example cellulose ether), sugar alcohols such as man-
nitol or sorbitol, calcium carbonate, calcium phosphate.
The concentration of azelastine is 1 part by weight of
azelastine to 50 to 200,000 parts by weight of carrier sub-
stance (0.0005 to 2% of azelastine).

MP0020

-10-

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention is illustrated by the following examples.

Example 1

Nasal spray or nasal drops or eye drops with 0.1% azelastine hydrochloride as active ingredient:

The following are dissolved, in the following order, into 9.00 kg of water:

10 g of azelastine hydrochloride, 5 g of edetic acid disodium salt. 2 $H_2O$, 68 g of sodium chloride, 1.25 g of alkyl-benzyldimethylammonium chloride (benzalkonium chloride), 4.38 g of citric acid, 64.8 g of sodium monohydrogen-phosphate.12 $H_2O$ as well as 10 g of hydroxypropylmethyl cellulose.)[1]

The solution obtained is diluted to 10.05 kg = 10 liters with water. The solution is filtered through a membrane filter of pore size 0.2 $\mu$m after careful mixing, the first 500 ml of filtrate being discarded. The filtrate has a pH value of 6.8 ±0.3. This is filled into plastic bottles which are closed with a conventional spray insert or into plastic or glass bottles which are closed with a conventional pump sprayer. In the latter case, pumps with nasal spray inserts are, for example used, which spray about 0.14 ml of solution per actuation. In this manner, 0.14 mg of azelastine hydrochloride are sprayed into the nose per actuation in the form of the solution.

If the above obtained filtrate is filled into the bottles with dropper pipettes conventionally used for nasal drops or eye drops, the solution can be dripped into the nose or eye using a dropper pipette.

[1] Commercially available product, for example methocel E4M premium.

MP0021

-11-

Example 2

Nasal ointment with 0.1% of azelastine hydrochloride :

5 kg of polyoxyethylene stearate[2], 8 kg of cetylstearyl al-
cohol (Lanette 0), 20 kg of white Vaseline, 15 kg of liquid
paraffin and 0.5 kg of silicon oil are melted together in a
heatable vessel.  126 g of p-hydroxybenzoic acid methyl
ester and 53 g of p-hydroxybenzoic acid propyl ester are
dissolved in the melt (temperature of the melt 80°C).  Sub-
sequently, a solution heated to 70°C of 0.1 kg of azelastine
hydrochloride, 140 g of p-hydroxybenzoic acid methyl ester
and 60 g of p-hydroxybenzoic acid propyl ester are emul-
sified into 51.021 kg of purified water with the aid of a
high speed stirrer and the emulsion obtained is stirred un-
til cold and repeatedly homogenized at regular time inter-
vals.

The ointment is filled into tubes which have a tubular
extension beyond the thread and are thus particularly
suitable for applying the ointment into the nose.

Example 3:

Dosage aerosol giving off 0.5 mg of azelastine hydrochloride
per stroke :

About 8.0 kg of a mixture of 70 parts by weight of
difluorodichloromethane and 30 parts by weight of 1,2-
dichlorotetrafluoroethane are cooled to about -55°C in an
appropriate cooling vessel.  A mixture of 0.086 kg of
precooled sorbitantrioleate and 0.8600 kg of precooled
trichlorofluoromethane are dissolved with stirring into this
mixture at -55°C.  0.0688 kg of micronized azelastine

---

[2] Polyoxyethylene-40-stearate, solid, white to cream-
colored mass, D.$^{25}$ ca. 1.1, F. 40-44°C.  Solidification
point ca. 41°C.

MP0022

-12-

hydrochloride and 0.0688 kg of micronized lactose are then incorporated in portions into the solution thereby obtained with intensive stirring. The total weight of the suspension thereby obtained is made up to 9.547 kg through addition of more of the mixture of 70 parts by weight of difluorodichloromethane and 30 parts by weight of 1,2-dichlorotetrafluoroethane cooled to about -55°C.

Following closure of the cooling vessel the suspension is again cooled to about -55°C under intensive stirring. It is then ready to be filled.

With continued stirring the suspension is filled into the conventional suitable aluminum monobloc tins. The monobloc tins are closed immediately after the suspension has been filled using conventional dosage valves which release 0.05 ml of suspension per valve actuation. Actuation of the valve thus releases 0.5 mg of azelastine hydrochloride. Presentation is effected in conjunction with a conventional applicator which permits introduction of the active substance into the nose of the patient.

Example 4:

Eye drops with 0.05% of azelastine hydrochloride.

140 g of polyvinylalcohol (trade name for example: Mowiol 26 - 88 / Hoechst AG, Frankfurt 80) are stirred into 4 liters of cold water for injection purposes, the suspension is heated to 90°C and left at this temperature for 45 minutes. After cooling, the solution obtained is mixed with the following solutions:

5 g of azelastine hydrochloride in 1 liter of water for injection purposes, 0.2 g of phenyl mercury silver nitrate in 2 liters of water for injection purposes, 70 g of sodium chloride in 1 liter of water for injection purposes.

MP0023

-13-

The mixture is adjusted to a pH value of 6.8 through addition of 0.1 N sodium hydroxide solution, mixed with a solution of 15 g of sodium hydrogen phosphate.2 $H_2O$ and 21 g of disodium hydrogen phosphate.2 $H_2O$ in 1 liter of water for injection purposes and filled up to 10 liters with water for injection purposes.

Following careful mixing the solution is filtered through a membrane filter of pore size 0.2 $\mu$m with glass fiber pre-filter and filled into sterile eye drop bottles under aseptic conditions after discarding a first 500 ml of filtrate.

What is claimed is:

16

MP0024

-14-

What is claimed is:

1. A method for the treatment of irritation or disorders of the nose and eye which comprises applying directly to nasal tissues or to the conjunctival sac of the eye a medicament which contains a member of the group consisting of azelastine and its physiologically acceptable salts.

2. A method as set forth in claim 1 in which the medicament contains 0.0005 to 2% (weight/weight) of azelastine.

3. A method as set forth in claim 2 in which the medicament contains 0.001 to 1% (weight/weight) azelastine.

4. A method as set forth in claim 3 in which the medicament contains 0.003 to 0.5% (weight/weight) azelastine.

5. A method as set forth in claim 1 in which the medicament contains a pharmaceutically usable preservative in an amount of 0.001 to 0.1%.

6. A method as set forth in claim 1 in which the medicament is a solution.

7. A method as set forth in claim 1 in which the medicament is an aqueous solution.

8. A method as set forth in claim 1 in which the medicament is a solution which contains 0.001 to 0.05% (weight/volume of solution) of sodium-2-(ethylmercurithio)-benzoate or 0.001 to 0.1% (weight/volume of solution) of alkylbenzyldimethyl ammonium chloride.

9. A method as set forth in claim 1 in which the medicament is applied by spraying.

10. A method as set forth in claim 1 in which the medicament is applied as drops.

11. A method as set forth in claim 1 in which the medicament is a powder.

MP0025

12. A method of treating a patient suffering from allergy-related, or vasomotor or rhino virus-related colds or symptoms which comprises applying directly to the patient's nasal tissues or to the conjunctival sac of the patient's eye a medicament which contains a member of the group consisting of azelastine and its physiologically acceptable salts.

13. A dispensing container containing an eye dropper, said container also containing a solution of azelastine or a physiologically acceptable salt of azelastine.

14. An atomizing container having a pump sprayer, said container containing a solution of azelastine or a physiologically acceptable salt of azelastine.

15. A compressed gas atomizing container having a valve constructed and arranged to release a predetermined amount of a atomized liquid upon each actuation, said container containing a propellant and a solution *(or suspension)* of azelastine or a physiologically acceptable salt of azelastine.

16. A compressed gas atomizing container as set forth in claim 15 in which the concentration of azelastine or a physiologically acceptable salt of azelastine is such that 0.03 to 3 mg of azelastine is released upon each actuation of said valve.

17. A dispensing tube containing an ointment, said ointment containing azelastine or a physiologically acceptable salt of azelastine.

18. Powder containing 0.0005 to 2% of azelastine or a physiologically acceptable salt of azelastine as active agent together with conventional pharmaceutical carrier substances.

-16-

MP0026

11/3/88

430.00 11 7 2 P 158



PATENT

3 new
1-12-90

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re PATENT Application of

Helmut HETTCHE

Serial No. 07/268,772                    Group Art Unit: 158

Filed: November 9, 1988                  Examiner: P. Prater

For: AZELASTINE - CONTAINING MEDICAMENTS

December 26, 1989

\* \* \* \* \*

Hon. Commissioner of Patents
     and Trademarks
Washington, D.C. 20231                   RECEIVED

Dear Sir:                                JAN 10 1990
                                         GROUP 150

The applicant respectfully requests reconsideration of
the rejection of claims 1-18 in the Office Action dated
June 23, 1989.

The basis of the rejection is that the Examiner consid-
ers the claimed method, composition and articles to be <u>prima
facie</u> obvious from the disclosure of Engel et al patent
4,704,387 in view of four secondary references. Engel et al
discloses compounds whose structures are similar to that of
the presently claimed azelastine, differing in the R group.
In the Engel patent, R is benzyl, phenethyl, methoxyethyl or
allyl, whereas, in the present invention, the corresponding
group is methyl. Barnes, Ashkenaz, Mendl and Arp are cited
in connection with dependent claims 13-17, but are not un-
derstood to add to the relevance of Engel et al to ap-
plicant's method claims.

While the process of applicant's claims 1-12 may be
<u>prima facie</u> obvious, that process is not obvious because it
produces an <u>unobvious</u> result. Applicants have conducted
comparative experiment which demonstrate this advantage.
Regrettably, the results of these experiments have come to

140  01/05/90  07268772                  1 117     430.00 CK

MP0055

Helmut HETTCHE
Serial No. 07/268,772
Page 2

hand only a few days ago, and so there has not been suffi-
cient time to obtain a declaration. Therefore, the data is
presented below. We will submit a declaration as soon as it
can be obtained, after the Christmas holiday season.

The experiments are based on the fact that an allergic
reaction in the eyes or the nose results from the liberation
of histamine from mast cells as a result of the action of an
antigen. The liberated histamine causes rhinitis symptoms.

The effectiveness of azelastine in preventing these
symptoms in the eyes and the nose can be determined by
measuring its effectiveness in preventing the liberation of
histamine from sensitized rat peritoneal mast cells. The
mast cells are incubated first with a test substance and
then challenged with antigen. The amount of histamine
released is measured, and this is compared with the total
potential release of histamine. The amount of inhibition of
histamine release is calculated for each test substance.

In the case of azelastine, the inhibition was 47.1%
whereas, in the case of the compound of Example 1 of the
cited Engel patent, the inhibition was only 24.4%.

Thus, azelastine was about twice as effective as the
compound of Example 1 of the Engel patent. This result is
surprising and unexpected.

For this reason, it is submitted that the claimed pro-
cess is unobvious.

In regard to claims 13-17, the Examiner cites In re
Durden 763 F.2d 1406 (Fed.Cir. 1985), but that case is not
thought to be relevant to the present case. In Durden, the
court dealt with the obviousness of a process of making a
novel compound, using a starting material which had not pre-
viously been used for that process. The process itself was

MP0056

Helmut HETTCHE
Serial No. 07/268,772
Page 3

known. The court held that the process was obvious, but it
cautioned against using its decision as precedent in other
situations:

> We reiterate another principle followed
> in obviousness issue cases, which is to
> decide each case on the basis of its own
> particular fact situation. What we or
> our predecessors may have said in dis-
> cussing different fact situations is not
> to be taken as having universal applica-
> tion.

The present case involves, in the case of claims 13-17,
various forms of apparatus for dispensing azelastine into
nasal or eye tissues. This is a different fact situation
from the Durden case. For the reason given in the quoted
passage, we submit that Durden does not deal with the
patentability of this type of claim.

Furthermore, in Durden, the Court distinguished the
fact situation from that in In re Kuehl, 475 F.2d 658
(C.C.P.A. 1973) where the result of the process was not
foreseeable. In the present case, where there is evidence
of a surprising result, it is submitted that the holding of
Durden is not applicable, for the same reason as that which
distinguished Durden from Kuehl.

The Kuehl case is much more relevant to the present
case than Durden. The question in Kuehl was whether it was
obvious to use a new zeolite in a catalytic process which
had been used previously with other zeolites. The Court
held that prior cases, relating to the obviousness of using
a known process of making a new substance, were not relevant
to that question. Further, the Court held that it was ap-
propriate to consider the surprising result which was
achieved with the new zeolite:

> We note that in the present case the
> novel catalyst, ZK-22, is not merely it-
> self reduced but itself catalyzes the

MP0057

Helmut HETTCHE
Serial No. 07/268,772
Page 4

hydrocarbon charge in the claimed pro-
cess, a result that was not predictable
until appellant had made his invention.

In the present case, the claimed articles produce a
result which was not foreseeable from the teachings of the
prior art, and, therefore, it is submitted that the articles
of claims 13-17 are patentable.

Favorable reconsideration and allowance are respectful-
ly requested.

The applicants have informed us that the following
documents have been cited in counterparts of the present ap-
plication:

German Application:

Published German Patent Application DE-OS 21 64 058,
corresponding to U.S. Patent 3,813,384

Arzneimittel, Fortschritte 1972-1985, Pages 936 and 939
(1977)

Org.-Chem. drugs and their symptoms, Vol. III,m No.
6496 (1987)

European Application:

German Patent Application 3 530 793, corresponding to
U.S. Patent 4,704,387.

Copies of these documents are attached.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By _Lawrence A. Hymo_

Lawrence A. Hymo

Reg. No. 19,057

MP0058