**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MEDPOINTE HEALTHCARE INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-164 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| APOTEX INC. and APOTEX CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT APOTEX INC.'S AND APOTEX CORP.'S**
**MOTION FOR ISSUANCE OF LETTERS OF REQUEST FOR**
**MR. HELMUT HETTCHE, DR. JÜRGEN ENGEL AND DR. ISTVAN SZELENYI**

On January 26, 2007, the Court ruled that depositions sought to be taken by defendant Apotex Inc. and Apotex Corp. ("Apotex") of certain German witnesses shall be governed by the rules of the Hague Evidence Convention. *See* Order dated January 26, 2007 (D.I. 48). The reference to the Hague Evidence Convention pertains to the procedures found in the Hague Convention of 18 March 1970 On Taking Of Evidence Abroad In Civil Or Commercial Matters of which both the United States and Germany are signatories. Apotex now moves for issuance of Letters of Request for three German witnesses – Mr. Helmut Hettche, Dr. Jürgen Engel and Dr. Istvan Szelenyi.

The proposed Letter of Request for Mr. Helmut Hettche ("Hettche Request") is attached as Exhibit A. The proposed Letter of Request for Dr. Jürgen Engel ("Engel Request") is attached as Exhibit B. Finally, the proposed Letter of Request for Dr. Istvan Szelenyi ("Szelenyi Request") is attached as Exhibit C. Copies of these Letters of Request were given to Plaintiff MedPointe Healthcare, Inc. ("MedPointe") in advance in an effort to resolve any objections that MedPointe may raise. The issuance of Letters of Request in this action was recently addressed at the May 3rd Discovery Conference with

the Court.  A previous motion seeking issuance of a Letter of Request for Mr. Hettche and objections filed by Plaintiff MedPointe Healthcare, Inc. ("MedPointe") have been withdrawn by agreement.

While three separate meet-and-confer conferences, the most recent occurring on May 10th, have resolved many of MedPointe's objections, one objection remains unresolved.[1]  The parties have been unable to resolve MedPointe's blanket objection to certain of the questions found in each of the Letters of Request on the ground that the questions *invite* the witnesses to reveal privileged information.  It is this single objection that now precludes the parties from submitting the Letters of Request as unopposed.  The specific questions in the Hettche Request, the Engel Request and the Szelenyi Request that are the subject of MedPointe's blanket privilege objection are identified in the correspondence attached as Exhibits D, E & F, respectively.  Additional objections to the Hettche Request are also found in Plaintiff's Opposition To Defendants' Motion For A Letter Of Request For Dr. Helmut Hettche previously filed by MedPointe.  *See* D.I. 72.

In an effort to resolve this objection, Apotex had already modified or eliminated certain questions based on MedPointe's specific objection that the question asked for the disclosure of privileged information.  However, Apotex does not agree that the remaining questions subject to this objection ask for the disclosure of privileged information.  MedPointe's objection is not that the specific questions ask for privileged information but that they *invite* the witness to reveal privileged information.  Apotex has offered to agree that objections submitted by MedPointe with the Court with respect to any of the proposed questions would be preserved for trial.  Thus, the objections do not have to be

---

[1] Counsel for Apotex hereby certifies pursuant to D. Del. LR 7.1.1 that the parties have conferred concerning this motion.  Plaintiff will oppose the motion.

2

resolved now. Rather, in the unlikely event that a German witness revealed privileged information in proceedings under the Hague Evidence Convention, MedPointe's right to object to the admissibility of that testimony before this Court is preserved.

Apotex has also pointed out to MedPointe the instructions, found in Section 13 of the Letters of Request, relating to "Special methods or procedures to be followed." The disclosed procedure provides that the witness should not reveal privileged information; and directs the witness on how to respond if the witness cannot answer on the basis of privilege. Additionally, the parties' conferred with their respective German counsel and have independently confirmed that the parties can object to any question on the record during the German proceeding including on the basis of privilege. It remains up to the German judicial authority and the witness whether privileged information will be revealed. Finally, these three German witnesses will be represented by U.S. counsel who will undoubtedly instruct the witnesses as to privilege. Combined with the fact that these German witnesses will have these written questions months in advance of the actual judicial proceedings, it is unlikely that privilege information will be revealed. However, if privileged information is revealed, Apotex has agreed that any objection to the admissibility of this testimony is preserved for resolution by this Court.

Apotex's efforts to reassure MedPointe that the danger of a German witness revealing privileged information is diminutive at best was unsuccessful. Instead of cooperating with Apotex's numerous proposals for resolution of the issue, MedPointe instead wants to share the pen with Apotex in drafting the questions. MedPointe has refused to give specific objections that Apotex can consider; and instead insists that Apotex hold the pen while MedPointe holds the eraser in drafting the questions. And to

that extent, MedPointe further insists that the last draft of the questions should flow through it.  Apotex fails to see the logic or fairness in MedPointe's position, as it is Apotex that is requesting the testimony, not MedPointe.  Apotex cannot agree with these conditions.  A great deal of time and effort has gone into the drafting of these questions. Given MedPointe's expansive view of the potential invitation for the disclosure of privileged information, as demonstrated below, allowing MedPointe the last word on the questions would effectively blunt Apotex's search for relevant, non-privileged information under the Hague Evidence Convention.

MedPointe's blanket privilege objection is unfounded.  By way of example, MedPointe objects to Questions LL3 and LL4 in the Hettche Request on the basis that they invite the witness to reveal privileged information.  *See* D.I. 72, p. 4.  These questions ask:

> 3.    In the 1980-1992 time frame, did you have access to a scientific library for research?  If so, what library?; and

> 4.    In the 1980-1992 time frame, did you keep a collection of books in your office or work space?  If so, what were some of the titles of books you had in your office or work space?

Ex. A, Hettche Request, Questionnaire of Mr. Helmut Hettche, LL3 – LL4, p. 34. MedPointe's privilege objection simply does not apply to this basic request for information.  It is difficult to believe that the books these witnesses turned to on a day-to-day basis as they conducted research would reveal privileged communications.  These are but two examples of MedPointe's unreasonable application of the privilege objection.

MedPointe's privilege objections for the other two German witnesses are equally unfounded.  For example, MedPointe objects to Dr. Engel's questionnaire on privilege grounds where Apotex simply asks the witness whether or not he recognizes his own

patent, whether he is a named inventor on the patent, and asks him to generally describe his invention. *See* Ex. B, Engel Request, Questionnaire for Dr. Jürgen Engel, E1, p 3. Similarly, with regards to the Questionnaire for Dr. Istvan Szelenyi, MedPointe objects on privilege grounds when Apotex asks: "What did you do to prepare for your testimony today?" *See* Ex. C, Szelenyi Request, Questionnaire for Dr. Istvan Szelenyi, B1. p. 2. MedPointe objects that this question invites the witness to reveal privileged information. MedPointe does not represent the witness and, therefore, has no basis for such an objection. The witnesses are represented by separate U.S. counsel who is in a better position to instruct the witness how to answer in the months leading up to the testimony where the witness has the questions in advance. In any event, Apotex is entitled to know if Dr. Szelenyi met with anyone in preparing for his testimony – even counsel. The question does not ask the witness to reveal any communications he may have had with counsel in preparing for his testimony.

MedPointe remains inflexible regarding this objection despite Apotex's repeated efforts to ensure that privileged information is not sought, and to provide remedies in the event that privileged information is requested or revealed. Rather that giving Apotex real and specific objections, in spite of Apotex's previous willingness to accommodate such specific objections, MedPointe now prefers the Court to go through these objections individually. However, if MedPointe had provided more complete objections as requested by Apotex, perhaps the Court would not be burdened with the issue. The end result is that MedPointe's privilege objection is delaying the issuance of the Letters of Request despite Apotex's reasonable proposals for resolving this objection before submitting the Letters of Request to the Court.

The attached Letters of Request comply with the format provided by the Hague Evidence Convention. In the interest of time and expense, Apotex has not yet translated the Letters of Request and associated exhibits into the German language pending any revisions that the Court may order to the Letters of Request. Once the Letters of Request are signed by the Court, Apotex will obtain certified German-language translations of the Letter of Request and associated exhibits and effect service upon the designated German Central Authority.

Apotex respectfully requests that the Court over-rule MedPointe's privilege objection with the understanding that such objections are preserved for trial so long as they are raised during the proceedings under the Hague Evidence Convention. Apotex asks the Court to sign the Letters of Request as presented and return the signed originals to counsel for Apotex for translation and service upon the designated German Central Authority and counsel of record. It is submitted that any objections that may be raised with respect to the certified German translations can be handled by the parties, their respective German counsel and the German judicial authority designated to conduct the examinations of the witnesses.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Sidney Katz
Robert B. Breisblatt
James P. White
Hartwell P. Morse, III
Steven E. Feldman
Craig M. Kuchii
Stephen P. Benson
WELSH & KATZ, LTD.
120 S. Riverside Plaza, 22nd Floor
Chicago, IL 60606
Tel:    (312) 655-1500
Fax:    (312) 655-0008

Dated: May 15, 2007
795656 / 30136

By: _/s/ Kenneth L. Dorsney_
    Richard L. Horwitz (No. 2246)
    Kenneth L. Dorsney (No. 3726)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19801
    (302) 984-6000
    rhorwitz@potteranderson.com
    kdorsney@potteranderson.com

*Counsel for Defendants*
*Apotex Inc. and Apotex Corp.*

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## **CERTIFICATE OF SERVICE**

I, Kenneth L. Dorsney, hereby certify that on May 15, 2007, the attached

document was hand delivered on the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jameson A. L. Tweedie
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

I hereby certify that on May 15, 2007, I have Electronically Mailed the

foregoing document(s) to the following non-registered participants:

John M. Desmarais
Peter J. Armenio
Anne S. Toker
Gerald J. Flattmann, Jr.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
jdesmarais@kirkland.com
parmenio@kirkland.com
atoker@kirkland.com
gflattmann@kirkland.com

I hereby certify that on May 15, 2007, I have Federal Expressed the

foregoing document(s) to the following non-registered participants:

Joseph M. O'Malley, Jr.
Eric W. Dittman
Paul Hastings
Park Avenue Tower
75 E. 55th Street
First Floor
New York, New York  10022

                                        /s/ Kenneth L. Dorsney
                                        Richard L. Horwitz
                                        Kenneth L. Dorsney
                                        Potter Anderson & Corroon LLP
                                        Hercules Plaza – Sixth Floor
                                        1313 North Market Street
                                        Wilmington, DE  19801
                                        (302) 984-6000
                                        rhorwitz@potteranderson.com
                                        kdorsney@potteranderson.com

700765

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MEDPOINTE HEALTHCARE INC.,     )
                                 )
                                 )
         Plaintiff,           )   C.A. No. 06-164 (SLR)
                                 )
     v.                      )
                                 )
APOTEX INC. and APOTEX CORP.,   )
                                 )
        Defendants.       )

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO
THE HAGUE CONVENTION OF 18 MARCH 1970 ON TAKING OF
EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

1.   Sender:

Hon. Sue L. Robinson
Chief Judge
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3519
(302) 573-6170

2.   Central Authority of
Germany:

Präsident des Oberlandesgerichts Frankfurt
Zeil 42
60313 Frankfurt am Main
Germany

3.   Person to whom the
executed request is to be
returned:

Hon. Sue L. Robinson
Chief Judge
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3519
(302) 573-6170

4.   In conformity with Article 3 of the Convention, the undersigned applicant has the honour to
     submit the following request:

5a.  Requesting judicial            United States District Court for the District of Delaware
     authority:                     J. Caleb Boggs Federal Building
                                    844 North King Street
                                    Wilmington, DE  19801

5b.  To the competent              The Federal Republic of Germany, State of Hessen
     authority of:

6.   Names and addresses of the    Plaintiff:    MedPointe Healthcare Inc.
     Parties and their                           265 Davidson Avenue
     Representatives:                             Somerset, New Jersey  08873
                                                  United States of America

                                   Representative:   Peter J. Armenio, Esq.
                                                     Kirkland & Ellis LLP
                                                     Citigroup Center
                                                     153 East 53rd Street
                                                     New York, New York  10022-4611
                                                     United States of America

                                   Defendants:   Apotex, Inc.
                                                 380 Elgin Hills Road East
                                                 Richmond Hill, Ontario
                                                 Canada  L4C 5H2

                                                      and

                                                 Apotex, Corp.
                                                 2400 North Commerce Parkway
                                                 Suite 400
                                                 Weston, Florida  33326
                                                 United States of America

                                   Representative:   A. Sidney Katz
                                                     Robert B. Breisblatt
                                                     Welsh & Katz, Ltd.
                                                     120 South Riverside Plaza • 22nd Floor
                                                     Chicago, Illinois 60606-3912
                                                     United States of America

| | | |
|---|---|---|
| 7. | Nature and purpose of the proceedings and summary of the facts: | MedPointe Healthcare Inc. ("MedPointe") is a U.S. pharmaceutical company that develops, markets and sells branded prescription drugs. Since August 16, 2002, MedPointe has been the sole owner of U.S. Patent No. 5,164,194 ("'194 patent") entitled "Azelastine Containing Medicaments." The '194 patent originally issued to Asta Pharma AG, as assignee, on November 17, 1992. Mr. Helmut Hettche is the sole named inventor on the '194 patent. MedPointe has sued Apotex, Inc. and Apotex, Corp. ("Apotex") for infringement of the '194 patent as a result of the filing of an Abbreviated New Drug Application with the United States Food and Drug Administration seeking to market and sell a generic nasal spray product containing 0.1% azelastine hydrochloride. Apotex has asserted non-infringement of the '194 patent. Apotex has also asserted that the '194 patent is invalid or unenforceable under the applicable United States Patent Laws. |
| 8. | Evidence to be obtained or | Mr. Helmut Hettche can provide evidence on the matters set forth in the attached questionnaire. It is respectfully requested that an appropriate German judicial authority ask Mr. Hettche the list of attached questions. |
| 9. | Identity and address of Person to be examined: | Mr. Helmut Hettche<br>Romerstrasse #43<br>63128 Dietzenbach<br>Germany |
| 10. | Questions to be put to the person to be examined or statement of the subject matter about which he is to be examined: | Please see the attached questionnaire. |
| 11. | Documents or other property to be inspected: | Any and all documents in the possession, custody or control of Mr. Hettche relating to the development or conception of azelastine containing medicaments. |

12.  Any requirement that the evidence be given on oath or affirmation and any specific form to be used:

Mr. Hettche should be examined under oath or affirmation, or in the alternative, should be instructed of the consequences for giving untruthful answers under the laws of Germany.

13.  Special methods or procedure to be followed:

To the extent allowed under German law, it is requested that: (1) the parties' representative and their designees, including local German counsel and interpreters be permitted to be present during the examination; (2) the representatives or their designees be permitted to request clarification or further elaboration of Mr. Hettche's answers to the questions posed; (3) the representatives or their designees be permitted to pose or submit for presentment to Mr. Hettche additional questions following presentment of the questions on the attached questionnaire; (4) if requested by Mr. Hettche, an attorney representing Mr. Hettche may be present and may participate on behalf of his client to the extent permitted by German law; (5) there be excluded from the examination, if permitted under German law, all persons other than the judicial officer conducting the examination of Mr. Hettche, the attorney representing Mr. Hettche, if any, the attorneys for the parties and their designees, interpreters, and other officials of the German court normally present during such proceedings.

It is respectfully requested that the judicial proceeding be scheduled in Frankfurt am Main.  In addition, it is requested that Mr. Hettche, who lives in Dietzenbach, be requested to travel to Frankfurt am Main for the judicial proceeding.  Apotex intends to request that counsel representing Mr. Hettche voluntarily agree to attend a judicial proceeding scheduled in Frankfurt am Main.

14.  Request for notification of the time and place for execution of the Request and the identity and address of any person to be notified:

Please notify the following persons by mail and telefax when and where the examination is to be conducted:

Robert B. Breisblatt, Esq.
Welsh & Katz, Ltd.
120 South Riverside Plaza • 22nd Floor
Chicago, Illinois  60606-3912
United States of America
Tel. No.:  (312) 655-1500
Fax No.:  (312) 655-1501

Peter J. Armenio, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
United States of America
Tel. No.:   (212) 446-4800
Fax No.     (212) 446-4900

Joseph M. O'Malley, Jr., Esq.
Eric W. Dittmann, Esq.
Paul Hastings
Park Avenue Tower
75 E. 55th Street
First Floor
New York, New York  10022
Tel. No.:   (212) 318-6090
Fax No.:    (212) 230-7712

15. Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request:

None.

16. Specification of privilege or duty to refuse to give evidence under the law of the State of Origin:

Mr. Hettche may refuse to answer any question propounded if such answer (1) would subject him to a real and appreciable danger of criminal liability in the United States, or (2) would disclose a confidential communication between him and his attorney or former attorney.  In some cases, it may be the party rather than the witness who may hold the privilege.  In addition, an attorney may assert a privilege on behalf of a client with respect to a question propounded to Mr. Hettche.  However, Mr. Hettche should respond to the question if he can do so without revealing the content of the privileged communication.  If a privilege is asserted, Mr. Hettche is required to reveal the following information regarding the privileged communication: (1) the date of the communication; (2) the form of the communication; (3) the identity of all individuals involved in the communication including, where possible, their employer and employment position at the time of the communication; and (4) the general subject matter of the privileged communication.

17. The fees and costs incurred which are reimbursable under the second paragraph of article 14 or under article 26 of the Convention will be borne by:

Apotex, Inc and Apotex, Corp.

Representative:    Robert B. Breisblatt, Esq.
Welsh & Katz, Ltd.
120 S. Riverside Plaza • 22nd Floor
Chicago, Illinois 60606-3912
United States of America
Tel. No.:   (312) 655-1500
Fax No.:   (312) 655-1501

18. Date of Request:    _____, 2007

19. Signature and seal of the Requesting authority:

_____
Hon. Sue L. Robinson
United States District Court Judge

20. Attachment:    Questionnaire for Mr. Helmut Hettche (Tab 1)
List of Exhibits for Mr. Helmut Hettche (Tab 2)

Peter D. Dalleo, Clerk of Court

By: _____

Seal of the
United States District Court
for the District of Delaware

795690 / 30136

6

# EXHIBIT 1

### Questionnaire For Mr. Helmut Hettche

## A.    Introduction

Mr. Helmut Hettche is identified as the named inventor on United States Patent No. 5,164,194 ("'194 patent") that issued on November 17, 1992. The '194 patent is entitled: "Azelastine Containing Medicaments." The '194 patent was originally assigned to Asta Pharma AG. The '194 patent is now owned by MedPointe Healthcare, Inc. The '194 patent claims a date of priority based on the filing of a German patent application (P 37 38 681.6) on November 13, 1987. MedPointe has accused Apotex, Inc. and Apotex, Corp. with infringing the '194 patent in seeking approval to market, in the U.S., a generic azelastine nasal spray.

## B.    General Background Information

1.    Will you please state your name and address?

2.    When were you born?

3.    Please describe your educational background including any degrees obtained?

4.    Do you speak English? Can you read and understand English.

5.    Please describe your employment history including the dates of employment and the identity of your employers?

6.    Between 1983 and 1992, what are the employment positions you held? For each position, please identify your duties and responsibilities as well as the identity of the person or persons to whom you reported.

7.    Did you ever work for Asta-Werke AG? If so, when did you work for Asta-Werke AG and what positions did you hold?

8.    Was Asta-Werke AG related in any way to Asta Pharma and, if so, what was that relationship if you know?

**Questionnaire For Mr. Helmet Hettche**

      9.      Have you ever been a member of any professional organizations?  If so, please identify the professional organizations and your years of membership?

      10.     Have you authored any articles for publication?  If so, please identify the articles that have been published where you are identified as an author?

      11.     During your employment between 1983 and 1992, did you keep a journal, calendar, lab book, diary or other source for recording your work?

**C.**     **Preparation for Judicial Proceeding**

      1.      What, if anything, did you do to prepare for your testimony today?

      2.      Did you meet with anyone to prepare for your testimony today?  Who did you meet with and for how long?

      3.      Did you review the documents that accompanied the Letters of Request from the United States court in preparation for your testimony today?  What other documents, if any, did you review in preparation for your testimony today?

      4.      Did the documents you reviewed help to refresh your recollection of events surrounding your development of an azelastine nasal spray and azelastine eye drops?

**D.**     **Hettche Exhibit 1 – German Priority Document to '194 Patent**

      1.      Please take a look at **Hettche Exhibit 1**?  Do you recognize this document?  What is this document?  Who prepared this document?  Why was this document prepared?  If you did not prepare this document, what involvement, if any, did you have in its preparation?  Does your name appear anywhere in **Hettche Exhibit 1**?

      2.      Please take a look at **Hettche Exhibit 2** which is a copy of U.S. Patent No. 5,164,194, with a German translation attached.  Do you recognize this patent?

      3.      Are you the sole named inventor on the U.S. '194 patent – **Hettche Exhibit 2**?

2

**Questionnaire For Mr. Helmet Hettche**

4.      Looking at **Hettche Exhibit 1** and **Hettche Exhibit 2**, do you understand that there is a relationship between these two exhibits?  What is that relationship to the best of your knowledge?

5.      Referring to **Hettche Exhibit 1**, please tell us generally what this document is about?

6.      Referring to **Hettche Exhibit 2**, please tell us generally what this patent is about?

7.      Are the claims of **Hettche Exhibit 1** and **Hettche Exhibit 2** the same?  If not, how do they differ?

8.      To your knowledge, in what other countries were patents obtained for azelastine containing medicaments where you are the sole named inventor?

**E.      European Patent No 0 316 633**

1.      Please take a look at **Hettche Exhibit 3** which is a copy of European Patent 0 316 633.  Do you recognize this patent?  Are you the sole named inventor on **Hettche Exhibit 3**?  Can you please tell us generally what **Hettche Exhibit 3** is about?

2.      Looking at **Hettche Exhibit 3** and **Hettche Exhibit 2**, is there any relationship between these two patents and, if so, what is the relationship?  Do both of these patents seek patent protection for your development of azelastine containing medicaments?

3.      Looking at **Hettche Exhibit 3** and **Hettche Exhibit 1**, is there any relationship between these two exhibits and, if so, what is the relationship?

4.      Please take a look at **Hettche Exhibit 4**, a copy of the decision of the Opposition Division of the European Patent Office mailed on March 28, 1996 with an attached English translation.  Do you recognize this document?  Who filed an opposition proceeding against your

3

## Questionnaire For Mr. Helmet Hettche

European patent, **Hettche Exhibit 3**? Who is Chemical Pharmaceutical Company, GmbH? At the time, was Chemical Pharmaceutical Company, GmbH a competitor of Asta Pharma AG?

5.      Is it correct that the Opposition Division of the European Patent Office revoked your European patent, **Hettche Exhibit 3**? What is your understanding of the reasons that the Opposition Division gave for revoking your European patent, **Hettche Exhibit 3**?

6.      Please take a look at **Hettche Exhibit 5**, a copy of the Decision of the Technical Court of Appeals dated April 5, 2000. Do you recognize this document? Is it correct that the Decision of the Technical Court of Appeals affirmed the March 1996 decision of the Opposition Division of the European Patent Office? What is your understanding of the reasons that the Technical Court of Appeals gave for revoking your European patent, **Hettche Exhibit 3**?

7.      Is it correct that, as a result of the decisions of the Opposition Branch of the European Patent Office and the Technical Court of Appeals, your European patent, **Hettche Exhibit 3**, is revoked?

8.      Please take a look at **Hettche Exhibit 6**, a copy of German Offenlegungsschrift 21 64 058 (with an English translation attached). Do you recognize this patent?

9.      Looking at **Hettche Exhibit 5**, the decision of the Technical Court of Appeals, please turn to page MPAT0000247, do you see the reference at paragraph II to "DE-C-2 164 058? Do you understand that reference to be the same as **Hettche Exhibit 6**, Offenlegungsschrift 21 64 058?

10.     On page 17 of **Hettche Exhibit 5** (MPAT 0000263), the Technical Court of Appeals notices evidence that topical antihistamines are known in the art, and that "considerable amounts of these preparations were still in use." To the best of your knowledge, please identify all topical antihistamine preparations that were known in the art at the time you first conceived of

## Questionnaire For Mr. Helmet Hettche

nasal and eye medicaments containing azelastine? Did you consider any of these formulations when arriving at the nasal and eye medicaments containing azelastine?

11.      Please take a look at **Hettche Exhibit 7**, a copy of U.S. Patent No. 3,813,384 (with a German translation attached)? Are you familiar with this patent?

12.      Referring to **Hettche Exhibit 6**, Offenlegungsschrift 21 64 058, and **Hettche Exhibit 7**, is it your understanding that there is a relationship between these two patents? What is that relationship? Is it correct that **Hettche Exhibit 7** is the U.S. counterpart patent to **Hettche Exhibit 6**?

13.      Referring to **Hettche Exhibit 5**, what role, if any, did you play in the opposition proceedings that resulted in the April 5, 2000 decision of the Technical Court of Appeals of the European Patent Office?

14.      Looking at **Hettche Exhibit 5** at paragraph III under the heading "Facts and Claims" (MPAT0000247-248), could you please describe what the list of publications represents?

## F.    **Azelastine**

1.      Please describe all of the work you have done with azelastine? In what forms, i.e. sprays, tablets, ointments, etc. have you worked with azelastine? Please identify, in order, the forms of azelastine you worked with and when.

2.      During what period of time in your employment history did you work with azelastine?

3.      Generally, please describe the various symptoms, illnesses or conditions that you were aware of that are treatable with azelastine? When did you first know that azelastine could be used to treat the symptoms, illnesses or conditions that you just described?

## Questionnaire For Mr. Helmet Hettche

4.     When did you first know of the anti-allergic and anti-histamine properties of azelastine?

5.     **Hettche Exhibit 6** is a copy of German Patent No. 21 64 058   Have you seen this German '058 patent before?

6.     When did you first become aware of the existence of **Hettche Exhibit 6**?

7.     Please describe the circumstances under which you first became aware of the German '058 patent.

8.     At the time you became aware of the existence of **Hettche Exhibit 6**, the German '058 patent, did you read it?  When do you recall first reading **Hettche Exhibit 6**, the German '058 patent?  When was the last time you recall reading **Hettche Exhibit 6**?

9.     Looking at **Hettche Exhibit 1**, the German '681 patent, on page 5 (MP0034), do you see where the German '681 patent is cited?

10.     In the German '681 patent application, it is stated that the German '058 patent disclosed the anti-allergic and antihistimine properties of azelastine, correct?

11.     Looking at **Hettche Exhibit 2**, the German '058 patent is cited as disclosing the anti-allergic and antihistimine properties of azelastine at Col. 1, lines 29-31, correct?

12.     Looking at **Hettche Exhibit 6**, do you agree that this patent discloses the anti-allergic and anti-histamine properties of azelastine?

13.     Please describe generally how you got involved in developing a nasal spray containing azelastine?

14.     With regard to a nasal spray containing azelastine, what symptoms, illnesses or conditions were you trying to treat with a nasal spray?

6

### Questionnaire For Mr. Helmet Hettche

15.    Please describe generally how you got involved in developing azelastine eye drops?

16.    With regard to azelastine eye drops, what symptoms, illnesses or conditions were you trying to treat with eye drops?

17.    What research into papers, publications, treatises, reference materials and patents did you conduct in connection with the development of an azelastine nasal spray.

**G.    Inventorship**

1.    When did you begin to work on an azelastine nasal spray?

2.    When did you begin to work on azelastine eye drops?

3.    **Hettche Exhibit 8** is a December 1982 Asta-Werke AG Toxicology Report. Are you familiar with this report? When did you first become aware of this report? Did you have any involvement in the study underlying this report? Do you have any understanding as to why Asta-Werke AG conducted the underlying study and prepared the Toxicology Report?

4.    At the time of the Asta-Werke AG Toxicology Report, were you working at Asta-Werke, AG?

5.    Referring to page ATI00001105 of **Hettche Exhibit 8**, please review the first full paragraph. Could you please describe your understanding of the substance of this first paragraph.

6.    What involvement, if any, did you have in the formulation of 0.1% azelastine solution to be applied to the eyes of guinea pigs as described in the first paragraph on page ATI00001105? What is meant by the statement that A 5610 acts like most antihistamines?

7

**Questionnaire For Mr. Helmet Hettche**

7.     Were you aware that your employer, Asta-Werke AG, in the 1982 time-frame was conducting studies of azelastine solutions for application to the eyes of guinea pigs?  If so, how did you know about this study?

8.     Please review Abstract 76 in **Hettche Exhibit 9**, referring to an article by Dr. Chand and others involving the effect of aerosolized azelastine on guinea pigs published in 1985 in Pharmacologist.  Having reviewed Abstract 76, do you understand that Dr. Chand describes a 1% aerosolized solution of azelastine?  Do you also understand that Dr. Chand reports that a 1% aerosolized solution of azelastine administered to guinea pigs had a prophylactic effect before an allergen challenge?

9.     Did you have any involvement in the study conducted by Dr. Chand as reported in **Hettche Exhibit 9**?  If so, what was your involvement?  Did you suggest or participate in the selection of a 1% aerosolized solution for use in the study conducted by Dr. Chand?

10.     Prior to 1985, please describe other tests and studies you were aware of involving azelastine solutions and your participation, if any, in these tests or studies?

11.     Please describe the circumstances that led you to begin work on the development of an azelastine nasal spray and eye medicaments?  Which came first, the development of an azelastine nasal spray or an azelastine eye medicament?  Whose idea was it to use the azelastine solution as a nasal and eye medicament?

12.     Please identify who, if anyone, you worked with in developing an azelastine nasal spray?

13.     At the time you began to work on azelastine nasal and eye medicaments, what other nasal and eye medicaments were you aware of?  What were the ingredients that were used

8

**Questionnaire For Mr. Helmet Hettche**

in other nasal and eye medicaments and what symptoms, illnesses or conditions were they used to treat?

14.     At the time you began to work on azelastine nasal and eye medicaments, what other nasal and eye medicaments were you aware of that contained antihistamines?

15.     What, if anything, did you know about azelastine that led you to believe it should be used in nasal and eye medicaments?

**H.      Timing Of Development Of Azelastine Nasal Spray**

1.     When did you first produce an azelastine nasal spray?

2.     What was the concentration of the first azelastine nasal spray you developed?

3.     What concentrations did you consider in formulating your first azelastine nasal spray?  How did you decide on those concentrations?

4.     Referring to **Hettche Exhibit 2**, your U.S. '194 patent, please review Col. 2, lines 35 through 47.  You have identified water as the preferred solvent for the azelastine nasal spray and eye drops, is that correct?  Is it also your understanding that your U.S. '194 patent, **Hettche Exhibit 2**, states that azelastine nasal drops and sprays, "preferably" contain preservatives and stabilizers, but that nasal drops and sprays can be formulated without preservatives and stabilizers?

5.     What preservatives or other excipients did you include in the first azelastine nasal spray you developed that included preservatives and excipients?  At the time you included preservatives and excipients in your azelastine formulation, were you aware of other nasal or eye medicaments using those preservatives and/or excipeints?  How did you decide on the specific preservatives and excipients you used in your azelastine nasal formulation?

9

## Questionnaire For Mr. Helmet Hettche

6.     What was the concentration of the preservatives or other excipients you included in the first azelastine nasal spray? Were you aware of other nasal or eye medicaments using those same preservatives and/or excipients that you selected?

7.     Please take a look at **Hettche Exhibit 10** (AS-MEDA0001568), a document produced by MedPointe from the files of Asta-Meda? Do you recognize this document? Do you recognize that this document was produced from a folder that bears your handwriting? Did you draw the box around the text for "Beispiel 24" on this document? Why did you do so? Were you aware of Beispiel 24 at the time you suggested producing nasal and/or eye medicaments containing azelastine?

8.     What would be the percent (weight/weight) of azelastine contained in a medicament produced by dissolving 0.3g of azelastine in 100ml of sterilized water? Would this percent concentration fall within the range of claim 2 of **Hettche Exhibit 2**, the '194 patent? Would this percent concentration fall within the range of claim 3 of **Hettche Exhibit 2**, the '194 patent? Would this percent concentration fall within the range of claim 4 of **Hettche Exhibit 2**, the '194 patent?

9.     If a medicament was produced according to Beispiel 24 in **Hettche Exhibit 10** using azelastine as disclosed in **Hettche Exhibit 6**, would that formulation fall within the range of claims 2, 3 and 4 of **Hettche Exhibit 2**? Would the formulation be an aqueous solution?

## I.    Hettche Exhibit 11

1.     Please take a look at **Hettche Exhibit 11** (AS-MEDA0000601-602). Do you recognize this document?

2.     Did you receive a copy of this document on or around September 6, 1985? Does the reference in the "Cc" to "Dr. He" refer to you?

## Questionnaire For Mr. Helmet Hettche

3.      At the time of **Hettche Exhibit 11**, what was Dr. Aurich's employment position? What was Prof. Dr. Breuel's employment position?

4.      How did Dr. Aurich become aware that you produced an A 5610 nasal spray?

5.      Is there any significance to the identification of the azelastine nasal spray as "A 5610"? Was there a classification system for identifying samples of azelastine nasal spray. What does the "A" denote, if anything? What does the number "5610" denote, if anything?

6.      When did you first produce the A 5610 nasal spray referenced in **Hettche Exhibit 11**?

7.      Was the nasal spray identified in **Hettche Exhibit 11** the first azelastine nasal spray you developed? If not, please describe the formulation and ingredients of other azelastine nasal sprays you developed before the A 5610 nasal spray referenced in **Hettche Exhibit 11**. How were these earlier azelastine nasal spray formulations identified?

8.      How did you arrive at the formulation using 0.1% solution of azelastine.?

9.      What preservatives or other excipients did you use in the nasal spray referenced in **Hettche Exhibit 11** ? What was the concentration of the preservatives or other excipients used in A 5610? How did you determine the concentrations?

10.      Who was Dr. Molliere? What was his employment position at the time? How did Dr. Molliere's employment position compare to yours?

11.      What role did Dr. Molliere play in the development of the nasal and eye medicaments containing azelastine? What role did Dr. Molliere play in the development of the azelastine nasal spray formulation referenced in **Hettche Exhibit 11**?

12.      What was the exact formulation of the azelastine nasal spray self-administered by Dr. Molliere and you including any preservatives, stabilizers or other excipients or impurities?

11

## Questionnaire For Mr. Helmet Hettche

Was there any difference between the nasal spray formulations tested by you and tested by Dr. Molliere? If so, what was the exact formulation of the azelastine nasal spray self-administered by Dr. Molliere, including any preservatives, excipients of impurities?

13.    Did you conduct any testing before you and Dr. Molliere personally used the A 5610 nasal spray?

14.    Did you conduct any testing in determining the concentration levels used in A 5610?

15.    What prompted you to select azelastine?

16.    At the time of **Hettche Exhibit 11**, were you working on the development plan for Azelastine in tablet form as referenced by Dr. Aurich? If so, what was your role?

17.    In **Hettche Exhibit 11**, on the second page, Dr. Aurich refers to Hismanal (astemizole). Did you know about this product at the time? What was this product? Who introduced it in Germany? Was Hismanal a nasal spray? Did you know the formulation of Hismanal?

18.    Was your work on the formulation of an azelastine nasal spray approved, in advance, by your superiors?

19.    Dr. Aurich writes in **Hettche Exhibit 11** that Dr. Muckenschnabel suggested there would be no problem producing solutions that were half and twice the dosage of the 0.1% solution you produced. Prior to Sep. 6, 1985, did you suggest to Dr. Muckenschnabel that he produce azelastine solutions that were half and twice the dosage of the 0.1% solution you produced?

## Questionnaire For Mr. Helmet Hettche

20.    Dr. Aurich also writes that "with this dosage it can be assumed that respective studies regarding fitness to drive will not produce any evidence of drowsiness." Do you agree with this statement? Why?

21.    Dr. Aurich also suggests supplementing development to include "simultaneously such nasal spray as well as eye drops." Is it true that Dr. Aurich was the first to suggest using the azelastine solution as an eye drop? If not, who suggested to Dr. Aurich that the azelastine solution could be used as an eye drop and when?

22.    Did Dr. Molliere and you self-administer any azelastine eye drop formulations prior to September 6, 1985. If so, please identify the exact formulation of the azelastine eye drop formulation and when it was self-administered by Dr. Molliere and you?

23.    Before September 6, 1985, please identify any studies conducted by you or under your direction concerning the application of an azelastine solution directly to the eye?

## J.    Hettche Exhibit 12

1.    Please take a look at **Hettche Exhibit 12** produced by Asta-Meda as AS-MEDA0004168-4169. Do you recognize this document? Did you prepare this document?

2.    What is meant by the title "Notice to Dr. Herbst?"

3.    On the first page, under Azelastine nasal spray is a reference to "PEGF-Dr. He/Jg of 9/30/1985" What does this refer to? Who does "Dr. He" refer to? Who does "Jg" refer to? What does PEGF refer to? Please describe this Notice of September 30, 1985? Why did you prepare this notice and who was it directed to?

4.    In your first sentence, you write: "Corresponding to the above-named notice and a decision of the research coordinate on 10/17/85, the development of Azelastine nasal spray has started at 0.05%, 0.1%, and 0.2% Azelastine hydrochloride." What are you referring to when

13

### Questionnaire For Mr. Helmet Hettche

you refer to the "above-named notice." What does the 'research coordinate" refer to? Were the 0.05%, 0.1%, and 0.2% solutions developed in response to Dr. Muckenschnabel's suggestions that they could easily be formulated? Who produced these solutions? Did Dr. Muckenschnabel direct the persons producing these solutions?

     5.    At the bottom of page 1 and the top of page 2 of **Hettche Exhibit 12**, you describe the 0.2% solution produced at the suggestion of Dr. Muckenschnabel. Who was responsible for choosing the preservatives and excipients described in **Hettche Exhibit 12**? Was this the first time preservatives and excipients were used in solutions containing azelastine?

     6.    In the last sentence on page 2 of **Hettche Exhibit 12**, you indicate that the 0.2% solution "was released for animal experimentation with AN 76 0001 of 1/23/86." What does AN 76 0001 refer to? The 0.2% solution was released for animal experimentation after Dr. Molliere and you had self-administered a 0.1% azelastine solution, correct?

### K.    Hettche Exhibit 13

     1.    Please take a look at **Hettche Exhibit 13**. Did you prepare this document on or about August 13, 1990? In the first paragraph, you indicate Carter Wallace suggested adjusting the pH of the nasal formulation. Who made the suggestion at Carter Wallace? What role did Carter Wallace play in formulating nasal and eye formulations containing azelastine?

### L.    Hettche Exhibit 14

     1.    Please take a look at **Hettche Exhibit 14** (AS-MEDA0001938). Do you recognize this document? It this document in your handwriting?

     2.    What is the date of **Hettche Exhibit 14**?

     3.    What prompted you to prepare this note?

     4.    What is this note about?

### Questionnaire For Mr. Helmet Hettche

5.    Does the reference to "nasal spray" refer to a nasal spray containing azelsastine?

6.    Was this the first time you determined that an azelastine nasal spray had positive results for treating a regular cold?  What do you mean by "positive results"?  How did you measure the results?

7.    How did the azelastine nasal spray referenced in **Hettche Exhibit 14** compare to A 5610 referenced in **Hettche Exhibit 11**?  What were the similarities?  What were the differences?

8.    As of February 18, 1986, had a three month stability trial been conducted as mentioned by Dr. Aurich in **Hettche Exhibit 11** ?  If so, what was the result of the stability trial? What is a stability trial?

9.    As of February 18, 1986, had a local compatibility trial been conducted as mentioned by Dr. Aurich in **Hettche Exhibit 11**?  What is meant by a local compatibility trial?

10.    What were the results of the local compatibility trial?

**M.**    **Hettche Exhibit 15**

1.    Please take a look at **Hettche Exhibit 15 (AS-MEDA0000600)**.  Do you recognize this document?  Generally, what is this document?

2.    What is the date of **Hettche Exhibit 15**?

3.    Who is Dr. Ulbrich and what was his position at the time you prepared this document?

4.    Why did you prepare this document?

5.    What do you mean when you write that "the tests currently performed deal with a clarification of the effectiveness of Azelastine nasal spray for seasonal rhinitis?"

### Questionnaire For Mr. Helmet Hettche

6.    You refer to your own experience with the effectiveness of the nasal spray during a common cold.  Is this referring back to experience that is reported in **Hettche Exhibit 14** (AS-MEDA0001938)?

7.    In August 1987, what changes, if any, were made to the formulation of an azelastine nasal spray as compared to the formulation of A 5610 as identified by Dr. Aurich in **Hettche Exhibit 11**?

8.    Between September 1985 and August 1987, can you describe the various formulations of an azelastine nasal spray that were prepared and tested?

9.    Did the planned clinical trial 2611 take place?  If so, please describe the clinical trial.  When did it take place and what was the result?

**N.    Hettche Exhibit 16**

1.    Please take a look at **Hettche Exhibit 16**, a copy of U.S. Patent No. 4,704,387 and the German translation.  Do you recognize this U.S. patent claiming substituted benzylphthalazinones having antiallergic and antihistamine action?  Please review Column 8, lines 21-26.  Is it your understanding that solutions for application to the skin and mucous membrane are discussed?  Is it also your understanding that the claimed percentage concentration of active materials are in the range of 0.1% to 3% of active ingrediaents with respect to solutions?  Does this range fall within or encompass the range claimed in claims 2, 3 and 4 of your '194 patent, **Hettche Exhibit 2**?

2.    At Column 7, lines 58-61 of **Hettche Exhibit 16**, the specification states that the antiallergic action of the claimed compounds is comparable to the known medicine azelastine.  What is the relationship between the claimed compounds in **Hettche Exhibit 16** and azelastine?

**Questionnaire For Mr. Helmet Hettche**

3.     Did you review **Hettche Exhibit 16** prior to formulating nasal and eye medicaments containing azelastine?  Knowing the derivatives of azelastine could be administered directly to the mucous membranes, would you have expected that azelastine could also be administered in that manner?  Given the antiallergic action of azelastine was comparable to the compounds claimed in **Hettche Exhibit 16**, would you have expected the concentration of azelastine solutions for topical application to the mucous membranes to be effective in similar concentrations disclosed in **Hettche Exhibit 16**?

**O.     Self-Administration Of Azelastine**

1.     Is it correct that you self-administered an azelastine nasal spray to treat both your hay-fever and a regular cold?  What made you decide to formulate an Azelastine nasal spray?

2.     Back in 1985, if you were not inclined to conduct self-administration of an azelastine nasal spray for your hay-fever and colds, what were the other testing methods available to determine whether azelastine, in a nasal spray, would work?  Please describe the various testing methods that could have been used.

3.     What was it about azelastine that compelled you to use the formulation on yourself?

4.     How did you know that you could use the azelastine nasal spray formulation on yourself without any adverse health consequences?  Please describe what you knew at the time about azelastine or nasal sprays or similar formulations in general that led you to conclude that self-administration of an azelastine nasal spray would not hurt you?

5.     How did the concentration of azelastine in the nasal spray compare to the azelastine concentration undergoing development in a tablet form at the time?

## Questionnaire For Mr. Helmet Hettche

6.      What side-effects, if any, did you encounter in the self-administration of the azelastine nasal spray?

7.      What side effects, if any, did Dr. Molliere encounter in the self-administration of the azelastine nasal spray?

8.      Do you know what prompted Dr. Molliere to join you in the self-administration of the azelastine nasal spray?

9.      Did Dr. Molliere ever express any reservations about potential adverse consequences of self-administering the azelastine nasal spray and, if so, what convinced him to proceed with self-administration?

10.      Prior to your self-administration of an azelastine nasal spray, did you have an expectation that it would work? If so, why did you expect it to work?

## P.      Hettche Exhibit 17

1.      **Hettche Exhibit 17** is a copy of German Patent Application No. 35 39 873. Have you seen this German '873 application before?

2.      When do you recall the first time you became aware of the existence of the German '873 application?

3.      Please describe the circumstances that led to your awareness of the German '873 application.

4.      At the time you became aware of the existence of **Hettche Exhibit 17**, the German '873 application, did you read it? When do you recall first reading **Hettche Exhibit 17**, the German '873 application?

## Q.      Hettche Exhibit 18 - German Patent No. 3,433,776

18

## Questionnaire For Mr. Helmet Hettche

1.      **Hettche Exhibit 18** is a copy of German Patent No. 3,433,776 identifying Dr. Jurgen Engel and Gerhard Scheffler as the named inventors.  Have you seen this German '776 patent before?

2.      When do you recall the first time you became aware of the existence of the German '776 patent?

3.      Please describe the circumstances that led to your awareness of the German '776 patent.

4.      At the time you became aware of the existence of **Hettche Exhibit 18**, the German '776 patent, did you read it?  When do you recall first reading **Hettche Exhibit 18**, the German '776 patent?

5.      When did you become aware that Dr. Engel had filed a patent on derivatives of azelastine?

6.      Did you consult or work with Dr. Engel in deciding what concentrations of azelastine would be favorable in a nasal spray?

**R.      Hettche Exhibit 19**

1.      Please refer to **Hettche Exhibit 19** (AS-MEDA0000617-629), a copy of a document, entitled "Vademecum" produced from the files of Asta-Meda.  Are you familiar with this reference?  Do you agree that this reference teaches external and internal administration of medicinal drops?  In the case of the external administration of medicinal drops, do you understand this reference to teach the application of medicinal drops to the eyes and to the nose?  In the case of the external administration of drops to the nose, do you understand this reference to teach applying drops to the nose using a spraying mechanism?  In the case of external

19

### Questionnaire For Mr. Helmet Hettche

administration of nasal drops, do you understand this reference to teach that many nasal drops also find application as eye drops?

**S.    Hettche Exhibit 20**

1.    Please take a look at **Hettche Exhibit 20**, a March 1971 article.  Are you familiar with this article?  How and when did you first become aware of this article?  In 1971, was it common to administer medicaments to the nose in drops to treat conditions of the nasal mucosa associated with colds or allergies?  Are you familiar with the term nasentropfen?  When did you first hear the term nasentropfen.  Could you please explain what this term means to you.

2.    Please review Table 2 in **Hettche Exhibit 20**.  Is it your understanding that Table 2 identifies nasal drops available in the market at the time of this article?  Is it also your understanding that Table 2 identifies the following nasal drops containing antihistimines:  (i) Antisin-Privin; (ii) Aqua-Mistol; (iii) Biomydrine; (iv) nasoptol spray; (v) Bebdosator; (vi) Tecoryl; and (vii) vibrocil?

3.    Table 2 discloses Antisin-Privin as a nasal drop available in the market.  To the best of you knowledge, does this medicament contain the same active ingredients used in eye drops?

4.    The last sentence on page 2 and the top of page 3 of **Hettche Exhibit 20** states: "The frequent local use of antihistamines on the nasal mucosa, according to current experimental results, leaves little to be expected, aside from a slight anesthetic effect of certain antihistamines."  Were you aware of this information at the time you produced the first nasal medicament containing azelastine?

**T.    Hettche Exhibit 21**

## Questionnaire For Mr. Helmet Hettche

1.      Please take a look at **Hettche Exhibit 21**, an Antistin-Privin package insert. Are you familiar with this package insert for Antistin-Privin eye drops? Are you familiar with this medicament? What symptoms, illnesses or conditions does this medicament treat? Is the concentration of antazoline sulphate in Antistin-Privin similar to the concentrations for azelastine found in claims 2, 3 and 4 of your '194 patent, **Hettche Exhibit 2**? Is the concentration of benzalkonium chloride within the range found in claim 8 of your '194 patent, **Hettche Exhibit 2**? To the best of your knowledge, what is the purpose of the 0.002% m/v benzalkonium chloride used in Anistin-Privin?

**U.**    **Hettche Exhibit 22**

1.      Please take a look at **Hettche Exhibit 22**, produced by Asta-Meda as AS-MEDA0007755. Do you recognize this reference document produced by MedPointe from the Asta-Meda files and referring to medications for use in the eye, ear and nose? What reference source do you recognize this page as coming from?

2.      Please take a look at the section of **Hettche Exhibit 22** designated as 7.3.1 entitled "Nasal drops." To the best of your knowledge, what concentrations of benzalkonium chloride are disclosed in Table 5.96? This reference shows the use of benzalkonium chloride as a preservative in eye drops, correct?

**V.**    **Hettche Exhibit 23**

1.      Please take a look at **Hettche Exhibit 23** which is a copy of an article entitled "The effects of nasal drops on the ciliary beat frequency of chicken embryo tracheas." Were you aware of this 1981 article from the journal Rhinology examining the effects of nasal drops on the ciliary beat frequency after its publication? How and when do you recall first learning of this journal article?

**Questionnaire For Mr. Helmet Hettche**

2.      Could you please review Table H.  How many of the nasal drops in Table H contain benzalkonium chloride in the percentage concentrations disclosed in claims 5 and 8 of your U.S. '194 patent, **Hettche Exhibit 2**?

3.      Please review Table III.  How many of the nasal formulations identified in Table III contain thimerosal or benzalkonium chloride in the concentration ranges disclosed in claims 5 and 8 of your U.S. '194 patent, **Hettche Exhibit 2**?

4.      At the page numbered as AS-MEDA0000332, Figure 6 is said to demonstrate "the effects of preparations containing drugs which are used against allergic diseases and sometimes against vasomotor rhinitis."  Reviewing Figure 6, how many of these nasal drop medicaments contain antihistamines?  Could you please identify any other antihistamine containing nasal drops that are not mentioned in Figure 6.

5.      At the last page of **Hettche Exhibit 23**, it is stated that it is unlikely that systemic administration of the drugs discussed in the reference will be preferable to local administration. Do you agree with this statement?

**X.      Hettche Exhibit 24**

1.      Please take a look at the article that has been marked as **Hettche Exhibit 24**.  Are you familiar with **Hettche Exhibit 24**?  How and when did you become aware of the publication of this article?  Do you have any clinical experience with nasal drops or eye drops prior to your work on nasal sprays containing azelastine?  What do you understand this article to show with respect to U.S. literature discouraging local application of antihistamines?

**Y.      Hettche Exhibit 25**

1.      Directing your attention to **(Hettche Exhibit 25)** (AS-MEDA0003522-3525), that is your signature on the front page of **Hettche Exhibit 25**, correct?

22

**Questionnaire For Mr. Helmet Hettche**

2.      You recognize Dr. Engel's signature which is also on the front page of **Hettche Exhibit 25,** correct?

3.      Hettche **Exhibit 25** is a report dated September 13, 1988, correct?

4.      The title of **Hettche Exhibit 25** is development pharmaceutics of Azelastine Hydrochloride 0.1% nasal spray, correct?

5.      The study was conducted at ASTA Pharma AG, correct?

6.      You were the study director, correct?

7.      Hettche **Exhibit 25** is the report of the study conducted at ASTA Pharma **AG?**

8.      You were the author of the report marked Hettche **Exhibit 25**, correct?

9.      Dr. Engel reviewed and approved the report, didn't he?

10.     Please review the first heading, titled "Preservatives" on Page 2 of **Hettche Exhibit 25**.

11.     You represent in **Hettche Exhibit 11** that your reasons for choosing benzalkonium chloride as the preservative in the nasal spray formulation was based on information contained in the scientific literature, correct?

12.     The literature you consulted with regard to the preservatives and presertive concentrations to use in the nasal medicament are listed on the final page of **Hettche Exhibit 25,** correct?

13.     The literature you consulted and which is referenced on the final page suggests benzalkonium chloride as a preservative, correct?

14.     To the best of your knowledge, have any other nasal medicaments used benzalkonium chloride as a preservative in the concentrations you selected based on the literature?

## Questionnaire For Mr. Helmet Hettche

15.     Please review the remainder of the report marked **Hettche Exhibit 25**.

16.     It's fair to say that you represent in this report that the nasal medicament you formulated was justified based on the literature and that you followed the literature when you formulated the nasal medicament with respect to preservatives, tonicity, pH, buffers, and thickening agents?

17.     You would agree that one skilled in the art wishing to administrer a medicament in drops to the nasal musosa would be able to formulate such a medicament by consulting the references you relied on in formulating the azelastine medicine?

18.     The literature you consulted also suggested the concentration of benzalkonium chloride for nasal medicaments, correct?

**Z.    Azelastine Eye Drops**

1.      Please describe what involvement, if any, you had in the development of azelastine eye drops?

2.      Who else was involved in the development of azelastine eye drops?

3.      When was the first azelastine eye drops developed?  How was it developed?

4.      Who had the idea to develop an azelastine eye drop?

5.      How did the first formulation of an azelstine eye drop compare to the formulation of the azelastine nasal spray?  Were the formulations the same of did they differ and, if so, how did they differ?

6.      Did you or anyone else engage in self-administration of azelastine eye drops as you did with the azelsatine nasal spray?

7.      Did the first formulation of an azelastine eye drop have the same concentration level of azelastine as found in the A 5610 nasal spray?

**Questionnaire For Mr. Helmet Hettche**

**AA.    Lawrence Hymo**

1.    Do you know a U.S. patent attorney by the name of Lawrence Hymo?  If so, how do you know Mr. Hymo?

2.    Have you ever met Mr. Hymo in person and, if so, please generally describe the circumstances where you have met Mr. Hymo in person.

3.    When was the last time you had any contact with Mr. Hymo?  What were the circumstances that last brought you into contact with Mr. Hymo?

**BB.        Dr. Istvan Szelenyi**

1.    Do you know Dr. Istvan Szelenyi and, if so, please describe how you know Dr. Szelenyi?

2.    When did you first have any contact with Dr. Szelenyi?

3.    Have you ever worked with or collaborated with Dr. Szelenyi and, if so, please describe the work or collaboration that you have had with Dr. Szelenyi?

**CC.    Hettche Exhibit 26**

1.    Please take a look at **Hettche Exhibit 26**, entitled "Declaration Under 37 CFR 1.132," a German translation is attached.  Do you recognize this document?  What is this document?

2.    Do you recognize the signature on the last page of **Hettche Exhibit 26**?

**DD.    Hettche Exhibit 27**

1.    Please take a look at **Hettche Exhibit 27**, entitled "Inhibition of allergic histamine release from rat peritoneal mast cells."  Do you recognize this document?  Where are rat peritoneal mast cells located?

2.    Who prepared this document?

## Questionnaire For Mr. Helmet Hettche

3.      Is this the materials and methods used by Dr. Szelenyi that are referenced in his January 23, 1990 Declaration?

4.      At the time of his January 1990 Declaration, where did Dr. Szelenyi work?

5.      What was Dr. Szelenyi's educational background, if you know.

6.      Why was Dr. Szelenyi approached to conduct this experiment?

7.      What role, if any, did you play in the selection of Dr. Szelenyi to conduct the experiment described in **Hettche Exhibits 26 & 27**?

8.      What role did you play in designing the comparison experiment Dr. Szelenyi conducted?

9.      Had you worked with Dr. Szelenyi before he conducted the comparison experiment described in **Hettche Exhibit 27**?  If so, please describe the work you have previously done with Dr. Szelenyi.

10.      What was the goal of the comparison experiment to be conducted by Dr. Szelenyi?

11.      Why was it necessary to employ Dr. Szelenyi to conduct the experiment described in **Hettche Exhibit 27**?

12.      Looking at **Hettche Exhibit 26**, paragraph 1, where it recites "Experiments have been conducted under my supervision to determine the effects of compounds disclosed in the above-referenced application and the cited U.S. Patent 4,704,387."  What compounds disclosed in your pending patent application did Dr. Szelenyi test?

13.      Who provided or prepared the compounds to be used by Dr. Szelenyi in the experiment?

26

**Questionnaire For Mr. Helmet Hettche**

14.     What was given to Dr. Szelenyi so that he could declare that his experiment could determine the effects of the compounds disclosed in the above-referenced application? Please describe what was given to him and by whom? What language was he given this material in?

15.     What was given to Dr. Szelenyi so that he could determine the compounds disclosed in U.S. Patent No. 4,704,387? Please describe what was given to him and by whom? What language was he given this material in?

16.     Please disclose the formulations of azelastine from your pending U.S. patent application that Dr. Szelenyi tested according to the procedures in **Hettche Exhibit 27**?

17.     Please disclose the compounds from the Engel '387 patent that Dr. Szelenyi tested according to the procedures in **Hettche Exhibit 27**?

18.     If Dr. Szelenyi did not test any other compounds from the Engel '387 patent other than Example 1, why did he restrict his experiments to only a comparison with Example1?

19.     What role did you play in the selection of the compounds from the Engel '387 patent that Dr. Szelenyi should compare to your azelastine formulation?

20.     Did Dr. Szelenyi test, for comparison purposes, the compound in Example 1 of the Engel '387 patent (of Example 1 in the German counterpart)?

21.     According to Dr. Szelenyi, the compound he tested from the disclosure in your patent application was twice as effective as the compound in Example 1 of the Engel '387 patent, as disclosed in paragraph 5 of his January 1990 Declaration, **Hettche Exhibit 26**, correct?

22.     What was the formulation of the azelastine compound Dr. Szelenyi compared to Exhibit 1? Who prepared the azelastine formulation for the comparison test?

23.     If you are unable to recall the azelastine formulation used by Dr. Szelenyi, how would you go about trying to find this information today?

27

### Questionnaire For Mr. Helmet Hettche

24.    Did you receive any type of communication from Dr. Szelenyi regarding the results of his experiments? If so, what did you receive?

25.    Did Dr. Szelenyi compare your azelastine compound to the compound disclosed in Example 2 of the Engel '387 patent? If so, what was the result of a comparison of the effectiveness of your azelastine compound with the effectiveness of the compound in Example 2? If not, why didn't Dr. Szelenyi compare the effectiveness of your azelastine compound to Example 2?

26.    Who made the decision not to test your azelastine compound against the compound in Example 2 of the Engel '387 patent?

27.    Did Dr. Szelenyi compare your azelastine compound to the compound disclosed in Example 3 of the Engel '387 patent? If so, what was the result of a comparison of the effectiveness of your azelastine compound with the effectiveness of the compound disclosed in Example 3? If not, why didn't Dr. Szelenyi compare the effectiveness of your azelastine compound to Example 3?

28.    Who made the decision not to test your azelastine compound against the compound in Example 3 of the Engel '387 patent?

29.    Did Dr. Szelenyi compare your azelastine compound to the compound disclosed in Example 4 of the Engel '387 patent? If so, what was the result of the comparison of the effectiveness of your azelastine compound with the effectiveness of the compound disclosed in Example 4? If not, why didn't Dr. Szelenyi compare the effectiveness of your azelastine compound to Example 4?

30.    Who made the decision not to test your azelastine compound against the compound in Example 4 of the Engel '387 patent?

## Questionnaire For Mr. Helmet Hettche

31.      Did Dr. Szelenyi prepare a report of the results from his comparisons of your azelastine compound with compounds disclosed in the Engel '387 patent?

32.      Did you review Dr. Szelenyi's January 1990 Declaration before it was submitted to the U.S. Patent Office?

33.      What role did you play in Dr. Szelenyi's experiment?

34.      Did you provide Dr. Szelenyi with the azelastine compound he used in his experiment?

35.      Who prepared the compounds based on the disclosure in the Engel '387 patent used by Dr. Szelenyi in his comparison experiment?

36.      Was Dr. Szelenyi paid for performing the comparison experiment and, if so, by whom was he paid?

### EE.    Hettche Exhibit 28

1.      Please take a look at **Hettche Exhibit 28**.  Do you recognize this document? What is it?

2.      Do you recognize the signature on page 2?  Who signed it?  Is this the same Dr. Szelenyi that signed the previous Declaration, **Hettche Exhibit 26**?

3.      Do you understand that this Declaration was also submitted to the U.S. Patent Office in connection with your patent application that led to issuance of the '194 patent?

4.      Why was it necessary to obtain a second declaration from Dr. Selenyi?

5.      Did Dr. Szelenyi conduct additional experiments or comparisons in connection with his second Declaration?  If so, please describe the additional experiments or comparisons he conducted.

### Questionnaire For Mr. Helmet Hettche

6.    Looking at paragraph 1 of **Hettche Exhibit 28**, it states: "I further declare and state that, in the experiments described in my previous declaration, the same amounts of the respective medicines were used, i.e., azelastine and the compound disclosed in Example 1 of U.S. Patent 4,704,387." Does this confirm that Dr. Szelenyi only conducted a comparison of your azelastine compound with the compound disclosed in Example 1 of the Engel '387 patent?

7.    Did you review this Declaration before it was submitted to the U.S. Patent Office?

8.    What involvement did you have in the preparation of Dr. Szelenyi's Second Declaration?

9.    In paragraph 2 of the Declaration, Dr. Szelenyi refers to "the nasal cavity contained about 2.5 ml mucus." What nasal cavity is he referring to in his experiment?

10.    Isn't it correct that bathing rat peritoneal mast cells in an azelastine solution in a test tube does not involve applying azelastine to the "nasal cavities?" Would you agree that Dr. Szelenyi's second declaration does not involve the same study disclosed in his first declaration? Would you agree the second declaration misrepresents the studies conducted in the first declaration? Would you further agree that the second declaration does not clarify or further describe the experiments described in the first declaration? What study was Dr. Szelenyi referring to that involved applying azelastine to the "nasal cavity contain[ing] about 2.5 ml mucus?"

### FF.    Other Contact With Dr. Szelenyi

1.    Did you have any other contact with Dr. Szelenyi during the prosecution of your U.S. patent application?

2.    When was the last time you spoke with Dr. Szelenyi? What were the circumstances that brought about your last contact with Dr. Szelenyi?

### GG.    Dr. Gerhard Scheffler

## Questionnaire For Mr. Helmet Hettche

      1.      Did you know Dr. Gerhard Scheffler?  If so, how do you know Dr. Scheffler?

      2.      Did you ever work for or with Dr. Scheffler?  If so, please describe the work you

have done with Dr. Scheffler and the time frame in which the work was performed.

**HH.**   **Dietrich Vogelsang**

      1.      Did you ever know Dietrich Vogelsang?  If so, how did you know Mr.

Vogelsang?

      2.      Did you ever work for or with Dietrich Vogelsang?  If so, please describe the

work you have done with Dietrich Vogelsang.

**II.**   **Dr. Achterrath-Tuckermann**

      1.      Do you know a Dr. Achterrath-Tuckermann?  If so, how do you know Dr.

Achterrath-Tuckermann?

      2.      Did you ever work with Dr. Achterrath-Tuckermann?  Are you familiar with any

studies conducted by Dr. Achterrath-Tuckermann comparing the antiallergic effects of

alzelastine as compared to other antihistaminic compounds?

**JJ.**   **Dr. Juergen Engel**

      1.      How do you know Dr. Juergen Engel?

      2.      Between 1985 and 1992, did your duties and responsibilities bring you into

contact with Dr. Engel.  If so, please describe the interactions you had with Dr. Engel during this

time frame?

      3.      Between 1985 and 1992, what employment positions did Dr. Engel hold and how

did his employment positions relate, if at all, to the employment positions you held during this

same time period?

### Questionnaire For Mr. Helmet Hettche

4.      Did you consult with Dr. Engel in connection with your work on an azelastine nasal spray? If so, what did you discuss with Dr. Engel about an azelastine nasal spray?

5.      Were you aware of Dr. Engel's work with azelastine before you began working on a nasal azelastine spray? What did you know about Dr. Engel's work before you started working on an azelastine nasal spray?

## KK.   Dr. Naresh Chand

1.      Do you know Dr. Naresh Chand? How do you know Dr. Chand?

2.      Did you have any communications or contact with Dr. Chand at the time you were developing an azelastine nasal spray? If so, what was the nature of your communications? Did you have access to Dr. Chand's protocols, lab notebooks and/or research reports?

3.      What other scientists or employees at Carter-Wallace did you work with to formulate Azelastine medicines? What were their names? What other Azelastine medicines did you work on with them? What methods of administration of Azelastine medicines did you work on with them? In what years did you work on formulations and methods of administration of Azelastine medicines with other scientists and/or physicians employed by Carter Wallace?

4.      At the time of your communications with Dr. Chand, who was his employer and what was his position?

5.      What brought you into contact with Dr. Chand?

6.      Were you aware of Dr. Chand's work with azelastine before you began work on an azelastine nasal spray? If so, what did you know about Dr. Chand's work with azelastine?

7.      Did you work, consult, or collaborate with scientists in Japan, Australia, Ireland or any other country with respect to azelastine containing medicaments?

## LL.   Reading Material

## Questionnaire For Mr. Helmet Hettche

1.    In the 1980 - 1992 time frame, did you subscribe to any scholarly or scientific journals or papers? If so, please name the journals or papers to which you subscribed?

2.    In the 1980 - 1992 time frame, did Asta Medica AG subscribe to scholarly or scientific journals or papers that were routed to you for review?

3.    In the 1980 - 1992 time frame, did you have access to a scientific library for research? If so, what library?

4.    In the 1980 - 1992 time frame, did you keep a collection of books in your office or work space? If so, what were some of the titles of the books you had in your office or work space?

5.    In the 1980 - 1992, please identify the reference books or treatises that you may have consulted on a regular basis in connection with your work?

**MM.    Preservatives**

1.    In 1985, were you aware that benzalkonium chloride was well known as an acceptable preservative for use with an azelastine nasal spray?

2.    Before 1985, did you have any experience in formulating nasal sprays? If so, please describe your experience in formulating nasal sprays.

3.    Please generally describe your involvement in assisting Asta Pharma AG in obtaining the German '681 patent?

4.    Please generally describe your involvement in assisting Asta Pharma AG in obtaining the U.S. '194 Patent?

**NN.    Development of Azelastine Nasal Spray**

33

### Questionnaire For Mr. Helmet Hettche

      1.      To your knowledge, was Asta Pharma AG working with any other companies on the formulation of azelastine medicaments? If so, who was Asta Pharma AG working with and when?

      2.      What was the relationship between Asta Pharma AG and Carter Wallace/Eisai regarding new drug formulations using azelastine?

      3.      When did you first learn that others were working on formulations of azelastine for topical administration? Who did you understand was working on the formulations of azelastine for topical administration?

      4.      What involvement, if any, did you have with Carter Wallace regarding the formulation of azelastine nasal sprays? Please describe your involvement with Carter Wallace on the formulation of azelastine nasal sprays.

**OO.**    **Miscellaneous Issues**

      1.      At the time you developed the azelastine nasal spray, what other nasal spray products were on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold? What were the names of the products and who were the manufacturers? If you know, what were the formulations of the various nasal sprays on the market at the time you developed the azelastine nasal spray?

      2.      At the time you developed the azelastine nasal spray, did Asta Pharma AG have any nasal sprays on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold? If so, what was the product and what was its active ingredients?

      3.      Is your azelastine nasal spray formulation the first nasal spray developed and offered by Asta Pharma AG or related companies for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?

## Questionnaire For Mr. Helmet Hettche

      4.      Is your azelastine eye drop formulation the first eye drop formulation developed and offered by Asta Pharma AG or related companies for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?

795694/30136

# EXHIBIT 2

## List of Exhibits for Mr. Helmet Hettche

1.  German Patent Application P 37 38 681.6 (MP0029-MP0049)

2.  U.S. Patent No. 5,164,194

3.  European Patent No. 0 316 633

4.  Decision of the Opposition Division of the European Patent Office mailed March 28, 1996 (with English translation)

5.  Decision of the Technical Court of Appeals 3.3.2 dated April 5, 2000 (with English translation).

6.  Offenlegungsschrift 21 64 058 (with English translation).

7.  U.S. Patent No. 3,813,384 (with German translation).

8.  December 1982 Asta-Werke AG Toxicology Report (with German translation) (ATI00001105)

9.  Abstract 76, Chand N., Nolan K., Diamantis W., Sofia R.D. (1985) *Pharmacologist*; 27:162 (with German translation).

10. Single page document with box drawn around text "Beispiel 24" (AS-MEDA0001568).

11. Internal Letter dated September 6, 1985 from Dr. Aurich to Prof. Dr. Breuel (AS-MEDA0000601-602) (with English translation)

12. Notice to Dr. Herbst prepared by Dr. Hettche and dated January 27, 1986.

13. Internal Memo prepared by Dr. Hettche to Dr. Herbst dated August 13, 1990 (AS-MEDA0001345 (with English translation).

14. Handwritten note by Dr. Hettche dated February 18, 1986 (AS-MEDA0001938) (with English translation).

15. Handwritten note by Dr. Hettche to Dr. Ulbrich dated August 12, 1987 (AS-MEDA0000600).

16. U.S. Patent No. 4,704,387 (with German translation).

17. German Patent No. 3,539,873 (with English translation).

18. German Patent No. 3,433,776 (with English translation).

19.    O. Keanz, "Vademecum," 12th Revised Edition (AS-MEDA0000617-629) (with English Translation).

20.    Breuninger H. (1971) *HNO*, 1971 Mar;19(3):65-8.

21.    Antistin-Privin package insert.

22.    Single page 725 taken from a reference involving "Medications for the eye, ear and nose" and produced as AS-MEDA0007755 (with English translation).

23.    H.J.M. van de Donk, et al., "The effects of nasal drops on the ciliary beat frequency of chicken embryo tracheas." Rhinology 19, 215-230, 1981.

24.    Aberer W., Tappeiner G. (1988) *Wiener klinische Wochenschrift*, 1988 Dec. 2; 100(23):763-765.

25.    Report dated September 13, 1988 (AS-MEDA0003522-3525).

26.    Declaration of Dr. Szelenyi dated January 23, 1990 (with German translation).

27.    Document entitled "Inhibition of allergic histamine release from rat peritoneal mast cells" attached as part of Dr. Szelenyi's January 23, 1990 Declaration.

28.    Declaration of Dr. Istvan Szelenyi dated June 1, 1990 (with German translation).

795711/30136

2

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MEDPOINTE HEALTHCARE INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-164 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| APOTEX INC. and APOTEX CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO
THE HAGUE CONVENTION OF 18 MARCH 1970 ON TAKING OF
EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

1.  Sender:

    Hon. Sue L. Robinson
    Chief Judge
    United States District Court for the District of
    Delaware
    J. Caleb Boggs Federal Building
    844 North King Street
    Wilmington, DE  19801-3519
    (302) 573-6170

2.  Central Authority of
    Germany:

    Präsident des Oberlandesgerichts Frankfurt
    Zeil 42
    60313 Frankfurt am Main
    Germany

3.  Person to whom the
    executed request is to be
    returned:

    Hon. Sue L. Robinson
    Chief Judge
    United States District Court for the District of
    Delaware
    J. Caleb Boggs Federal Building
    844 North King Street
    Wilmington, DE  19801-3519
    (302) 573-6170

4.    In conformity with Article 3 of the Convention, the undersigned applicant has the honour to submit the following request:

| | | |
|---|---|---|
| 5a. | Requesting judicial authority: | United States District Court for the District of Delaware<br>J. Caleb Boggs Federal Building<br>844 North King Street<br>Wilmington, DE 19801 |
| 5b. | To the competent authority of: | The Federal Republic of Germany, State of Hessen |
| 6. | Names and addresses of the Parties and their Representatives: | Plaintiff:  MedPointe Healthcare Inc.<br>          265 Davidson Avenue<br>          Somerset, New Jersey 08873<br>          United States of America |

5a.    Requesting judicial authority:

United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801

5b.    To the competent authority of:

The Federal Republic of Germany, State of Hessen

6.    Names and addresses of the Parties and their Representatives:

Plaintiff:    MedPointe Healthcare Inc.
265 Davidson Avenue
Somerset, New Jersey 08873
United States of America

Representative:    Peter J. Armenio, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
United States of America

Defendants:    Apotex, Inc.
380 Elgin Hills Road East
Richmond Hill, Ontario
Canada L4C 5H2

Apotex, Corp.
2400 North Commerce Parkway
Suite 400
Weston, Florida 33326
United States of America

Representative:    A. Sidney Katz
Robert B. Breisblatt
Welsh & Katz, Ltd.
120 South Riverside Plaza
22nd Floor
Chicago, Illinois 60606-3912
United States of America

| 7. | Nature and purpose of the proceedings and summary of the facts: | MedPointe Healthcare Inc. ("MedPointe") is a U.S. pharmaceutical company that develops, markets and sells branded prescription drugs. Since August 16, 2002, MedPointe has been the sole owner of U.S. Patent No. 5,164,194 ("'194 patent") entitled "Azelastine Containing Medicaments." The '194 patent originally issued to Asta Pharma AG, as assignee, on November 17, 1992. Mr. Helmut Hettche is the sole named inventor on the '194 patent. MedPointe has sued Apotex, Inc. and Apotex, Corp. ("Apotex") for infringement of the '194 patent by the filing of an Abbreviated New Drug Application with the United States Food and Drug Administration seeking to market and sell a generic nasal spray product containing 0.1% azelastine hydrochloride in an aqueous solution. Apotex has asserted non-infringement of the '194 patent. Apotex has also asserted that the '194 patent is invalid or unenforceable under the applicable United States Patent Laws. |
|----|----|----|
| 8. | Evidence to be obtained or judicial act to be performed: | Dr. Jürgen Engel can provide evidence on the matters set forth in the attached questionnaire. It is respectfully requested that an appropriate German judicial authority ask Dr. Jürgen the list of attached questions. |
| 9. | Identity and address of Person to be examined: | Dr. Jürgen Engel<br>Chairman and Managing Director<br>Zentaris GmbH<br>Weismuekkerstrasse 50<br>60314 Frankfurt am Main<br>Germany |
| 10. | Questions to be put to the person to be examined or statement of the subject matter about which he is to be examined: | Please see the attached questionnaire. |

| 11. | Documents or other property to be inspected: | Any and all documents in the possession, custody or control of Dr. Engel relating to (1) the development or conception of azelastine containing medicaments and (2) the comparison of the effects of azelastine with other compounds or medicaments including those identified in U.S. Patent No. 4,704,387 and its German counterpart, DE 35 30 793 A1. |
|---|---|---|
| 12. | Any requirement that the evidence be given on oath or affirmation and any specific form to be used: | Dr. Engel should be examined under oath or affirmation, or in the alternative, should be instructed of the consequences for giving of untruthful and false answers under the laws of Germany. |
| 13. | Special methods or procedure to be followed: | To the extent allowed under German law, it is requested that: (1) the parties' representatives and their designees, including local German counsel and interpreters, be permitted to be present during the examination; (2) the representatives or their designees be permitted to request clarification or further elaboration of Dr. Engel's answers to the questions posed; (3) the representatives or their designees be permitted to pose or submit for presentment to Dr. Engel additional questions following presentment of the questions on the attached questionnaire; (4) if requested by Dr. Engel, an attorney representing Dr. Engel may be present and may participate on behalf of his client to the extent permitted by German law; (5) there be excluded from the examination, if permitted under German law, all persons other than the judicial officer conducting the examination of Dr. Engel, the attorney representing Dr. Engel, if any, the attorneys for the parties and their designees, interpreters, and other officials of the German court normally present during such proceedings. |
| | | In addition to Dr. Engel, Apotex has requested that evidence be taken from another German citizen – Mr. Helmut Hettche (for which a separate Letter of Request has been submitted to the Court for issuance). Both Dr. Engel and Mr. Hettche reside in the State of Hessen. Mr. Hettche lives in |

4

Dietzenbach.  Apotex respectfully requests that, to the extent possible, the examination of Dr. Engel and Mr. Hettche pursuant to Letters of Request be consolidated for one judicial proceeding before one judicial officer scheduled for consecutive days in Frankfurt am Main.  In addition, it is requested that Mr. Hettche, who lives in Dietzenbach, be requested to travel to Frankfurt am Main for the judicial proceeding.  Apotex intends to request that counsel representing Mr. Hettche voluntarily agree to attend a judicial proceeding scheduled in Frankfurt am Main.

14. Request for notification of the time and place for execution of the Request and the identity and address of any person to be notified:

Please notify the following persons by mail and telefax when and where the examination is to be conducted:

Robert B. Breisblatt, Esq.
Welsh & Katz, Ltd.
120 South Riverside Plaza • 22nd Floor
Chicago, Illinois  60606-3912
United States of America
Tel. No.:   (312) 655-1500
Fax No.:   (312) 655-1501

Peter J. Armenio, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
United States of America
Tel. No.:   (212) 446-4800
Fax No.    (212) 446-4900

Joseph M. O'Malley, Jr., Esq.
Eric W. Dittmann, Esq.
Paul Hastings
Park Avenue Tower
75 E. 55th Street
First Floor
New York, New York  10022
Tel. No.:   (212) 318-6090
Fax No.:   (212) 230-7712

15. Request for attendance of participation of judicial personnel of the requesting authority at the execution of the Letter of Request:

None.

16. Specification of privilege or duty to refuse to give evidence under the law of the State of Origin:

Dr. Engel may refuse to answer any question propounded if such answer (1) would subject him to a real and appreciable danger of criminal liability in the United States or (2) would disclose a confidential communication between him and his attorney, former attorney, or person acting on behalf of his attorney or former attorney. In some cases, it may be the party rather than the witness who may hold the privilege. In addition, an attorney may assert a privilege on behalf of a client with respect to a question propounded to Dr. Engel. However, Dr. Engel should respond to the question if he can do so without revealing the content of the privileged communication. If a privilege is asserted, Dr. Engel is required to reveal the following information regarding the privileged communication: (1) the date of the communication; (2) the form of the communication; (3) the identity of all individuals involved in the communication including, where possible, their employer and employment position at the time of the communication; and (4) the general subject matter of the privileged communication.

17. The fees and costs incurred which are reimbursable under the second paragraph of article 14 or under article 26 of the Convention will be borne by:

Apotex, Inc and Apotex, Corp.

Representative: Robert B. Breisblatt, Esq.
       Welsh & Katz, Ltd.
       120 S. Riverside Plaza
       22nd Floor
       Chicago, Illinois 60606-3912
       United States of America
       Tel. No.: (312) 655-1500
       Fax No.: (312) 655-1501

18.  Date of Request:                    _____, 2007

19.  Signature and seal of the           _____
     Requesting authority:               Hon. Sue L. Robinson
                                         United States District Court Judge

20.  Attachment:                         Questionnaire for Dr. Jürgen Engel (Exhibit 1)
                                         List of Exhibits for Dr. Jürgen Engel (Exhibit 2)


Peter D. Dalleo, Clerk of Court

By:  _____

Seal of the
United States District Court
for the District of Delaware

795717 / 30136

# EXHIBIT 1

**Questionnaire For Mr. Helmut Hettche**

**A.      Introduction**

Dr. Jeurgen Engel, a former employee of Asta Pharma AG ("Asta Pharma")(formerly known as Asta-Werke AG), is being asked to provide testimony pertaining to his employment activities at Asta Pharma relating to the development of antihistaminic and antiallergic medicaments. Dr. Engel is being asked to provide testimony that is relevant to an infringement suit brought in the United States by MedPointe Healthcare Inc. ("MedPointe") against Apotex, Inc. and Apotex Corp. for the alleged infringement of U.S. Patent No. 5,164,194 ("the '194 patent"). The '194 patent is entitled: "Azelastine Containing Medicaments." The '194 patent was originally assigned to Asta Pharma and is now owned by MedPointe. The '194 patent claims a date of priority based on the filing of a German patent application (P 37 38 681.6) on November 13, 1987. Dr. Engel is believed to have information relevant to the lawsuit based, at least, on his employment activities with Asta Pharma. Dr. Engel is also the named inventor on several prior art patents that are relevant to the subject matter of the '194 patent including U.S. Patent No. 4,704,387 and its German counterpart, Offenlegungsschrift DE 35 30 793 A1.

**B.      General Background Information**

1.      Will you please state your name and address?

2.      When were you born?

3.      Please describe your educational background including any degrees obtained?

4.      Do you speak English? Can you read and understand English?

5.      Please describe your employment history including the dates of employment and the identity of your employers?

<u>Questionnaire For Dr. Jürgen Engel</u>

6.    Between 1983 and 1992, what are the employment positions you held?  For each position, please identify your employer, your duties and responsibilities and the identity of the person or persons to whom you reported.

7.    When did you work for Asta-Werke AG and what positions did you hold?

8.    Did Asta-Werke change its name to Asta Pharma?  Where you employed at Asta-Werke at the time the name was changed to Asta-Pharma?

9.    Please identify any professional organizations that you have been a member of and your years of membership?

10.   Please identify the articles that you have authored and published?

11.   During your employment between 1983 and 1992, did you keep a journal, calendar, lab book, diary or other source for recording your work?  If so, what is the present location of your journal, calendar, lab book, diary or other source for recording your work from this time frame?

**C.    <u>Preparation for Judicial Proceeding</u>**

1.    What did you do to prepare for your testimony today?

2.    Did you meet with anyone to prepare for your testimony today?  Who did you meet with and for how long?

3.    Did you review the documents that accompanied the Letters of Request from the United States court in preparation for your testimony today?  What other documents, if any, did you review in preparation for your testimony today?

4.    Did the documents you reviewed help to refresh your recollection of events surrounding the development of an azelastine nasal spray and azelastine eye drops?

**D.    <u>Engel Exhibits 1 – U.S. Patent No. 5,164,194</u>**

2

## Questionnaire For Dr. Jürgen Engel

1.      Please take a look at **Engel Exhibit 1** which is a copy of U.S. Patent No. 5,164,194, with a German translation attached.  Do you recognize this patent?

2.      When did you first become aware that Asta Pharma was interested in developing an azelastine containing medicament for topical application?  Were you involved in the development of azelastine containing medicaments for the nose and eye while at Asta Pharma? If so, please describe your involvement in the development of azelastine containing medicaments for the nose and eye while at Asta Pharma?

3.      When did you first learn that Dr. Hettche was seeking patent protection for nose and eye medicaments containing azelastine?  When did you become aware that Dr. Hettche had applied for a U.S. patent claiming nose and eye medicaments containing azelastine?

**E.      Engel Exhibit 2 – U.S. Patent No. 4,704,387**

1.      Please take a look at **Engel Exhibit 2**.  Do you recognize this document?  Are you a named inventor of the '387 patent?  Please generally describe the invention disclosed in **Engel Exhibit** 2.  Please describe your inventive contribution to the invention claimed in the '387 patent.

**F.      Engel Exhibit 3 – German Offenlegungsschrift DE 35 30 793 A1**

1.      Please take a look at **Engel Exhibit 3**.  Do you recognize this document?  If so, please explain what this document is?

2.      Is **Engel Exhibit 3** the German counterpart patent application to **Engel Exhibit 2**, your '387 patent?

3.      The German patent application identified as **Engel Exhibit 3**, was filed on August 29, 1985, correct?

3

### Questionnaire For Dr. Jürgen Engel

4.      The German patent application identified as **Engel Exhibit 3**, was published on March 27, 1986, correct?

**G.    Engel Exhibit 4 – P 34 33 776.8**

1.      Please take a look at **Engel Exhibit 4**.  Do you recognize this document?  If so, what is this document?

2.      Looking at the first page of **Engel Exhibit 4**, what does the September 14, 1984 date refer to?  Is this the date that **Engel Exhibit 4** was filed with the German Patent Office?

3.      Looking at **Engel Exhibit 3**, on the first page at number 30, do you see **Engel Exhibit 4** is listed as the basis for a claim for a September 14, 1984 priority date?

4.      Looking at **Engel Exhibit 2** one the first page at line [30], do you see that **Engel Exhibit 4** is listed under the heading "Foreign Application Priority Data."  Do you understand that your '387 patent, **Engel Exhibit 2**, claims a priority date of September 14, 1984 based on **Engel Exhibit 4**?

**H.    Engel Exhibit 5 – AS-MEDA0009924**

1.      Please take a look at **Engel Exhibit 5** relating to a September 30, 1985 Notice to Dr. Aurich authored by Dr. Helmut Hettche.  In the upper left hand corner of **Engel Exhibit 5**, are you listed as one of the recipients of this Notice to Dr. Aurich?  Which entry in the distribution list refers to you?  Do you have any reason to believe that you did not receive a copy of this Notice to Dr. Aurich on or about September 30, 1985?

2.      In the distribution list, there is a reference to "Dr. He."  Who does this refer to?

3.      In September 1985, what was Dr. Aurich's position at Asta Pharma?

4.      In September 1985, what was Dr. Hettche's position at Asta Pharma?

5.      In September 1985, what was your position at Asta Pharma?

### Questionnaire For Dr. Jürgen Engel

6.    Do you see the reference to you in the first paragraph of **Engel Exhibit** 5?

7.    Did you advise Dr. Hettche to proceed with the analytic examination of an azelastine nasal spray as reflected in the first paragraph of **Engel Exhibit 5**?  Why did you determine that it was advisable to pursue this medicines?  How soon before September 30, 1985 did you advise Dr. Hettche to proceed with an analytic examination of an azelastine nasal spray.  What is meant by an "analytic examination" of an azelastine nasal spray?  What involvement did you have in selecting solutions with 0.05%, 0.1% and 0.2% azelastine hydrochloride for analytic examination?  What involvement did you have in selecting other excipients to include in the azelastine hydrochloride solutions for analytic examination?

8.    When did you first learn that Dr. Hettche was self-administering an azelastine nasal spray?  How did you learn that Dr. Hettche was self-administering an azelastine nasal spray?

9.    To your knowledge, had Dr. Hettche ever sought approval for self-administering an azelastine nasal spray from anyone at Asta Pharma?

10.    When did you first learn that Dr. Molliere was also self-administering an azelastine nasal spray?  How did you learn that Dr. Molliere was also self-administering an azelastine nasal spray?

11.    As of Sept. 30, 1985, were you aware of any medicines containing antihistamines that could be applied directly to the nose or eye?  If so, what were those medicines containing antihistamines for application directly to the nose or eye?

12.    Referring again to **Engel Exhibit 2**, isn't it true that you filed an application for the compounds of your U.S. '387 patent in the United States on August 12, 1985?  Does your patent describe applying the compounds of the invention directly to the nose and eye?  If so,

5

please point out where in your patent you describe applying the compounds of the invention directly to the nose and eye?

13.    Referring to **Engel Exhibit 4,** isn't it true that you filed a application for the compounds of your U.S. '387 patent in Germany on September 14, 1984? Does **Engel Exhibit 4** describe applying compounds of the invention directly to the nose and eye? If so, please point out where in **Engel Exhibit 4** you describe applying the compounds of the invention directly to the nose and eye?

14.    Referring to **Engel Exhibit 3,** isn't it true that you filed an application for the compounds of your U.S. '387 patent in Germany on August 29, 1985? Does **Engel Exhibit 3** describe applying compounds of the invention directly to the nose and eye? If so, please point out where in **Engel Exhibit 3** you describe applying the compounds of the invention directly to the nose and eye?

15.    To the best of your knowledge, did Dr. Hettche produce an azelastine nasal spray prior to the August 12, 1985 filing of your patent application in the United States? If so, please describe the components of the azelastine nasal spray developed before August 12, 1985. Did Dr. Hettche and Dr. Molliere self-administer the azelastine nasal spray prior to the August 12, 1985 filing of your patent application for the '387 patent in the United States?

16.    Did you suggest to Dr. Hettche that he should produce an eye or nasal medication containing azelastine after you produced nasal sprays of the compounds of your own invention disclosed in your '387 patent, **Engel Exhibit 2?**

17    Did you suggest to Dr. Hettche that he should produce an eye or nasal medication containing azelastine after you produced nasal sprays of the compounds of your own invention disclosed in **Engel Exhibit 3?**

18.    Did you suggest to Dr. Hettche that he should produce an eye or nasal medication containing azelastine after you produced nasal sprays of the compounds of your own invention disclosed in **Engel Exhibit 4**?

19.    Who at Asta Pharma was ultimately responsible for deciding that a topical medicine for the nose or eye containing azelastine should be developed? What role, if any, did you play in the decision to pursue nasal and eye medicaments using azelastine?

20.    Please take a moment to read the second full paragraph of **Engel Exhibit 5**. Is it your understanding based on your patent that the stability of azelastine hydrochloride in solution was well known as of the Sept. 30, 1985 date of your patent application?

21.    At the top of the page of **Engel Exhibit 5**, reference is made to a Sept. 6, 1985 notice from Dr. Aurich. Did you receive this Sept. 6, 1985 notice? If so, did you review the Sept. 6, 1985 notice before you concluded that azelastine nasal and eye medicines should be pursued? Were there any other letters, notices, reports, or studies on which you based your decision to pursue the azelastine nasal and eye medicines? Can you recall any conversation you had with any person, either at Asta Pharma, Degussa, Asta Werke, Carter Wallace, or any other company in 1985 that helped you reach the conclusion that nasal and eye medicines containing azelastine should be produced?

22.    As of Sept. 6, 1985, were you aware of any prior administration of azelastine in an aerosol, drop, powder, gel, cream, ointment or any other form directly to the eye or nose of any research participant or animal, including but not limited to humans, guinea pigs, rats, dogs and/or mice? If so, please describe any such prior administration.

I.    **Engel Exhibit 6 – German Offenlegungsschrift 21 64 058**

### Questionnaire For Dr. Jürgen Engel

1.     Returning to **Engel Exhibit 2**, please review column 3, lines 40 through 47. Your '387 patent states that the compounds of your invention are "considerably stronger and better than the known compounds of German Pat. No. 2164058," correct? Your '387 patent also states that azelastine is disclosed in Example 5 of German Patent No. 2164058, correct? At the time of your 1985 patent application, was it your understanding that azelastine represented the strongest and best antiallergic medicine of German Pat. No. 2164058? According to your '387 patent, the compounds of your invention are "considerably stronger and better" than the known compound of azelastine, correct?

2.     Please take a look at **Engel Exhibit 6**, a copy of German Offenlegungsschrift 21 64 058. Is this a copy of the German Pat. No. 21 64 058 referenced in Col 3, lines 40 through 47 of your '387 patent, **Engel Exhibit 2**?

**J.    Engel Exhibit 7 – Declaration of Dr. Achterrath-Tuckermann**

1.     Please take a look at **Engel Exhibit 7**, the declaration of Dr. Achterrath-Tuckermann dated February 16, 1987? Do you recognize this Declaration as having been submitted to the U.S. Patent Office in connection with your pending patent application that issued as the '387 patent, **Engel Exhibit 2**? Do you know Dr. Achterrath-Tuckermann? When and how did you first come to know Dr Achterrath-Tuckermann?

2.     What involvement did you have in obtaining the Declaration of Dr. Achterrath-Tuckermann for submission to the U.S. Patent Office? What involvement did you have in designing the study conducted by Dr. Achterrath-Tuckermann described in her declaration? The goal of the study conducted by Dr. Achterrath-Tuckermann was to compare the antiallergic and asthma prophylactic activity of the compounds of your application with the most effective compound from German Patent 2164058 and the corresponding U.S. Patent No. 3,813,384 to

8

Vogelsang, correct?  Dr. Achterrath-Tuckermann indicates that azelastine is the most effective compound from German Patent No. 2164058, correct?

      3.      What involvement did you have in the selection of compounds 2 and 4 of your '387 patent to test against azelastine?

      4.      What involvement did you have in the preparation of Dr. Achterrath-Tuckermann's Declaration?

      5.      Please look at the next to last paragraph on page 3 of **Engel Exhibit 4**.  Dr. Achterrath-Tuckermann concludes that "(T)he compounds of the invention have almost 3 times as strong an antiallergic and asthma prophylactic action as the comparison material," correct?  The "comparison material" refers to azelastine from German Patent 2164058 and the corresponding U.S. Patent No. 3,813,384 to Vogelsang, correct?  You represented to the U.s. patent office that your compounds in **Engel Exhibit 2**, based on the study conducted by Dr. Achterrath-Tuckermann, were 3 times as effective as azelastine when used as a prophylactic antiallergic and antiasthma medicine, correct?  You further represented to the U.S. patent office that the compounds of your invention are "considerably stronger and better" than azelastine, correct?

      6.      Returning to **Engel Exhibit 2**, could you please review column 7, lines 58 through 66.  Who conducted the studies investigating the antiallergic and antihistamine action of your compounds on rabbit leucocytes and rat peritoneal mast cells?  All four of the compounds disclosed in your '387 patent were used in these studies, correct?  When those experiments were conducted, were the results recorded in a laboratory notebook?  Were the results published in any articles or appear in any publications?  Do you know where the results of those studies are?  What involvement did you have in any of these studies referenced in your '387 patent?

### Questionnaire For Dr. Jürgen Engel

7.    Please review column 8, lines 3 through 6 of **Engel Exhibit 2**.  Your '387 patent

states that "(t)his antiallergic action is comparable with the action of the known medicine

'Azelastine.'"  Isn't it true that your patent discloses that the antiallergic action obtained in the

experiments conducted with the compounds of your invention, including studies with rabbit

leucocytes and rat peritoneal mast cells, are "comparable with the action of the known medicine

'Azelastine'"?  When your patent states that the compounds are comparable to azelastine, do you

also mean they are "considerably stronger and better" and "3 times stronger" than azelastine?

How much stronger were the compounds of your invention to azelastine in the experiments with

rabbit leucocytes and rat peritoneal mast cells?

### K.    Engel Exhibit 8 – Declaration of Dr. Istvan Szelenyi

1.    Please review **Engel Exhibit 8** a copy of a Declaration dated January 23, 1990

prepared by Dr. Istvan Szelenyi?  Have you seen this Declaration before receiving a copy as part

of the exhibits submitted in connection with this proceeding?  If so, when do you first recall

seeing a copy of this Declaration?

2.    Do you know Dr. Istvan Szelenyi?  How do you know Dr. Szelenyi?  When did

you first come to know Dr. Szelenyi?  Who was Dr. Szelenyi's employer in 1989 - 1990?  What

responsibility did you have in 1989 – 1990 for the activities of Dr. Szelenyi?

3.    Were you aware back in 1989 - 1990 that Dr. Szelenyi was involved in a study of

azelastine involving rat peritoneal mast cells?  Were you aware that Dr. Szelenyi prepared this

declaration that was submitted in support of the patentability of the subject matter of Dr.

Hettche's '194 patent, **Engel Exhibit 1**?

4.    What involvement, if any, did you have in the study conducted by Dr. Szelenyi as

reported in his declaration, **Engel Exhibit 8**?  What involvement, if any, did you have in the

selection of Dr. Szelenyi as a source of information for use during the prosecution of the '194 patent, **Engel Exhibit 1**?

5.    What involvement did you have in the preparation of Dr. Szelenyi's declaration?

6.    Were you aware in 1990 that Dr. Szelenyi claimed that azelastine was twice as effective as the compounds of your invention when he conducted studies with rat peritoneal mast cells? When did you first learn of the results obtained by Dr. Szelenyi as disclosed in his declaration, **Engel Exhibit 8**? When did you first learn that studies had been conducted that showed azelastine was twice as effective as the compounds disclosed in your '387 patent, **Engel Exhibit 2**?

7.    On Feb. 16, 1987, you represented to the patent office that the compounds disclosed in your '387 patent were 3 times better, considerably stronger and better than azelastine when used to treat allergy, correct? Approximately two years later, Dr. Szelenyi reported that azelastine was twice as effective as compound 1 in your '387 patent, correct? However, according to the 1987 study conducted by Dr. Achterrath-Tuckermann, compounds 2 and 4 of your '387 patent were 3 times stronger in antiallergic and asthma prophylactic actions than azelastine, correct?

8.    Returning to **Engel Exhibit 7**, please now look at the third page of Dr. Achterrath Tuckermann's declaration. Isn't it true that Dr. Achterrath-Tuckermann represented to the U.S. Patent Office on Feb. 16, 1987 that the compounds of your invention were better than azelastine because azelastine could not be applied in the form of an aerosol? In other words, the compounds of your invention were superior to azelastine because they could be used as an aerosol, correct? Isn't it also true that less than nine months later Dr. Hettche submitted an application with the German patent office claiming azelastine medicaments that could be applied

11

as aerosols?  Isn't it true that , by September 1985, you were aware that Dr. Hettche was self-administering an azelastine nasal spray?  Weren't you also aware, at least as early as Sept. 1985, that Asta Pharma was developing a nasal and eye medicine containing azelastine?  What did you understand Dr. Achterrath-Tuckermann to mean when she wrote that azelastine could not be applied as an aerosol and why?

       8.     Please review **Engel Exhibit 9**, Aerosols in Medicine.  Do you understand that this text was cited in the course of seeking FDA approval to market a nasal spray containing azelastine in the United States?  On page ___ of this publication, aerosols are described that can be administered to the nose of the patient, correct?  When you argued azelastine could not be applied in an aerosol, did you limit your statement to nasal or oral administration?  Where in the '387 patent or in the Declaration of Dr. Achterrath Tuckermann did you limit your statement regarding application of azelastine as an aerosol?

**L.**    **Engel Exhibit 10**

       1.     Please refer to **Hettche Exhibit 10** (AS-MEDA0000617-629), a copy of a document, entitled "Vademecum" produced from the files of Asta-Meda.  Are you familiar with this reference?  Do you agree that this reference discusses external and internal administration of medicinal drops?  In the case of the external administration of medicinal drops, do you understand this reference to describe the application of medicinal drops to the eyes and to the nose?  In the case of the external administration of drops to the nose, do you understand this reference to describe applying drops to the nose using a spraying mechanism?  In the case of external administration of nasal drops, do you understand this reference to recognize that many nasal drops also find application as eye drops?

**M.**    **Engel Exhibit 11**

## Questionnaire For Dr. Jürgen Engel

1.      Please take a look at **Engel Exhibit 11**, a copy of an Asta Pharma report dated September 13, 1988. Looking at the first page, does your signature appear twice? By your signatures you are indicating that you both reviewed and approved of this report, correct? The report was prepared and signed by Dr. Hettche, correct? Do you know why Dr. Hettche prepared did you make for this report? Do you recall if you reviewed any drafts of this report? If so, did you give Dr. Hettche any suggestions or corrections regarding this report? If so, what suggestions or revisions did you give to Dr. Hettche?

2.      **Engel Exhibit 11** is dated September 13, 1988, correct?

3.      The title of **Engel Exhibit 11** is "Development Pharmaceutics of Azelastine Hydrochloride 0.1% Nasal Spray," correct? This report relates to a study conducted by Asta Pharma AG, correct?

4.      What was the purpose of the study conducted by Dr. Hettche as reported in **Engel Exhibit 11**?

5.      What does it mean when you sign this report as having been approved by you? Does your signature signify that you agree with the analysis and conclusions found in this report?

6.      What involvement, if any, did you have in this study conducted by Dr. Hettche? Who approved this study?

## N.    **Lawrence Hymo**

1.      Do you know a U.S. patent attorney by the name of Lawrence Hymo? If so, how do you know Mr. Hymo?

2.      Have you ever met Mr. Hymo in person and, if so, please generally describe the circumstances where you have met Mr. Hymo in person.

## Questionnaire For Dr. Jürgen Engel

3.    When was the last time you had any contact with Mr. Hymo?  What were the circumstances that last brought you into contact with Mr. Hymo?

**O.**    **Alvin Guttag**

1.    Do you know a U.S. patent attorney by the name of Alvin Guttag?  If so, how do you know Mr. Guttag?

2.    Have you ever met Mr. Guttag in person and, if so, please generally describe the circumstances where you have met Mr. Guttag in person.

3.    When was the last time you had any contact with Mr. Guttag?  What were the circumstances that last brought you into contact with Mr. Guttag?

**P.**    **Reading Material**

1.    In the 1980 - 1992 time frame, did you subscribe to any scholarly or scientific journals or papers?  If so, please name the journals or papers to which you subscribed?

2.    In the 1980 - 1992 time frame, did Asta Medica AG subscribe to scholarly or scientific journals or papers that were routed to you for review?

3.    In the 1980 - 1992 time frame, did you have access to a scientific library for research?  If so, what library?

4.    In the 1980 - 1992 time frame, did you keep a collection of books in your office or work space?  If so, what were some of the titles of the books you had in your office or work space?

5.    In the 1980 – 1992 time frame, please identify the reference books or treatises that you may have consulted on a regular basis in connection with your work?

**Q.**    **Development of Azelastine Nasal Spray**

### Questionnaire For Dr. Jürgen Engel

1.      To your knowledge, was Asta Pharma AG working with any other companies on the formulation of azelastine medicaments in the 1980 – 1992 time period? If so, who was Asta Pharma AG working with and when?

2.      What was the relationship between Asta Pharma AG and Carter Wallace/Eisai regarding new drug formulations using azelastine?

3.      When did you first learn that others were working on formulations of azelastine for topical administration? Who did you understand was working on the formulations of azelastine for topical administration?

4.      What involvement, if any, did you have with Carter Wallace regarding the formulation of azelastine nasal sprays? Please describe your involvement with Carter Wallace on the formulation of azelastine nasal sprays.

**R.**      **Dr. Naresh Chand**

1.      Do you know Dr. Naresh Chand? If so, how do you know Dr. Chand? When you learned of Dr. Chand, who did he work for and, to the best of your knowledge, what type of work did he do?

2.      Have you ever met Dr. Chand in person and, if so, please generally describe the circumstances where you have met Dr. Chand in person.

3.      When was the last time you had any contact with Dr. Chand? What were the circumstances that last brought you into contact with Dr. Chand?

4.      Did any of your duties and responsibilities while at Asta Pharma and related companies bring you into contact with Dr. Chand?

**S.**      **Miscellaneous Issues**

## Questionnaire For Dr. Jürgen Engel

1.    At the time Asta Pharma developed an azelastine nasal spray, what other nasal spray products were on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?  What were the names of the products and who were the manufacturers?  If you know, what were the formulations of the various nasal sprays on the market at the time Asta Pharma developed an azelastine nasal spray?

2.    At the time Asta Pharma developed an  azelastine nasal spray, did Asta Pharma have any other nasal sprays on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?  If so, what were the products and what were their active ingredients?

3.    To you knowledge, was the Asta Pharma azelastine nasal spray formulation the first nasal spray developed and offered by Asta Pharma AG or related companies for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?

4.    Is the Asta Pharma azelastine eye drop formulation the first eye drop formulation developed and offered by Asta Pharma AG or related companies for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?

795726/30136

# EXHIBIT 2

## List of Exhibits for Dr. Jürgen Engel

1.    U.S. Patent No. 5,164,194 (with German translation).

2.    U.S. Patent No. 4,704,387 (with German translation).

3.    Memorandum entitled "Memo for Dr. Aurich" dated September 30, 1985 (AS-MEDA0009924)(with English translation).

4.    German Offenlegungsschrift 21 64 058 (with English translation).

5.    Declaration Under Rule 132 of Dr. Achterrath-Tuckermann dated February 16, 1987 (with German translation).

6.    Declaration of Dr. Szelenyi dated January 23, 1990 (with German translation).

7.    Excerpts from book entitled "Aerosols in Medicine."

8.    Vandemecum (AS-MEDA0000617-629)(with English translation).

9.    Asta Pharma Report dated September 13, 1988 (AS-MEDA0003522-3525) (with German translation).

795734/30136

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MEDPOINTE HEALTHCARE INC.,       )
                                             )
                                           )
          Plaintiff,              )     C.A. No. 06-164 (SLR)
                                           )
      v.                            )
                                           )
APOTEX INC. and APOTEX CORP.,      )
                                           )
          Defendants.        )

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO
THE HAGUE CONVENTION OF 18 MARCH 1970 ON TAKING OF
EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

| | | |
|---|---|---|
| 1. | Sender: | Hon. Sue L. Robinson<br>Chief Judge<br>United States District Court for the District of Delaware<br>J. Caleb Boggs Federal Building<br>844 North King Street<br>Wilmington, DE 19801-3519<br>(302) 573-6170 |
| 2. | Central Authority of Germany: | Präsidentin des Oberlandesgerichts Müchen<br>Prielmayerstraße 5<br>80097 Müchen |
| 3. | Person to whom the executed request is to be returned: | Hon. Sue L. Robinson<br>Chief Judge<br>United States District Court for the District of Delaware<br>J. Caleb Boggs Federal Building<br>844 North King Street<br>Wilmington, DE 19801-3519<br>(302) 573-6170 |

4.    In conformity with Article 3 of the Convention, the undersigned applicant has the honour to submit the following request:

| | | |
|---|---|---|
| 5a. | Requesting judicial authority: | United States District Court for the District of Delaware<br>J. Caleb Boggs Federal Building<br>844 North King Street<br>Wilmington, DE  19801 |
| 5b. | To the competent authority of: | The Federal Republic of Germany, State of Bavaria |
| 6. | Names and addresses of the Parties and their Representatives: | Plaintiff:  MedPointe Healthcare Inc.<br>265 Davidson Avenue<br>Somerset, New Jersey  08873<br>United States of America |

Representative:  Peter J. Armenio, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022
United States of America

Defendants:  Apotex, Inc.
380 Elgin Hills Road East
Richmond Hill, Ontario
Canada  L4C 5H2

Apotex, Corp.
2400 North Commerce Parkway
Suite 400
Weston, Florida  33326
United States of America

Representative:  A. Sidney Katz
Robert B. Breisblatt
Welsh & Katz, Ltd.
120 South Riverside Plaza
22nd Floor
Chicago, Illinois 60606-3912
United States of America

7.  Nature and purpose of the proceedings and summary of the facts:

MedPointe Healthcare Inc. ("MedPointe") is a U.S. pharmaceutical company that develops, markets and sells branded prescription drugs. Since August 16, 2002, MedPointe has been the sole owner of U.S. Patent No. 5,164,194 ("'194 patent") entitled "Azelastine Containing Medicaments." The '194 patent originally issued to Asta Pharma AG, as assignee, on November 17, 1992. Mr. Helmut Hettche is the sole named inventor on the '194 patent. MedPointe has sued Apotex, Inc. and Apotex, Corp. ("Apotex") for infringement of the '194 patent by the filing of an Abbreviated New Drug Application with the United States Food and Drug Administration seeking to market and sell a generic nasal spray product containing 0.1% azelastine hydrochloride in an aqueous solution. Apotex has asserted non-infringement of the '194 patent. Apotex has also asserted that the '194 patent is invalid or unenforceable under the applicable United States Patent Laws. While seeking issuance of a patent from the U.S. Patent and Trademark Office, Dr. Szelenyi was hired by Asta Pharma AG to conduct testing that was submitted to the U.S. Patent and Trademark Office in the form of two separate declarations signed by him.

8.  Evidence to be obtained or judicial act to be performed:

Dr. Istvan Szelenyi can provide evidence on the matters set forth in the attached questionnaire. It is respectfully requested that an appropriate German Judicial authority ask Dr. Szelenyi the list of attached questions.

9.  Identity and address of Person to be examined:

Dr. Istvan Szelenyi
Händelstrasse 32
D-90571 Schwaig
Germany

10. Questions to be put to the person to be examined or statement of the subject matter about which he is to be examined:

Please see the attached questionnaire.

3

11.  Documents or other property to be inspected:

Any and all documents in the possession, custody or control of Dr. Szelenyi relating (1) to the development or conception of azelastine containing medicaments; (2) the comparison of the effects of azelastine with other compounds or medicaments including those identified in U.S. Patent No. 4,704,387 and its German counterpart, DE 35 30 793 A1; and (3) the declarations submitted by Dr. Szelenyi to the U.S. Patent Office in connection with the patent application for U.S. Patent No. 5,164,194.

12.  Any requirement that the evidence be given on oath or affirmation and any specific form to be used:

Dr. Szelenyi should be examined under oath or affirmation or, in the alternative, should be instructed of the consequences for giving of untruthful and false answers under the laws of Germany.

13.  Special methods or procedure to be followed:

To the extent allowed under German law, it is requested that: (1) the parties' representatives and their designees, including local German counsel and interpreters, be permitted to be present during the examination; (2) the representatives or their designees be permitted to request clarification or further elaboration of Dr. Szelenyi's answers to the questions posed; (3) the representatives or their designees be permitted to pose or submit for presentment to Dr. Szelenyi additional questions following presentment of the questions on the attached questionnaire; (4) if requested by Dr. Szelenyi, an attorney representing Dr. Szelenyi may be present and may participate on behalf of his client to the extent permitted by German law; (5) there be excluded from the examination, if permitted under German law, all persons other than the judicial officer conducting the examination of Dr. Szelenyi, the attorney representing Dr. Szelenyi, if any, the attorneys for the parties and their designees, interpreters, and other officials of the German court normally present during such proceedings.

In addition to Dr. Szelenyi, Apotex intends to request that evidence be taken from two other German citizens – Mr. Helmut Hettche and Dr. Jürgen Engel (for which separate Letters of Request have been submitted to the Court). Both Mr. Hettche and Dr. Engel reside in the State of Hessen and Apotex has requested that their examination pursuant to the Letters of Request be consolidated for one judicial proceeding before one judicial officer scheduled for consecutive days in Frankfurt am Main. Apotex request that, to the extent possible, the judicial examination of Dr. Szelenyi be coordinated with the scheduled examinations of Mr. Hettche and Dr. Engel such that only one trip to Germany is required for the parties and their representatives to conduct the examinations pursuant to the Letters of Request. For example, Apotex requests that the examination of Dr. Szelenyi be scheduled such that the parties can conduct the examination either several days before or several days after the examinations to be scheduled for Mr. Hettche and Dr. Szelenyi. Apotex intends to request that counsel representing Dr. Szelenyi agree to cooperate in trying to coordinate all three examinations so that they can be completed in one trip to Germany.

| 14. | Request for notification of the time and place for execution of the Request and the identity and address of any person to be notified: | Please notify the following persons by mail and telefax when and where the examination is to be conducted: |
|---|---|---|

Robert B. Breisblatt, Esq.
Welsh & Katz, Ltd.
120 South Riverside Plaza • 22nd Floor
Chicago, Illinois 60606-3912
United States of America
Tel. No.:  (312) 655-1500
Fax No.:  (312) 655-1501

Peter J. Armenio, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
United States of America
Tel. No.:   (212) 446-4800
Fax No.    (212) 446-4900

Joseph M. O'Malley, Jr., Esq.
Eric W. Dittmann, Esq.
Paul Hastings
Park Avenue Tower
75 E. 55th Street
First Floor
New York, New York  10022
Tel. No.:   (212) 318-6090
Fax No.:   (212) 230-7712

| | | |
|---|---|---|
| 15. | Request for attendance of participation of judicial personnel of the requesting authority at the execution of the Letter of Request: | None. |
| 16. | Specification of privilege or duty to refuse to give evidence under the law of the State of Origin: | Dr. Szelneyi may refuse to answer any question propounded if such answer would subject him to a real and appreciable danger of criminal liability in the United States. |
| 17. | The fees and costs incurred which are reimbursable under the second paragraph of article 14 or under article 26 of the Convention will be borne by: | Apotex, Inc and Apotex, Corp. |

Representative:    Robert B. Breisblatt, Esq.
                  Welsh & Katz, Ltd.
                  120 S. Riverside Plaza
                  22nd Floor
                  Chicago, Illinois  60606-3912
                  United States of America
                  Tel. No.:   (312) 655-1500
                  Fax No.:   (312) 655-1501

18.  Date of Request:                    _____, 2007

19.  Signature and seal of the          _____
     Requesting authority:               Hon. Sue L. Robinson
                                         United States District Court Judge

20.  Attachment:                        Questionnaire for Dr. Istvan Szelenyi (Exhibit 1)
                                         List of Exhibits for Dr. Istvan Szelenyi (Exhibit 2)


Peter D. Dalleo, Clerk of Court

By:  _____

Seal of the
United States District Court
for the District of Delaware

795752 / 30136

7

# EXHIBIT 1

### Questionnaire For Dr. Istvan Szelenyi

**A.**    **Introduction**

Dr. Istvan Szelenyi, a former employee of Asta Pharma AG ("Asta Pharma"), is being asked to provide testimony pertaining to experiments he supervised in connection with the submission of two declarations by him to the United States Patent Office during the prosecution of the patent application for U.S. Patent No. 5,164,194 (the "'194 patent"). Dr. Szelenyi is being asked to provide testimony that is relevant to a lawsuit brought in the United States by MedPointe Healthcare Inc. ("MedPointe") against Apotex, Inc. and Apotex Corp. for the alleged infringement of the '194 patent. The '194 patent, entitled: "Azelastine Containing Medicaments," was originally assigned to Asta Pharma. MedPointe now owns the '194 patent. MedPointe has accused Apotex, Inc. and Apotex, Corp. of infringing the '194 patent in seeking approval to market, in the U.S., a generic azelastine nasal spray. Dr. Szelenyi is believed to have information relevant to the litigation based, at least, on his employment activities and experiments conducted while he was employed with Asta Pharma.

**A.**    **General Background Information**

1.    Will you please state your name and address?

2.    When were you born?

3.    Please describe your educational background including any degrees obtained?

4.    Do you speak English? Can you read and understand English.

5.    Please describe your employment history including the dates of employment and the identity of your employers?

## Questionnaire For Dr. Istvan Szelenyi

6.      What was your employment position during the time period between July 1989 and April 1991? What were your duties and responsibilities during this time period? Who was your immediate supervisor?

7.      Please identify any professional organizations that you have belonged to and your years of membership?

8.      Please identify any articles that you have authored and published?

9.      During your employment between 1983 and 1992, did you keep a journal, calendar, lab book, diary or other source for recording your work? If so, what is the present location of this material?

**B.      Preparation for Judicial Proceeding**

1.      What did you do to prepare for your testimony today?

2.      Did you meet with anyone to prepare for your testimony today? Who did you meet with and for how long?

3.      Did you review the documents that accompanied the Letters of Request from the United States court in preparation for your testimony today? What other documents, if any, did you review in preparation for your testimony today?

4.      Did the documents you reviewed help to refresh your recollection of events surrounding the development of an azelastine nasal spray and azelastine eye drops?

**C.      Szelenyi Exhibit 1 – U.S. Patent No. 5,164,194**

1.      Please take a look at **Szelenyi Exhibit 1** which is a copy of U.S. Patent No. 5,164,194, with a German translation attached. Do you recognize this patent?

### Questionnaire For Dr. Istvan Szelenyi

2.  Do you know Mr. Helmut Hettche, the named inventor on the '194 patent?
When and how did you meet Mr. Hettche?

3.  Generally, what role, if any, did you play in obtaining this U.S. patent for
Mr. Hettche and Asta Pharma?

4.  When did you first learn that Mr. Hettche was seeking a patent in the
United States for azelastine nasal and eye medicaments?  How did you first learn that Mr.
Hettche was seeking a patent in the United States for azelastine nasal and eye
medicaments?

**D.   Szelenyi Exhibit 2 – Declaration of Istvan Szelenyi dated January 23, 1990**

1.  Please take a look at **Szelenyi Exhibit 2**, entitled "Declaration Under 37
CFR 1.132," a German translation is attached.  Do you recognize this document?  What is
this document?

2.  Do you recognize your signature on the last page of **Szelenyi Exhibit 2**?

3.  Do you understand that **Szelenyi Exhibit 2** was filed in the U.S. Patent
Office in connection with the patent application filed on behalf of Mr. Hettche for
azelastine containing medicaments?

4.  Please describe generally your involvement in the preparation and
submission of your declaration, **Szelenyi Exhibit 2**, to the U.S. Patent Office?

5.  In the first sentence of paragraph 1 of **Szelenyi Exhibit 2**, you state that
"my training and experience have made me familiar with the effect of substances in
treatment of the effects of allergins on nasal and eye tissues."  Please describe in detail
your training and experience as it relates to the effect of substances for treatment of the
effects of allergins on nasal and eye tissues.  Please identify all substances that you had

### Questionnaire For Dr. Istvan Szelenyi

training and experience with for treatment of the effects of allergins on nasal and eye tissues before preparation of your declaration.

6.     As of January 23, 1990, you were employed by Asta Pharma, correct?

7.     Where in your declaration do you indicate that you are employed by Asta Pharma?  You state in paragraph 1 of **Szelenyi Exhibit 2** that you are "a physician," correct?

8.     In the second sentence of paragraph 1 of **Szelenyi Exhibit 2**, you state that: "Experiments have been conducted under my supervision to determine the effects of compounds disclosed in the above-identified application and the cited U.S. Patent No. 4,704,387."  What experiments were conducted under your supervision?  Please describe the experiments in detail including the compounds tested in the experiments.  Were these experiments conducted specifically for this declaration?

9.     What is your understanding as to why you were selected to supervise the experiments that are referenced in paragraph 1 of your declaration?  What were the reasons given to you as to why the experiments referenced in paragraph 1 of your declaration needed to be done?

10.     How did you learn which compounds were disclosed "in the above-identified application?"  Who provided you with the information from which you learned of the compounds disclosed "in the above-referenced application?"

11.     How did you learn what compounds were disclosed in the "cited U.S. Patent 4,704,387."  Who provided you with the information from which you learned of the compounds disclosed in the "cited U.S. Patent 4,704,387."  Did you have any previous experience with those compounds?  Had you ever compared those compounds

### Questionnaire For Dr. Istvan Szelenyi

to azelastine previously? Were you aware of anyone else comparing those compounds to azelastine?

12.    Please take a look at **Szelenyi Exhibit 3**, a copy of U.S. Patent No. 4,704,387 and the accompanying German translation. In connection with the experiments you supervised, did you have a copy of **Szelenyi Exhibit 3**?

13.    In 1990, did you have an understanding that four separate compounds were disclosed in U.S. Patent No. 4,704,387? Those compounds are referred to as "Example" in U.S. Patent No. 4,704,387, correct?

14.    In January 1990, did you know Dr. Jürgen Engel? How did you know Dr. Engel? What was Dr. Engel's employment position in January 1990?

15.    In January 1990, did you know Dr. Gerhard Scheffler? How did you know Gerhard Scheffler? What was Dr. Scheffler's employment position in January 1990?

16.    What work, if any, had you done with Dr. Engel or Dr. Scheffler before January 1990? Please describe the work you had done with Dr. Engel or Dr. Scheffler?

17.    Before January 1990, had you done any work with any of the compounds disclosed in U.S. Patent 4,704,387? Please describe the work you had done with any of the compounds disclosed in U.S. Patent 4,704,387.

18.    Who asked you to prepare **Szelenyi Exhibit 2**? What reasons were you given regarding the need for you to prepare this declaration?

19.    Did you have any direct contact with or communication with Mr. Hettche's U.S. patent attorney, Mr. Lawrence Hymo, in connection with the preparation of your declaration?

5

### Questionnaire For Dr. Istvan Szelenyi

20.    You indicate that the experiments were conducted "under my supervision" in paragraph 1 of your declaration. Who actually performed the experiments? When were the experiments performed? For each experiment, please identify the compounds that were used.

21.    What compounds disclosed in U.S. Patent 4,704,387 were tested in the experiments you supervised? Did you include all the tested compounds in your declaration? Why were these compounds from U.S. Patent 4,704,387 selected for use in the experiments?

22.    What compounds disclosed in the "above-identified patent application" were tested in the experiments you supervised? Why were these compounds from the patent application selected for use in the experiments?

23.    What were the results of each of the experiments supervised by you?

24.    Please take a look at the last page of your declaration, entitled "Inhibition of allergic histamine release from rat peritoneal mast cells." In the last sentence of paragraph 3 of your declaration, you indicate that "(t)he test procedure is described in the attached Appendix A."? Is this last page the Appendix A referred to in paragraph 3 of your declaration? Where are rat peritoneal mast cells located? Are mast cells located in the peritoneal cavity of rats similar to mast cells located in the nasal mucosa? Does this page disclose the specific compounds used in the described experiment?

25.    How were the results from the various experiments you supervised recorded? Who received information on the results of the various experiments you supervised and how was the information on the results given to him or her? What written

### Questionnaire For Dr. Istvan Szelenyi

records were made regarding the results of the experiments you supervised?  Do those written records still exist and, if so, where are they?

26.    Please describe how your declaration was prepared.  What language was your declaration originally prepared in?  Please describe your involvement in the preparation of your declaration?

27.    What were the goals of the various experiments performed under your supervision?

28.    Looking at the next to last sentence in paragraph 3 on page 2 of your declaration, you state that:  "The amount of inhibition of histamine release is calculated for each test substance."  Can you describe each test substance that was used in the experiments you supervised and the results obtained for each test substance?

29.    In paragraph 4 on page 2 of your declaration, you state:  "In the case of azelastine, the inhibition of liberation of histamine was 47.1% whereas, in the case of the compound in Example 1 of the cited Engel patent, the inhibition was only 24.4%."  You then conclude, in paragraph 5:  "Thus, azelastine was about twice as effective as the compound of Example 1 of the Engel patent."  The reference to the "Engel patent" is to U.S. Patent 4,704,387, correct?  How many rats were used to generate these results?  Did you repeat the studies?  Were these results ever subjected to peer review or were they published in any journal?  Were the results statistically significant?  In your opinion, were these results reliable?  Was it appropriate to conclude azelastine was better than the comparative compounds based on these experiments?

## Questionnaire For Dr. Istvan Szelenyi

30.     What was the exact concentration of azelastine that you used in concluding it was "about twice as effective as the compound of Example 1 of the Engel patent."

31.     What other azelastine concentrations were tested against the compound of Example 1 of the Engel patent?  What were the results, in terms of the inhibition of the liberation of histamine" with other azelastine concentrations compared to the compound of Exhibit 1 of the Engel patent?

32.     What were the results regarding the liberation of histamine for the compound of Example 2 in U.S. Patent 4,704,387 as compared to azelastine?  If you did not conduct an experiment using Example 2, why did you exclude a test of this compound?

33.     What were the results regarding the liberation of histamine for the compound of Example 3 in U.S. Patent 4,704,387 as compared to azelastine?  If you did not conduct an experiment using Example 3, why did you exclude a test of this compound?

34.     What were the results regarding the liberation of histamine for the compound of Example 4 in U.S. Patent 4,704,387 as compared to azelastine?  If you did not conduct an experiment using Example 4, why did you exclude a test of this compound?

35.     Other than your declaration, did you prepare a report or a memo of the results achieved in the experiments you supervised involving the comparison of the compounds in the patent application with the compounds in the Engel patent?  When, in relation to your declaration, was the report prepared and who received copies?

8

36.     Did you consult with Mr. Hettche regarding the experiments you supervised?  If so, what involvement did Mr. Hettche have in the experiments?

37.     Did you consult with Dr. Engel regarding the experiments you supervised?  If so, what involvement did Dr. Engel have in the experiments?

38.     Did you consult with Dr. Scheffler regarding the experiments you supervised?  If so, what involvement did Dr. Scheffler have in the experiments?

39.     Who prepared the azelastine compounds used in the experiments you supervised?

40.     Who prepared the compounds from the Engel patent used in the experiments you supervised?

41.     Would the experiment of **Szelenyi Exhibit 2** demonstrate azelastine was superior to the tested compounds when applied directly to the nose and eye?  If not, what would have been a proper study to conduct?

42.     Please review your first declaration.  Were all the statements in the first declaration true at the time you drafted them?  Are they true today?  If they are not, please explain why any statement in your first declaration is, in your opinion, no longer accurate or correct.

43.     Do you consider yourself as having expertise in allergy of the nose and eye?

E.     **Szelenyi Exhibit 4 – Declaration of Dr. Szelenyi Dated June 1, 1990**

1.     Please take a look at **Szelenyi Exhibit 4**, a copy of your Declaration dated June 1, 1990.  Do you recognize this document?  What is this document?

2.     Do you recognize your signature on the second page of this document?

9

## Questionnaire For Dr. Istvan Szelenyi

3.      Do you understand that **Szelenyi Exhibit 4** was also filed in the U.S. Patent Office in connection with the patent application filed on behalf of Mr. Hettche for an azelastine containing medicines?

4.      Why was it necessary for you to submit a second declaration to the U.S. Patent Office in connection with Mr. Hettche's patent application?  Who directed you to prepare a second declaration?

5.      Please describe generally your involvement in the preparation and submission of your second declaration, **Szelenyi Exhibit 4,** to the U.S. Patent Office?

6.      In the first paragraph of your second declaration, you state that "(i)n the experiments described in my previous declaration, the same amounts of the respective medicines were used, i.e., azelastine and the compound disclosed in Example 1 of U.S. Patent 4,704,387.  In each case, the amount used was $10\mu Mol/liter$ of mucus in the nasal cavity which was treated."  In your second declaration, you are representing to the U.S. Patent Office that your experiments involved treatment in the nasal cavity with a solution disclosed in the patent application and a solution of the compound of Example 1 of U.S. Patent 4,704,387, correct?  Does this description of the study conducted for your first declaration accurately describe the experimental method of that study?  If not, how is it different?

7.      The experiment described in your first declaration, **Szelenyi Exhibit 2,** involved rat peritoneal mast cells, correct?  Why did you represent to the patent office that azelastine and the comparative compounds of the first study were applied directly to the nasal cavity of a rat?  Do these experiments describe a different experimental method

10

## Questionnaire For Dr. Istvan Szelenyi

than the one you described in **Szelenyi Exhibit 2**? Where are the results of the experiment described in **Szelenyi Exhibit 4**? What were the results?

8.    What experiments did you supervise involving the administration of the compound disclosed in Example 1 of U.S. Patent 4,704,387 to "the nasal cavity which was treated"?

9.    If the experiments you are referring to in your second declaration are different than the experiment described in your first declaration, please describe in detail the experiments conducted that are referenced in your second declaration, **Szelenyi Exhibit 4**? Where, in your second declaration, do you tell the U.S. Patent Office that you are using a different experiment?

10.    In the second paragraph of **Szelenyi Exhibit 4,** you state that "(t)he concentration of the active component in the solution which was sprayed, in each case, was 0.01%, and 0.1 ml was sprayed in each case." Where in **Szelenyi Exhibit 2** do you describe spraying azelastine? If the experiment described in **Szelenyi Exhibit 4** involved spraying solutions of azelastine and/or comparative compounds, what was the solution being sprayed upon? What was the active component of the compound of Example 1 of U.S. Patent No. 4,704,387? What were the other ingredients and their concentrations in the azelastine solution identified in your second declaration? What were the other ingredients and their concentrations in the solution of Example 1 of U.S. Patent No. 4,704,387 identified in your second declaration.

11.    The second sentence of the second paragraph of your declaration, **Szelenyi Exhibit 4**, states that "(i)n each case, the nasal cavity contained about 2.5 ml mucus." You conclude that "it can be computed that the concentration of the active component in

Questionnaire For Dr. Istvan Szelenyi

the nasal cavity was, as mentioned above, 10 µMol/liter." What nasal cavity are you referring to?

    12.    Were additional experiments conducted with regard to your second declaration, **Szelenyi Exhibit 4**? If so, please describe the experiments and the solutions used in those experiments. Were you using an experimental rat model in these experiments? If not, what research animals were you using?

    13.    The date you signed your first declaration, **Szelenyi Exhibit 2**, is January 23, 1990 and the date you signed your second declaration, **Szelenyi Exhibit 4**, is June 1, 1990, correct? Before June 1, 1990, did you conduct or supervise any experiments or studies involving the application of solutions disclosed in the patent application to nasal cavities? If so, please describe the experiments or studies you conducted or supervised and the solutions involved? Please describe the results of the experiments or studies.

    14.    Before June 1, 1990, did you conduct or supervise any experiments or studies involving the application of any of the compounds disclosed in U.S. Patent 4,704,387 to nasal cavities or to the eyes? If so, please describe the experiments or studies you conducted or supervised? Please describe the results of the experiments or studies you conducted or supervised and the compounds used from U.S. Patent 4,704,387. Please describe the results of the experiments or studies.

    15.    In connection with the experiments you supervised as reported in your first declaration, **Szelenyi Exhibit 2**, were you aware of any other experiments or studies conducted at Asta Pharma or at any other location comparing the effects of azelastine with any of the compounds disclosed in U.S. Patent 4,704,387? If so, what experiments and studies were you aware of? Please describe the solutions used in the studies and the

results of the experiments or studies. How did you learn about these other experiments or studies comparing the effects of azelastine with any of the compounds of U.S. Patent 4,704,387?

      16.    In connection with the experiments you supervised as reported in your first declaration, **Szelenyi Exhibit 2**, were you aware of any other experiments or studies conducted for Asta Pharma or at any other location comparing the effects of azelastine with any of the compounds disclosed in U.S. Patent 4,704,387? If so, what experiments and studies were you aware of? Please describe the solutions used in the studies and the results of the experiments or studies.

      17.    Before November 3, 1987, did you become aware of experiments or studies conducted by or for Asta Pharma showing that the antiallergic activity of the compounds of Examples 2 and 4 disclosed in U.S. Patent 4,704,387 were three times as strong as astelizine? If so, when and how did you become aware of these experiments or studies?

      18.    By April 1991, had you learned that experiments or studies had been conducted by or for Asta Pharma that confirmed that compounds disclosed in U.S. patent 4,704,387 were stronger than azelastine?

      19.    What involvement, if any, did Mr. Hettche have in the preparation of your second declaration, **Szelenyi Exhibit 4**?

      20.    Please review your second declaration, **Szelenyi Exhibit 4**. Were all the statements in your second declaration true at the time you drafted them? Are they true today? If they are not, please explain why any statement in your second declaration is, in your opinion, no longer accurate or correct.

## Questionnaire For Dr. Istvan Szelenyi

21.     Other than your two declarations and the experiments conducted in connection with your two declarations, what other involvement did you have with the U.S. patent application filed by Mr. Hettche relating to an azelastine nasal spray or an azelastine eye drop?

## F.     Dr. Achterrath-Tuckermann

1.     Do you know Dr. Achterrath-Tuckerman?  If so, how do you know Dr. Achterrath-Tuckerman?  If you know Dr. Achterrath-Tuckerman, did you consult with her in connection with any of the experiments you supervised regarding the effects of azelastine with compounds disclosed in U.S. Patent 4,704,387?  Please describe what you discussed with Dr. Achterrath-Tuckerman as it relates to the experiments you supervised in connection with your declarations.

2.     At any time before November 17, 1992, did you learn that experiments or studies had been conducted that demonstrated that the antiallergic effects of any of the compounds disclosed in U.S. Patent 4,704,387 were stronger that azelastine?  If so, what did you learn about these experiments or studies?

3.     After submission of you second declaration in June 1990, did you supervise or conduct any other experiments or studies regarding the compounds disclosed in the application for the '194 patent?  If so, please describe the experiments or studies you conducted, the compounds used, and the results obtained?

4.     In connection with the experiments you supervised and the preparation of your declarations, did you receive additional compensation from anyone for this work?  If so, what was the additional compensation that you received?

14

### Questionnaire For Dr. Istvan Szelenyi

**G.    Lawrence Hymo**

1.    Have you ever met Mr. Lawrence Hymo in person and, if so, please generally describe the circumstances where you have met Mr. Hymo in person.

2.    When was the last time you had any contact with Mr. Hymo? What were the circumstances that last brought you into contact with Mr. Hymo?

**H.    Dr. Naresh Chand**

1.    Do you know Dr. Naresh Chand, a former Carter-Wallace, Inc. employee? How do you know Dr. Chand?

2.    Have you attended any meetings at which Dr. Chand was present? What meetings have you attended where Dr. Chand was present? When were the meetings held? What was the subject matter of each meeting you attended at which Dr. Chand was present?

3.    Have you ever reviewed any abstracts, articles or publications where Dr. Chand is listed as an author? If so, please identify the abstracts, articles or publications and when you reviewed them. Please also identify the subject matter of any abstract, article or publication you have reviewed where Dr. Chand is listed as an author.

4.    Have you ever reviewed any reports, studies or memoranda prepared by Dr. Chand at Carter-Wallace, Inc. If so, please identify the reports, studies or memoranda prepared by Dr. Chand that you have reviewed and when you reviewed them. Please describe the subject matter of any reports, studies or memoranda prepared by Dr. Chand that you have reviewed.

5.    Are you aware of any studies conducted by Dr. Chand or any other person at Carter-Wallace, Inc. comparing azelastine with any of the compounds of U.S. Patent

15

### Questionnaire For Dr. Istvan Szelenyi

No. 4,704,387, **Szelenyi Exhibit 3**?  Who conducted those studies?  When were those studies conducted?  What were the results of those studies?  Why were those studies conducted?

6.      Are you aware of any studies conducted by Dr. Chand or by any other person at Carter-Wallace, Inc. utilizing rat leukocytes to compare the effectiveness of azelastine as an antihistamine to any of the compounds of U.S. Patent No. 4,704,387, **Szelenyi Exhibit 3**?  Who conducted those studies?  When were those studies conducted?  What were the results of those studies?  Why were those studies conducted?

7.      Are you aware of any studies conducted by Dr. Chand or by any other person at Carter-Wallace, Inc. utilizing rat peritoneal mast cells to compare the effectiveness of azelastine as an antihistamine with any of the compounds of U.S. Patent No. 4,704,387, **Szelenyi Exhibit 3**?  Who conducted those studies?  When were those studies conducted?  What were the results of those studies?  Why were those studies conducted?

8.      Were any of the studies conducted by Dr. Chand or any other person at Carter-Wallace, Inc. disclosed to the United States Patent Office in connection with the patent application that issued as U.S. Patent 5,164,194?  If not, why didn't you include the results of these studies or mention these studies in connection with the preparation of your declarations?  Were any studies conducted utilizing rabbit leukocytes disclosed to the United States Patent Office?  If not, why didn't you include the results of these studies or mention these studies in your daclarations?

9.      Did you ever tell Dr. Hettche that studies had been conducted before the date of the submission of your first declaration to the U.S. Patent Office indicating that

Questionnaire For Dr. Istvan Szelenyi

some of the compounds of U.S. Patent 4,704,387, **Szelenyi Exhibit 3**, were stronger than azelastine?

10.    Have you ever traveled to Carter-Wallace, Inc. in the United States? If so, please identify the visits you have made to Carter-Wallace, Inc. in the United States. When did you visit Carter-Wallace, Inc.? What was the purpose of your visit to Carter-Wallace, Inc.? Who did you meet with at Carter-Wallace, Inc.?

**I.    Dr. R. Duane Sofia**

1.    Do you know Dr. R. Duane Sofia, a former Carter-Wallace, Inc. employee? How do you know Dr. Sofia?

2.    Have you attended any meetings at which Dr. Sofia was present? What meetings have you attended where Dr. Sofia was present? When were the meetings held? What was the subject matter of each meeting you attended at which Dr. Sofia was present?

3.    Have you ever reviewed any abstracts, articles or publications where Dr. Sofia is listed as an author? If so, please identify the abstracts, articles or publications and when you reviewed them. Please also identify the subject matter of any abstract, article or publication you have reviewed where Dr. Sofia is listed as an author.

4.    Have you ever reviewed any reports, studies or memoranda prepared by Dr. Sofia at Carter-Wallace, Inc. If so, please identify the reports, studies or memoranda prepared by Dr. Sofia that you have reviewed and when you reviewed them. Please describe the subject matter of any reports, studies or memoranda prepared by Dr. Sofia that you have reviewed.

**Questionnaire For Dr. Istvan Szelenyi**

**J.    Reading Material**

1.    In the 1980 - 1992 time frame, did you subscribe to any scholarly or scientific journals or papers?  If so, please name the journals or papers to which you subscribed?

2.    In the 1980 - 1992 time frame, did Asta Pharma subscribe to scholarly or scientific journals or papers that were routed to you for review?

3.    In the 1980 - 1992 time frame, did you have access to a scientific library for research?  If so, what library?

4.    In the 1980 - 1992 time frame, did you keep a collection of books in your office or work space?  If so, what were some of the titles of the books you had in your office or work space?

5.    In the 1980 - 1992, please identify the reference books or treatises that you may have consulted on a regular basis in connection with your work?

**K.    Miscellaneous Issues**

1.    Before 1985, what other medicaments for topical application to the nose and eye were on the market for the treatment of symptoms of allergy including, but not limited to allergy-related rhinitis, normal common colds and the vasomotor cold?  What were the names of the products and who were the manufacturers?  If you know, what were the formulations of the various nasal sprays on the market?

2.    Before 1985, did Asta Pharma AG have any medicaments for topical application to the nose and eye on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?  If so, what were the products and what were their active ingredients?

18

# EXHIBIT 2

## List of Exhibits for Dr. Istvan Szelenyi

1.    U.S. Patent No. 5,164,194 (with German translation).

2.    Declaration of Dr. Szelenyi dated January 23, 1990 (with German translation).

3.    U.S. Patent No. 4,704,387 (with German translation).

4.    Declaration of Dr. Szelenyi dated June 1, 1990 (with German translation).

# EXHIBIT D

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Anne Toker
To Call Writer Directly:
212 446-4901
atoker@kirkland.com

212 446-4800

www.kirkland.com

Facsimile:
212 446-4900
Dir. Fax: 212 446-6460

April 6, 2007

**BY ELECTRONIC MAIL**
**AND FIRST CLASS MAIL**

Stephen P. Benson, Esq.
Welsh & Katz, Ltd.
Suite 2200
120 S. Riverside Plaza
Chicago, Illinois 60606

Re:     *MedPointe Healthcare Inc. v. Apotex Inc. and Apotex Corp.,*
        Civil Action No. 06-164-SLR (D. Del.)

Dear Stephen:

I write regarding the scope of discovery sought in Apotex's motion for judicial assistance in obtaining testimony from Dr. Helmut Hettche pursuant to the Hague Convention.

MedPointe has the following objections to the questions intended for Dr. Hettche that you sent to us on April 3, 2007:

LC 1.    MedPointe objects to all questions that call for legal conclusions, including questions D4-D7, E1-E3, E5-7, E9, E12, E14, F10-12, H4, H8, H9, and N1;

P 2.    MedPointe objects to all questions that invite Dr. Hettche to reveal privileged information, including E10, N1-3, P1-4, Q1-6, R1, V1-5, X1, DD10, DD18, DD24-31, EE4, EE10, and FF2-5.

We note in particular that questions FF2-5 improperly ask Dr. Hettche to discuss the content of documents that MedPointe has withheld and logged as protected by the attorney client and/or work product privileges.

Chicago      Hong Kong      London      Los Angeles      Munich      San Francisco      Washington, D.C.

**KIRKLAND & ELLIS LLP**

Stephen P. Benson, Esq.
April 6, 2007
Page 2

Sincerely,

Anne S. Toker

<u>**Questionnaire For Mr. Helmet Hettche**</u>

**A.** <u>**Introduction**</u>

Mr. Helmut Hettche is identified as the named inventor on United States Patent No. 5,164,194 ("'194 patent") that issued on November 17, 1992. The '194 patent is entitled: "Azelastine Containing Medicaments." The '194 patent was originally assigned to Asta Pharma AG. The '194 patent is now owned by MedPointe Healthcare, Inc. The '194 patent claims a date of priority based on the filing of a German patent application (P 37 38 681.6) on November 13, 1987. MedPointe has accused Apotex, Inc. and Apotex, Corp. with infringing the '194 patent in seeking approval to market, in the U.S., a generic azelastine nasal spray.

**B.** <u>**General Background Information**</u>

1.   Will you please state your name and address?

2.   When were you born?

3.   Please describe your educational background including any degrees obtained?

4.   Do you speak English? Can you read and understand English.

5.   Please describe your employment history including the dates of employment and the identity of your employers?

6.   Between 1983 and 1992, what are the employment positions you held? For each position, please identify your duties and responsibilities as well as the identity of the person or persons to whom you reported.

7.   Did you ever work for Asta-Werke AG? If so, when did you work for Asta-Werke AG and what positions did you hold?

8.   Was Asta-Werke AG related in any way to Asta Pharma and, if so, what was that relationship if you know?

1

**Questionnaire For Mr. Helmet Hettche**

     9.     Have you ever been a member of any professional organizations? If so, please identify the professional organizations and your years of membership?

     10.     Have you authored any articles for publication? If so, please identify the articles that have been published where you are identified as an author?

     11.     During your employment between 1983 and 1992, did you keep a journal, calendar, lab book, diary or other source for recording your work?

**C.**     **Preparation for Judicial Proceeding**

     1.     What, if anything, did you do to prepare for your testimony today?

     2.     Did you meet with anyone to prepare for your testimony today? Who did you meet with and for how long?

     3.     Did you review the documents that accompanied the Letters of Request from the United States court in preparation for your testimony today? What other documents, if any, did you review in preparation for your testimony today?

     4.     Did the documents you reviewed help to refresh your recollection of events surrounding your development of an azelastine nasal spray and azelastine eye drops?

**D.**     **Hettche Exhibit 1 – German Priority Document to '194 Patent**

     1.     Please take a look at **Hettche Exhibit 1**? Do you recognize this document? What is this document? Who prepared this document? Why was this document prepared? If you did not prepare this document, what involvement, if any, did you have in its preparation? Does your name appear anywhere in **Hettche Exhibit 1**?

     2.     Please take a look at **Hettche Exhibit 2** which is a copy of U.S. Patent No. 5,164,194, with a German translation attached. Do you recognize this patent?

     3.     Are you the sole named inventor on the U.S. '194 patent – **Hettche Exhibit 2**?

## Questionnaire For Mr. Helmet Hettche

 Looking at **Hettche Exhibit 1** and **Hettche Exhibit 2**, do you understand that there is a relationship between these two exhibits? What is that relationship to the best of your knowledge?

 Referring to **Hettche Exhibit 1**, please tell us generally what this document is about?

 Referring to **Hettche Exhibit 2**, please tell us generally what this patent is about?

Are the claims of **Hettche Exhibit 1** and **Hettche Exhibit 2** the same? If not, how do they differ?

8. To your knowledge, in what other countries were patents obtained for azelastine containing medicaments where you are the sole named inventor?

### E. European Patent No 0 316 633

Please take a look at **Hettche Exhibit 3** which is a copy of European Patent 0 316 633. Do you recognize this patent? Are you the sole named inventor on **Hettche Exhibit 3**? Can you please tell us generally what **Hettche Exhibit 3** is about?

Looking at **Hettche Exhibit 3** and **Hettche Exhibit 2**, is there any relationship between these two patents and, if so, what is the relationship? Do both of these patents seek patent protection for your development of azelastine containing medicaments?

Looking at **Hettche Exhibit 3** and **Hettche Exhibit 1**, is there any relationship between these two exhibits and, if so, what is the relationship?

4. Please take a look at **Hettche Exhibit 4**, a copy of the decision of the Opposition Division of the European Patent Office mailed on March 28, 1996 with an attached English translation. Do you recognize this document? Who filed an opposition proceeding against your European patent, **Hettche Exhibit 3**? Who is Chemical Pharmaceutical Company, GmbH? At

3

## Questionnaire For Mr. Helmet Hettche

the time, was Chemical Pharmaceutical Company, GmbH a competitor of Asta Pharma AG?

☞    Is it correct that the Opposition Division of the European Patent Office revoked your European patent, **Hettche Exhibit 3**?  What is your understanding of the reasons that the Opposition Division gave for revoking your European patent, **Hettche Exhibit 3**?

☞    Please take a look at **Hettche Exhibit 5**, a copy of the Decision of the Technical Court of Appeals dated April 5, 2000.  Do you recognize this document?  Is it correct that the Decision of the Technical Court of Appeals affirmed the March 1996 decision of the Opposition Division of the European Patent Office?  What is your understanding of the reasons that the Technical Court of Appeals gave for revoking your European patent, **Hettche Exhibit 3**?

☞    Is it correct that, as a result of the decisions of the Opposition Branch of the European Patent Office and the Technical Court of Appeals, your European patent, **Hettche Exhibit 3**, is revoked?

8.    Please take a look at **Hettche Exhibit 6**, a copy of German Offenlegungsschrift 21 64 058 (with an English translation attached).  Do you recognize this patent?

☞    Looking at **Hettche Exhibit 5**, the decision of the Technical Court of Appeals, please turn to page MPAT0000247, do you see the reference at paragraph II to "DE-C-2 164 058?  Do you understand that reference to be the same as **Hettche Exhibit 6**, Offenlegungsschrift 21 64 058?

10.    On page 17 of **Hettche Exhibit 5** (MPAT 0000263), the Technical Court of Appeals notices evidence that topical antihistamines are known in the art, and that "considerable amounts of these preparations were still in use."  To the best of your knowledge, please identify all topical antihistamine preparations that were known in the art at the time you first conceived of nasal and eye medicaments containing azelastine?  Did you consider any of these formulations

4

<u>**Questionnaire For Mr. Helmet Hettche**</u>

when arriving at the nasal and eye medicaments containing azelastine?

      11.    Please take a look at **Hettche Exhibit 7**, a copy of U.S. Patent No. 3,813,384 (with a German translation attached)?  Are you familiar with this patent?

      Referring to **Hettche Exhibit 6**, Offenlegungsschrift 21 64 058, and **Hettche Exhibit 7**, is it your understanding that there is a relationship between these two patents?  What is that relationship?  Is it correct that **Hettche Exhibit 7** is the U.S. counterpart patent to **Hettche Exhibit 6**?

      13.    Referring to **Hettche Exhibit 5**, what role, if any, did you play in the opposition proceedings that resulted in the April 5, 2000 decision of the Technical Court of Appeals of the European Patent Office?

      Looking at **Hettche Exhibit 5** at paragraph III under the heading"Facts and Claims" (MPAT0000247-248), could you please describe what the list of publications represents?

**F.**    <u>**Azelastine**</u>

      1.    Please describe all of the work you have done with azelastine?  In what forms, i.e. sprays, tablets, ointments, etc. have you worked with azelastine?  Please identify, in order, the forms of azelastine you worked with and when.

      2.    During what period of time in your employment history did you work with azelastine?

      3.    Generally, please describe the various symptoms, illnesses or conditions that you were aware of that are treatable with azelastine?  When did you first know that azelastine could be used to treat the symptoms, illnesses or conditions that you just described?

5

## Questionnaire For Mr. Helmet Hettche

4.    When did you first know of the anti-allergic and anti-histamine properties of azelastine?

5.    **Hettche Exhibit 6** is a copy of German Patent No. 21 64 058   Have you seen this German '058 patent before?

6.    When did you first became aware of the existence of **Hettche Exhibit 6**?

7.    Please describe the circumstances under which you first became aware of the German '058 patent.

8.    At the time you became aware of the existence of **Hettche Exhibit 6**, the German '058 patent, did you read it?  When do you recall first reading **Hettche Exhibit 6**, the German '058 patent?  When was the last time you recall reading **Hettche Exhibit 6**?

9.    Looking at **Hettche Exhibit 1**, the German '681 patent, on page 5 (MP0034), do you see where the German '681 patent is cited?

In the German '681 patent application, it is stated that the German '058 patent disclosed the anti-allergic and antihistimine properties of azelastine, correct?

Looking at **Hettche Exhibit 2**, the German '058 patent is cited as disclosing the anti-allergic and antihistimine properties of azelastine at Col. 1, lines 29-31, correct?

Looking at **Hettche Exhibit 6**, do you agree that this patent discloses the anti-allergic and anti-histamine properties of azelastine?

13.    Please describe generally how you got involved in developing a nasal spray containing azelastine?

14.    With regard to a nasal spray containing azelastine, what symptoms, illnesses or conditions were you trying to treat with a nasal spray?

6

## Questionnaire For Mr. Helmet Hettche

15.    Please describe generally how you got involved in developing azelastine eye drops?

16.    With regard to azelastine eye drops, what symptoms, illnesses or conditions were you trying to treat with a eye drops?

17.    What research into papers, publications, treatises, reference materials and patents did you conduct in connection with the development of an azelastine nasal spray.

**G.    Inventorship**

1.    When did you begin to work on an azelastine nasal spray?

2.    When did you begin to work on azelastine eye drops?

3.    **Hettche Exhibit 8** is a December 1982 Asta-Werke AG Toxicology Report. Are you familiar with this report? When did you first become aware of this report? Did you have any involvement in the study underlying this report? Do you have any understanding as to why Asta-Werke AG conducted the underlying study and prepared the Toxicology Report?

4.    At the time of the Asta-Werke AG Toxicology Report, were you working at Asta-Werke, AG?

5.    Referring to page ATI00001105 of **Hettche Exhibit 8**, please review the first full paragraph. Could you please describe your understanding of the substance of this first paragraph.

6.    What involvement, if any, did you have in the formulation of 0.1% azelastine solution to be applied to the eyes of guinea pigs as described in the first paragraph on page ATI00001105? What is meant by the statement that A 5610 acts like most antihistamines?

7.    Were you aware that your employer, Asta-Werke AG, in the 1982 time-frame was conducting studies of azelastine solutions for application to the eyes of guinea pigs? If so, how

7

## Questionnaire For Mr. Helmet Hettche

did you know about this study?

8.    Please review Abstract 76 in **Hettche Exhibit 9**, referring to an article by Dr. Chand and others involving the effect of aerosolized azelastine on guinea pigs published in 1985 in Pharmacologist. Having reviewed Abstract 76, do you understand that Dr. Chand describes a 1% aerosolized solution of azelastine? Do you also understand that Dr. Chand reports that a 1% aerosolized solution of azelastine administered to guinea pigs had a prophylactic effect before an allergen challenge?

9.    Did you have any involvement in the study conducted by Dr. Chand as reported in **Hettche Exhibit 9**? If so, what was your involvement? Did you suggest or participate in the selection of a 1% aerosolized solution for use in the study conducted by Dr. Chand?

10.    Prior to 1985, please describe other tests and studies you were aware of involving azelastine solutions and your participation, if any, in these tests or studies?

11.    Please describe the circumstances that led you to begin work on the development of an azelastine nasal spray and eye medicaments? Which came first, the development of an azelastine nasal spray or an azelastine eye medicament? Whose idea was it to use the azelastine solution as a nasal and eye medicament?

12.    Please identify who, if anyone, you worked with in developing an azelastine nasal spray?

13.    At the time you began to work on azelastine nasal and eye medicaments, what other nasal and eye medicaments were you aware of? What were the ingredients that were used in other nasal and eye medicaments and what symptoms, illnesses or conditions were they used to treat?

8

## Questionnaire For Mr. Helmet Hettche

14.    At the time you began to work on azelastine nasal and eye medicaments, what other nasal and eye medicaments were you aware of that contained antihistamines?

15.    What, if anything, did you know about azelastine that led you to believe it should be used in nasal and eye medicaments?

**H.    Timing Of Development Of Azelastine Nasal Spray**

1.    When did you first produce an azelastine nasal spray?

2.    What was the concentration of the first azelastine nasal spray you developed?

3.    What concentrations did you consider in formulating your first azelastine nasal spray? How did you decide on those concentrations?

Referring to **Hettche Exhibit 2**, your U.S. '194 patent, please review Col. 2, lines 35 through 47. You have identified water as the preferred solvent for the azelastine nasal spray and eye drops, is that correct? Is it also your understanding that your U.S. '194 patent, **Hettche Exhibit 2**, states that azelastine nasal drops and sprays, "preferably" contain preservatives and stabilizers, but that nasal drops and sprays can be formulated without preservatives and stabilizers?

5.    What preservatives or other excipients did you include in the first azelastine nasal spray you developed that included preservatives and excipients? At the time you included preservatives and excipients in your azelastine formulation, were you aware of other nasal or eye medicaments using those preservatives and/or excipeints? How did you decide on the specific preservatives and excipients you used in your azelastine nasal formulation?

6.    What was the concentration of the preservatives or other excipients you included in the first azelastine nasal spray? Were you aware of other nasal or eye medicaments using those same preservatives and/or excipients that you selected?

9

**Questionnaire For Mr. Helmet Hettche**

7.    Please take a look at **Hettche Exhibit 10** (AS-MEDA0001568), a document produced by MedPointe from the files of Asta-Meda? Do you recognize this document? Do you recognize that this document was produced from a folder that bears your handwriting? Did you draw the box around the text for "Beispiel 24" on this document? Why did you do so? Were you aware of Beispiel 24 at the time you suggested producing nasal and/or eye medicaments containing azelastine?

What would be the percent (weight/weight) of azelastine contained in a medicament produced by dissolving 0.3g of azelastine in 100ml of sterilized water? Would this percent concentration fall within the range of claim 2 of **Hettche Exhibit 2**, the '194 patent? Would this percent concentration fall within the range of claim 3 of **Hettche Exhibit 2**, the '194 patent? Would this percent concentration fall within the range of claim 4 of **Hettche Exhibit 2**, the '194 patent?

If a medicament was produced according to Beispiel 24 in **Hettche Exhibit 10** using azelastine as disclosed in **Hettche Exhibit 6**, would that formulation fall within the range of claims 2, 3 and 4 of **Hettche Exhibit 2**? Would the formulation be an aqueous solution?

**I.    Hettche Exhibit 11**

1.    Please take a look at **Hettche Exhibit 11** (AS-MEDA0000601-602). Do you recognize this document?

2.    Did you receive a copy of this document on or around September 6, 1985? Does the reference in the "Cc" to "Dr. He" refer to you?

3.    At the time of **Hettche Exhibit 11**, what was Dr. Aurich's employment position? What was Prof. Dr. Breuel's employment position?

4.    How did Dr. Aurich become aware that you produced an A 5610 nasal spray?

10

## Questionnaire For Mr. Helmet Hettche

5.    Is there any significance to the identification of the azelastine nasal spray as "A 5610"? Was there a classification system for identifying samples of azelastine nasal spray. What does the "A" denote, if anything? What does the number "5610" denote, if anything?

6.    When did you first produce the A 5610 nasal spray referenced in **Hettche Exhibit 11?**

7.    Was the nasal spray identified in **Hettche Exhibit 11** the first azelastine nasal spray you developed? If not, please describe the formulation and ingredients of other azelastine nasal sprays you developed before the A 5610 nasal spray referenced in **Hettche Exhibit 11.** How were these earlier azelastine nasal spray formulations identified?

8.    How did you arrive at the formulation using 0.1% solution of azelastine.?

9.    What preservatives or other excipients did you use in the nasal spray referenced in **Hettche Exhibit 11** ? What was the concentration of the preservatives or other excipients used in A 5610? How did you determine the concentrations?

10.    Who was Dr. Molliere? What was his employment position at the time? How did Dr. Molliere's employment position compare to yours?

11.    What role did Dr. Molliere play in the development of the nasal and eye medicaments containing azelastine? What role did Dr. Molliere play in the development of the azelastine nasal spray formulation referenced in **Hettche Exhibit 11**?

12.    What was the exact formulation of the azelastine nasal spray self-administered by Dr. Molliere and you including any preservatives, stabilizers or other excipients or impurities? Was there any difference between the nasal spray formulations tested by you and tested by Dr. Molliere? If so, what was the exact formulation of the azelastine nasal spray self-administered by Dr. Molliere, including any preservatives, excipients of impurities?

11

## Questionnaire For Mr. Helmet Hettche

13.     Did you conduct any testing before you and Dr. Molliere personally used the A 5610 nasal spray?

14.     Did you conduct any testing in determining the concentration levels used in A 5610?

15.     What prompted you to select azelastine?

16.     At the time of **Hettche Exhibit 11**, were you working on the development plan for Azelastine in tablet form as referenced by Dr. Aurich? If so, what was your role?

17.     In **Hettche Exhibit 11**, on the second page, Dr. Aurich refers to Hismanal (astemizole). Did you know about this product at the time? What was this product? Who introduced it in Germany? Was Hismanal a nasal spray? Did you know the formulation of Hismanal?

18.     Was your work on the formulation of an azelastine nasal spray approved, in advance, by your superiors?

19.     Dr. Aurich writes in **Hettche Exhibit 11** that Dr. Muckenschnabel suggested there would be no problem producing solutions that were half and twice the dosage of the 0.1% solution you produced. Prior to Sep. 6, 1985, did you suggest to Dr. Muckenschnabel that he produce azelastine solutions that were half and twice the dosage of the 0.1% solution you produced?

20.     Dr. Aurich also writes that "with this dosage it can be assumed that respective studies regarding fitness to drive will not produce any evidence of drowsiness." Do you agree with this statement? Why?

21.     Dr. Aurich also suggests supplementing development to include "simultaneously such nasal spray as well as eye drops." Is it true that Dr. Aurich was the first to suggest using the

12

<u>Questionnaire For Mr. Helmet Hettche</u>

azelastine solution as an eye drop?  If not, who suggested to Dr. Aurich that the azelastine

solution could be used as an eye drop and when?

22.    Did Dr. Molliere  and you self-administer any azelastine eye drop formulations

prior to September 6, 1985.  If so, please identify the exact formulation of the azelastine eye drop

formulation and when it was self-administered by Dr. Molliere and you?

23.    Before September 6, 1985, please identify any studies conducted by you or under

your direction concerning the application of an azelastine solution directly to the eye?

**J.    Hettche Exhibit 12**

1.    Please take a look at **Hettche Exhibit 12** produced by Asta-Meda as AS-

MEDA0004168-4169.  Do you recognize this document?  Did you prepare this document?

2.    What is meant by the title "Notice to Dr. Herbst?"

3.    On the first page, under Azelastine nasal spray is a reference to "PEGF-Dr. He/Jg

of 9/30/1985"  What does this refer to?  Who does "Dr. He" refer to?  Who does "Jg" refer to?

What does PEGF refer to?  Please describe this Notice of September 30, 1985?  Why did you

prepare this notice and who was it directed to?

4.    In your first sentence, you write: "Corresponding to the above-named notice and

a decision of the research coordinate on 10/17/85, the development of Azelastine nasal spray has

started at 0.05%, 0.1%, and 0.2% Azelastine hydrochloride."  What are you referring to when

you refer to the "above-named notice."  What does the 'research coordinate" refer to?  Were the

0.05%, 0.1%, and 0.2% solutions developed in response to Dr. Muckenschnabel's suggestions

that they could easily be formulated?  Who produced these solutions?  Did Dr. Muckenschnabel

direct the persons producing these solutions?

13

## Questionnaire For Mr. Helmet Hettche

5.    At the bottom of page 1 and the top of page 2 of **Hettche Exhibit 12**, you describe the 0.2% solution produced at the suggestion of Dr. Muckenschnabel. Who was responsible for choosing the preservatives and excipients described in **Hettche Exhibit 12**? Was this the first time preservatives and excipients were used in solutions containing azelastine?

6.    In the last sentence on page 2 of **Hettche Exhibit 12**, you indicate that the 0.2% solution "was released for animal experimentation with AN 76 0001 of 1/23/86." What does AN 76 0001 refer to? The 0.2% solution was released for animal experimentation after Dr. Molliere and you had self-administered a 0.1% azelastine solution, correct?

**K.    Hettche Exhibit 13**

1.    Please take a look at **Hettche Exhibit 13**. Did you prepare this document on or about August 13, 1990? In the first paragraph, you indicate Carter Wallace suggested adjusting the pH of the nasal formulation. Who made the suggestion at Carter Wallace? What role did Carter Wallace play in formulating nasal and eye formulations containing azelastine?

**L.    Hettche Exhibit 14**

1.    Please take a look at **Hettche Exhibit 14** (AS-MEDA0001938). Do you recognize this document? It this document in your handwriting?

2.    What is the date of **Hettche Exhibit 14**?

3.    What prompted you to prepare this note?

4.    What is this note about?

5.    Does the reference to "nasal spray" refer to a nasal spray containing azelsastine?

6.    Was this the first time you determined that an azelastine nasal spray had positive results for treating a regular cold? What do you mean by "positive results"? How did you measure the results?

14

<u>**Questionnaire For Mr. Helmet Hettche**</u>

7.    How did the azelastine nasal spray referenced in **Hettche Exhibit 14** compare to A 5610 referenced in **Hettche Exhibit 11**?  What were the similarities?  What were the differences?

8.    As of February 18, 1986, had a three month stability trial been conducted as mentioned by Dr. Aurich in **Hettche Exhibit 11** ?  If so, what was the result of the stability trial? What is a stability trial?

9.    As of February 18, 1986, had a local compatibility trial been conducted as mentioned by Dr. Aurich in **Hettche Exhibit 11**?  What is meant by a local compatibility trial?

10.    What were the results of the local compatibility trial?

**M.    Hettche Exhibit 15**

1.    Please take a look at **Hettche Exhibit 15 (AS-MEDA0000600)**.  Do you recognize this document?  Generally, what is this document?

2.    What is the date of **Hettche Exhibit 15**?

3.    Who is Dr. Ulbrich and what was his position at the time you prepared this document?

4.    Why did you prepare this document?

5.    What do you mean when you write that "the tests currently performed deal with a clarification of the effectiveness of Azelastine nasal spray for seasonal rhinitis?"

6.    You refer to your own experience with the effectiveness of the nasal spray during a common cold.  Is this referring back to experience that is reported in **Hettche Exhibit 14 (AS-MEDA0001938)**?

7.    In August 1987, what changes, if any, were made to the formulation of an azelastine nasal spray as compared to the formulation of A 5610 as identified by Dr. Aurich in

15

## Questionnaire For Mr. Helmet Hettche

**Hettche Exhibit 11?**

8.    Between September 1985 and August 1987, can you describe the various formulations of an azelastine nasal spray that were prepared and tested?

9.    Did the planned clinical trial 2611 take place? If so, please describe the clinical trial. When did it take place and what was the result?

**N.    Hettche Exhibit 16**

Please take a look at **Hettche Exhibit 16**, a copy of U.S. Patent No. 4,704,387 and the German translation. Do you recognize this U.S. patent claiming substituted benzylphthalazinones having antiallergic and antihistamine action? Please review Column 8, lines 21-26. Is it your understanding that solutions for application to the skin and mucous membrane are discussed? Is it also your understanding that the claimed percentage concentration of active materials are in the range of 0.1% to 3% of active ingrediaents with respect to solutions? Does this range fall within or encompass the range claimed in claims 2, 3 and 4 of your '194 patent, **Hettche Exhibit 2**?

2.    At Column 7, lines 58-61 of **Hettche Exhibit 16**, the specification states that the antiallergic action of the claimed compounds is comparable to the known medicine azelastine. What is the relationship between the claimed compounds in **Hettche Exhibit 16** and azelastine?

3.    Did you review **Hettche Exhibit 16** prior to formulating nasal and eye medicaments containing azelastine? Knowing the derivatives of azelastine could be administered directly to the mucous membranes, would you have expected that azelastine could also be administered in that manner? Given the antiallergic action of azelastine was comparable to the compounds claimed in **Hettche Exhibit 16**, would you have expected the concentration of azelastine solutions for topical application to the mucous membranes to be effective in similar

16

## Questionnaire For Mr. Helmet Hettche

concentrations disclosed in **Hettche Exhibit 16**?

**O.    Self-Administration Of Azelastine**

1.     Is it correct that you self-administered an azelastine nasal spray to treat both your hay-fever and a regular cold?  What made you decide to formulate an Azelastine nasal spray?

2.     Back in 1985, if you were not inclined to conduct self-administration of an azelastine nasal spray for your hay-fever and colds, what were the other testing methods available to determine whether azelastine, in a nasal spray, would work?  Please describe the various testing methods that could have been used.

3.     What was it about azelastine that compelled you to use the formulation on yourself?

4.     How did you know that you could use the azelastine nasal spray formulation on yourself without any adverse health consequences?  Please describe what you knew at the time about azelastine or nasal sprays or similar formulations in general that led you to conclude that self-administration of an azelastine nasal spray would not hurt you?

5.     How did the concentration of azelastine in the nasal spray compare to the azelastine concentration undergoing development in a tablet form at the time?

6.     What side-effects, if any, did you encounter in the self-administration of the azelastine nasal spray?

7.     What side effects, if any, did Dr. Molliere encounter in the self-administration of the azelastine nasal spray?

8.     Do you know what prompted Dr. Molliere to join you in the self-administration of the azelastine nasal spray?

17

## Questionnaire For Mr. Helmet Hettche

9.      Did Dr. Molliere ever express any reservations about potential adverse consequences of self-administering the azelastine nasal spray and, if so, what convinced him to proceed with self-administration?

10.     Prior to your self-administration of an azelastine nasal spray, did you have an expectation that it would work? If so, why did you expect it to work?

**P.    Hettche Exhibit 17**

1.      **Hettche Exhibit 17** is a copy of German Patent Application No. 35 39 873.  Have you seen this German '873 application before?

2.      When do you recall the first time you became aware of the existence of the German '873 application?

3.      Please describe the circumstances that led to your awareness of the German '873 application.

4.      At the time you became aware of the existence of **Hettche Exhibit 17**, the German '873 application, did you read it?  When do you recall first reading **Hettche Exhibit 17**, the German '873 application?

**Q.    Hettche Exhibit 18 - German Patent No. 3,433,776**

1.      **Hettche Exhibit 18** is a copy of German Patent No. 3,433,776 identifying Dr. Jurgen Engel and Gerhard Scheffler as the named inventors.  Have you seen this German '776 patent before?

2.      When do you recall the first time you became aware of the existence of the German '776 patent?

3.      Please describe the circumstances that led to your awareness of the German '776 patent.

18

**Questionnaire For Mr. Helmet Hettche**

4.     At the time you became aware of the existence of **Hettche Exhibit 18**, the German '776 patent, did you read it?  When do you recall first reading **Hettche Exhibit 18**, the German '776 patent?

5.     When did you become aware that Dr. Engel had filed a patent on derivatives of azelastine?

6.     Did you consult or work with Dr. Engel in deciding what concentrations of azelastine would be favorable in a nasal spray?

**R.     Hettche Exhibit 19**

1.     Please refer to **Hettche Exhibit 19** (AS-MEDA0000617-629), a copy of a document, entitled "Vademecum" produced from the files of Asta-Meda.  Are you familiar with this reference?  Do you agree that this reference teaches external and internal administration of medicinal drops?  In the case of the external administration of medicinal drops, do you understand this reference to teach the application of medicinal drops to the eyes and to the nose?  In the case of the external administration of drops to the nose, do you understand this reference to teach applying drops to the nose using a spraying mechanism?  In the case of external administration of nasal drops, do you understand this reference to teach that many nasal drops also find application as eye drops?

**S.     Hettche Exhibit 20**

1.     Please take a look at **Hettche Exhibit 20**, a March 1971 article.  Are you familiar with this article?  How and when did you first become aware of this article?  In 1971, was it common to administer medicaments to the nose in drops to treat conditions of the nasal mucosa associated with colds or allergies?  Are you familiar with the term nasentropfen?  When did you first hear the term nasentropfen.  Could you please explain what this term means to you.

19

### Questionnaire For Mr. Helmet Hettche

2.      Please review Table 2 in **Hettche Exhibit 20**. Is it your understanding that Table

2 identifies nasal drops available in the market at the time of this article? Is it also your

understanding that Table 2 identifies the following nasal drops containing antihistimines: (i)

Antisin-Privin; (ii) Aqua-Mistol; (iii) Biomydrine; (iv) nasoptol spray; (v) Bebdosator; (vi)

Tecoryl; and (vii) vibrocil?

3.      Table 2 discloses Antisin-Privin as a nasal drop available in the market. To the

best of you knowledge, does this medicament contain the same active ingredients used in eye

drops?

4.      The last sentence on page 2 and the top of page 3 of **Hettche Exhibit 20** states:

"The frequent local use of antihistamines on the nasal mucosa, according to current experimental

results, leaves little to be expected, aside from a slight anesthetic effect of certain

antihistamines." Were you aware of this information at the time you produced the first nasal

medicament containing azelastine?

**T.      Hettche Exhibit 21**

1.      Please take a look at **Hettche Exhibit 21**, an Antistin-Privin package insert. Are

you familiar with this package insert for Antistin-Privin eye drops? Are you familiar with this

medicament? What symptoms, illnesses or conditions does this medicament treat? Is the

concentration of antazoline sulphate in Antistin-Privin similar to the concentrations for azelastine

found in claims 2, 3 and 4 of your '194 patent, **Hettche Exhibit 2**? Is the concentration of

benzalkonium chloride within the range found in claim 8 of your '194 patent, **Hettche Exhibit**

**2**? To the best of your knowledge, what is the purpose of the 0.002% m/v benzalkonium

chloride used in Anistin-Privin?

20

## Questionnaire For Mr. Helmet Hettche

U.    **Hettche Exhibit 22**

1.    Please take a look at **Hettche Exhibit 22**, produced by Asta-Meda as AS-MEDA0007755.  Do you recognize this reference document produced by MedPointe from the Asta-Meda files and referring to medications for use in the eye, ear and nose?  What reference source do you recognize this page as coming from?

2.    Please take a look at the section of **Hettche Exhibit 22** designated as 7.3.1 entitled "Nasal drops."  To the best of your knowledge, what concentrations of benzalkonium chloride are disclosed in Table 5.96?  This reference shows the use of benzalkonium chloride as a preservative in eye drops, correct?

V.    **Hettche Exhibit 23**

1.    Please take a look at **Hettche Exhibit 23** which is a copy of an article entitled "The effects of nasal drops on the ciliary beat frequency of chicken embryo tracheas."  Were you aware of this 1981 article from the journal Rhinology examining the effects of nasal drops on the ciliary beat frequency after its publication?  How and when do you recall first learning of this journal article?

2.    Could you please review Table H.  How many of the nasal drops in Table H contain benzalkonium chloride in the percentage concentrations disclosed in claims 5 and 8 of your U.S. '194 patent, **Hettche Exhibit 2**?

3.    Please review Table III.  How many of the nasal formulations identified in Table III contain thimerosal or benzalkonium chloride in the concentration ranges disclosed in claims 5 and 8 of your U.S. '194 patent, **Hettche Exhibit 2**?

4.    At the page numbered as AS-MEDA0000332, Figure 6 is said to demonstrate "the effects of preparations containing drugs which are used against allergic diseases and sometimes

21

### Questionnaire For Mr. Helmet Hettche

against vasomotor rhinitis." Reviewing Figure 6, how many of these nasal drop medicaments contain antihistamines? Could you please identify any other antihistamine containing nasal drops that are not mentioned in Figure 6.

5.    At the last page of **Hettche Exhibit 23**, it is stated that it is unlikely that systemic administration of the drugs discussed in the reference will be preferable to local administration. Do you agree with this statement?

X.    **Hettche Exhibit 24**

1.    Please take a look at the article that has been marked as **Hettche Exhibit 24**. Are you familiar with **Hettche Exhibit 24**? How and when did you become aware of the publication of this article? Do you have any clinical experience with nasal drops or eye drops prior to your work on nasal sprays containing azelastine? What do you understand this article to show with respect to U.S. literature discouraging local application of antihistamines?

Y.    **Hettche Exhibit 25**

1.    Directing your attention to **(Hettche Exhibit 25)** (AS-MEDA0003522-3525), that is your signature on the front page of **Hettche Exhibit 25**, correct?

2.    You recognize Dr. Engel's signature which is also on the front page of **Hettche Exhibit 25,** correct?

3.    Hettche **Exhibit 25** is a report dated September 13, 1988, correct?

4.    The title of **Hettche Exhibit 25** is development pharmaceutics of Azelastine Hydrochloride 0.1% nasal spray, correct?

5.    The study was conducted at ASTA Pharma AG, correct?

6.    You were the study director, correct?

7.    Hettche **Exhibit 25** is the report of the study conducted at ASTA Pharma **AG?**

### Questionnaire For Mr. Helmet Hettche

8.    You were the author of the report marked Hettche **Exhibit 25**, correct?

9.    Dr. Engel reviewed and approved the report, didn't he?

10.    Please review the first heading, titled "Preservatives" on Page 2 of **Hettche Exhibit 25**.

11.    You represent in **Hettche Exhibit 11** that your reasons for choosing benzalkonium chloride as the preservative in the nasal spray formulation was based on information contained in the scientific literature, correct?

12.    The literature you consulted with regard to the preservatives and presertive concentrations to use in the nasal medicament are listed on the final page of **Hettche Exhibit 25**, correct?

13.    The literature you consulted and which is referenced on the final page suggests benzalkonium chloride as a preservative, correct?

14.    To the best of your knowledge, have any other nasal medicaments used benzalkonium chloride as a preservative in the concentrations you selected based on the literature?

15.    Please review the remainder of the report marked **Hettche Exhibit 25**.

16.    It's fair to say that you represent in this report that the nasal medicament you formulated was justified based on the literature and that you followed the literature when you formulated the nasal medicament with respect to preservatives, tonicity, pH, buffers, and thickening agents?

17.    You would agree that one skilled in the art wishing to administrer a medicament in drops to the nasal musosa would be able to formulate such a medicament by consulting the references you relied on in formulating the azelastine medicine?

23

**Questionnaire For Mr. Helmet Hettche**

18.     The literature you consulted also suggested the concentration of benzalkonium chloride for nasal medicaments, correct?

**Z.    Azelastine Eye Drops**

1.     Please describe what involvement, if any, you had in the development of azelastine eye drops?

2.     Who else was involved in the development of azelastine eye drops?

3.     When was the first azelastine eye drops developed? How was it developed?

4.     Who had the idea to develop an azelastine eye drop?

5.     How did the first formulation of an azelstine eye drop compare to the formulation of the azelastine nasal spray? Were the formulations the same of did they differ and, if so, how did they differ?

6.     Did you or anyone else engage in self-administration of azelastine eye drops as you did with the azelsatine nasal spray?

7.     Did the first formulation of an azelastine eye drop have the same concentration level of azelastine as found in the A 5610 nasal spray?

**AA.    Lawrence Hymo**

1.     Do you know a U.S. patent attorney by the name of Lawrence Hymo? If so, how do you know Mr. Hymo?

2.     Have you ever met Mr. Hymo in person and, if so, please generally describe the circumstances where you have met Mr. Hymo in person.

3.     When was the last time you had any contact with Mr. Hymo? What were the circumstances that last brought you into contact with Mr. Hymo?

24

## Questionnaire For Mr. Helmet Hettche

**BB.**     **Dr. Istvan Szelenyi**

1.     Do you know Dr. Istvan Szelenyi and, if so, please describe how you know Dr.

Szelenyi?

2.     When did you first have any contact with Dr. Szelenyi?

3.     Have you ever worked with or collaborated with Dr. Szelenyi and, if so, please

describe the work or collaboration that you have had with Dr. Szelenyi.

**CC.**     **Hettche Exhibit 26**

1.     Please take a look at **Hettche Exhibit 26**, entitled "Declaration Under 37 CFR

1.132," a German translation is attached.  Do you recognize this document?  What is this

document?

2.     Do you recognize the signature on the last page of **Hettche Exhibit 26**?

**DD.**     **Hettche Exhibit 27**

1.     Please take a look at **Hettche Exhibit 27**, entitled "Inhibition of allergic histamine

release from rat peritoneal mast cells."  Do you recognize this document?  Where are rat

peritoneal mast cells located?

2.     Who prepared this document?

3.     Is this the materials and methods used by Dr. Szelenyi that are referenced in his

January 23, 1990 Declaration?

4.     At the time of his January 1990 Declaration, where did Dr. Szelenyi work?

5.     What was Dr. Szelenyi's educational background, if you know.

6.     Why was Dr. Szelenyi approached to conduct this experiment?

7.     What role, if any, did you play in the selection of Dr. Szelenyi to conduct the

experiment described in **Hettche Exhibits 26 & 27**?

## Questionnaire For Mr. Helmet Hettche

8.     What role did you play in designing the comparison experiment Dr. Szelenyi conducted?

9.     Had you worked with Dr. Szelenyi before he conducted the comparison experiment described in **Hettche Exhibit 27**?  If so, please describe the work you have previously done with Dr. Szelenyi.

10.    What was the goal of the comparison experiment to be conducted by Dr. Szelenyi?

11.    Why was it necessary to employ Dr. Szelenyi to conduct the experiment described in **Hettche Exhibit 27**?

12.    Looking at **Hettche Exhibit 26**, paragraph 1, where it recites "Experiments have been conducted under my supervision to determine the effects of compounds disclosed in the above-referenced application and the cited U.S. Patent 4,704,387."  What compounds disclosed in your pending patent application did Dr. Szelenyi test?

13.    Who provided or prepared the compounds to be used by Dr. Szelenyi in the experiment?

14.    What was given to Dr. Szelenyi so that he could declare that his experiment could determine the effects of the compounds disclosed in the above-referenced application?  Please describe what was given to him and by whom?  What language was he given this material in?

15.    What was given to Dr. Szelenyi so that he could determine the compounds disclosed in U.S. Patent No. 4,704,387?  Please describe what was given to him and by whom? What language was he given this material in?

16.    Please disclose the formulations of azelastine from your pending U.S. patent application that Dr. Szelenyi tested according to the procedures in **Hettche Exhibit 27**?

## Questionnaire For Mr. Helmet Hettche

17.    Please disclose the compounds from the Engel '387 patent that Dr. Szelenyi tested according to the procedures in **Hettche Exhibit 27**?

18.    If Dr. Szelenyi did not test any other compounds from the Engel '387 patent other than Example 1, why did he restrict his experiments to only a comparison with Example1?

19.    What role did you play in the selection of the compounds from the Engel '387 patent that Dr. Szelenyi should compare to your azelastine formulation?

20.    Did Dr. Szelenyi test, for comparison purposes, the compound in Example 1 of the Engel '387 patent (of Example 1 in the German counterpart)?

21.    According to Dr. Szelenyi, the compound he tested from the disclosure in your patent application was twice as effective as the compound in Example 1 of the Engel '387 patent, as disclosed in paragraph 5 of his January 1990 Declaration, **Hettche Exhibit 26**, correct?

22.    What was the formulation of the azelastine compound Dr. Szelenyi compared to Exhibit 1? Who prepared the azelastine formulation for the comparison test?

23.    If you are unable to recall the azelastine formulation used by Dr. Szelenyi, how would you go about trying to find this information today?

24.    Did you receive any type of communication from Dr. Szelenyi regarding the results of his experiments? If so, what did you receive?

25.    Did Dr. Szelenyi compare your azelastine compound to the compound disclosed in Example 2 of the Engel '387 patent? If so, what was the result of a comparison of the effectiveness of your azelastine compound with the effectiveness of the compound in Example 2? If not, why didn't Dr. Szelenyi compare the effectiveness of your azelastine compound to Example 2?

27

## Questionnaire For Mr. Helmet Hettche

Q26.     Who made the decision not to test your azelastine compound against the compound in Example 2 of the Engel '387 patent?

Q27.     Did Dr. Szelenyi compare your azelastine compound to the compound disclosed in Example 3 of the Engel '387 patent? If so, what was the result of a comparison of the effectiveness of your azelastine compound with the effectiveness of the compound disclosed in Example 3? If not, why didn't Dr. Szelenyi compare the effectiveness of your azelastine compound to Example 3?

Q28.     Who made the decision not to test your azelastine compound against the compound in Example 3 of the Engel '387 patent?

Q29.     Did Dr. Szelenyi compare your azelastine compound to the compound disclosed in Example 4 of the Engel '387 patent? If so, what was the result of the comparison of the effectiveness of your azelastine compound with the effectiveness of the compound disclosed in Example 4? If not, why didn't Dr. Szelenyi compare the effectiveness of your azelastine compound to Example 4?

Q30.     Who made the decision not to test your azelastine compound against the compound in Example 4 of the Engel '387 patent?

Q31.     Did Dr. Szelenyi prepare a report of the results from his comparisons of your azelastine compound with compounds disclosed in the Engel '387 patent?

32.     Did you review Dr. Szelenyi's January 1990 Declaration before it was submitted to the U.S. Patent Office?

33.     What role did you play in Dr. Szelenyi's experiment?

34.     Did you provide Dr. Szelenyi with the azelastine compound he used in his experiment?

28

## Questionnaire For Mr. Helmet Hettche

35.     Who prepared the compounds based on the disclosure in the Engel '387 patent used by Dr. Szelenyi in his comparison experiment?

36.     Was Dr. Szelenyi paid for performing the comparison experiment and, if so, by whom was he paid?

**EE.     Hettche Exhibit 28**

1.     Please take a look at **Hettche Exhibit 28**.  Do you recognize this document? What is it?

2.     Do you recognize the signature on page 2?  Who signed it?  Is this the same Dr. Szelenyi that signed the previous Declaration, **Hettche Exhibit 26**?

3.     Do you understand that this Declaration was also submitted to the U.S. Patent Office in connection with your patent application that led to issuance of the '194 patent?

4.     Why was it necessary to obtain a second declaration from Dr. Selenyi?

5.     Did Dr. Szelenyi conduct additional experiments or comparisons in connection with his second Declaration?  If so, please describe the additional experiments or comparisons he conducted.

6.     Looking at paragraph 1 of **Hettche Exhibit 28**, it states:  "I further declare and state that, in the experiments described in my previous declaration, the same amounts of the respective medicines were used, i.e., azelastine and the compound disclosed in Example 1 of U.S. Patent 4,704,387."  Does this confirm that Dr. Szelenyi only conducted a comparison of your azelastine compound with the compound disclosed in Example 1 of the Engel '387 patent?

7.     Did you review this Declaration before it was submitted to the U.S. Patent Office?

8.     What involvement did you have in the preparation of Dr. Szelenyi's Second Declaration?

29

## Questionnaire For Mr. Helmet Hettche

9.    In paragraph 2 of the Declaration, Dr. Szelenyi refers to "the nasal cavity contained about 2.5 ml mucus." What nasal cavity is he referring to in his experiment?

10.    Isn't it correct that bathing rat peritoneal mast cells in an azelastine solution in a test tube does not involve applying azelastine to the "nasal cavities?" Would you agree that Dr. Szelenyi's second declaration does not involve the same study disclosed in his first declaration? Would you agree the second declaration misrepresents the studies conducted in the first declaration? Would you further agree that the second declaration does not clarify or further describe the experiments described in the first declaration? What study was Dr. Szelenyi referring to that involved applying azelastine to the "nasal cavity contain[ing] about 2.5 ml mucus?"

**FF.    Other Contact With Dr. Szelenyi**

1.    Did you have any other contact with Dr. Szelenyi during the prosecution of your U.S. patent application?

2.    In March 1991, do you recall that you sent Dr. Szelenyi a letter and memorandum concerning the U.S. Patent Application? If so, what was the memorandum you recall sending him and what did you say in it?

3.    Why were you corresponding with Dr. Szelenyi in March, 1991?

4.    Do you recall that Dr. Szelenyi prepared and sent you a memorandum or a report in April 1991 regarding the U.S. Patent Application? If so, what was the memorandum you recall receiving and what did it say?

5.    Why was it necessary to obtain another report from Dr. Szelenyi in April, 1991?

6.    When was the last time you spoke with Dr. Szelenyi? What were the circumstances that brought about your last contact with Dr. Szelenyi?

30

## Questionnaire For Mr. Helmet Hettche

**GG.    Dr. Gerhard Scheffler**

1.    Did you know Dr. Gerhard Scheffler? If so, how do you know Dr. Scheffler?

2.    Did you ever work for or with Dr. Scheffler? If so, please describe the work you have done with Dr. Scheffler and the time frame in which the work was performed.

**HH.    Dietrich Vogelsang**

1.    Did you ever know Dietrich Vogelsang? If so, how did you know Mr. Vogelsang?

2.    Did you ever work for or with Dietrich Vogelsang? If so, please describe the work you have done with Dietrich Vogelsang.

**II.    Dr. Juergen Engel**

1.    How do you know Dr. Juergen Engel?

2.    Between 1985 and 1992, did your duties and responsibilities bring you into contact with Dr. Engel. If so, please describe the interactions you had with Dr. Engel during this time frame?

3.    Between 1985 and 1992, what employment positions did Dr. Engel hold and how did his employment positions relate, if at all, to the employment positions you held during this same time period?

4.    Did you consult with Dr. Engel in connection with your work on an azelastine nasal spray? If so, what did you discuss with Dr. Engel about an azelastine nasal spray?

5.    Were you aware of Dr. Engel's work with azelastine before you began working on a nasal azelastine spray? What did you know about Dr. Engel's work before you started working on an azelastine nasal spray?

31

## Questionnaire For Mr. Helmet Hettche

**JJ.**  **Dr. Naresh Chand**

1.  Do you know Dr. Naresh Chand? How do you know Dr. Chand?

2.  Did you have any communications or contact with Dr. Chand at the time you were developing an azelastine nasal spray? If so, what was the nature of your communications? Did you have access to Dr. Chand's protocols, lab notebooks and/or research reports?

3.  · What other scientists or employees at Carter-Wallace did you work with to formulate Azelastine medicines? What were their names? What other Azelastine medicines did you work on with them? What methods of administration of Azelastine medicines did you work on with them? In what years did you work on formulations and methods of administration of Azelastine medicines with other scientists and/or physicians employed by Carter Wallace?

4.  At the time of your communications with Dr. Chand, who was his employer and what was his position?

5.  What brought you into contact with Dr. Chand?

6.  Were you aware of Dr. Chand's work with azelastine before you began work on an azelastine nasal spray? If so, what did you know about Dr. Chand's work with azelastine?

7.  Did you work, consult, or collaborate with scientists in Japan, Australia, Ireland or any other country with respect to azelastine containing medicaments?

**KK.**  **Reading Material**

1.  In the 1980 - 1992 time frame, did you subscribe to any scholarly or scientific journals or papers? If so, please name the journals or papers to which you subscribed?

2.  In the 1980 - 1992 time frame, did Asta Medica AG subscribe to scholarly or scientific journals or papers that were routed to you for review?

32

### Questionnaire For Mr. Helmet Hettche

3.    In the 1980 - 1992 time frame, did you have access to a scientific library for research?  If so, what library?

4.    In the 1980 - 1992 time frame, did you keep a collection of books in your office or work space?  If so, what were some of the titles of the books you had in your office or work space?

5.    In the 1980 - 1992, please identify the reference books or treatises that you may have consulted on a regular basis in connection with your work?

LL.    **Preservatives**

1.    In 1985, were you aware that benzalkonium chloride was well known as an acceptable preservative for use with an azelastine nasal spray?

2.    Before 1985, did you have any experience in formulating nasal sprays?  If so, please describe your experience in formulating nasal sprays.

3.    Please generally describe your involvement in assisting Asta Pharma AG in obtaining the German '681 patent?

4.    Please generally describe your involvement in assisting Asta Pharma AG in obtaining the U.S. '194 Patent?

MM.    **Development of Azelastine Nasal Spray**

1.    To your knowledge, was Asta Pharma AG working with any other companies on the formulation of azelastine medicaments?  If so, who was Asta Pharma AG working with and when?

2.    What was the relationship between Asta Pharma AG and Carter Wallace/Eisai regarding new drug formulations using azelastine?

33

## Questionnaire For Mr. Helmet Hettche

3.    When did you first learn that others were working on formulations of azelastine for topical administration? Who did you understand was working on the formulations of azelastine for topical administration?

4.    What involvement, if any, did you have with Carter Wallace regarding the formulation of azelastine nasal sprays? Please describe your involvement with Carter Wallace on the formulation of azelastine nasal sprays.

**NN.    Miscellaneous Issues**

1.    At the time you developed the azelastine nasal spray, what other nasal spray products were on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold? What were the names of the products and who were the manufacturers? If you know, what were the formulations of the various nasal sprays on the market at the time you developed the azelastine nasal spray?

2.    At the time you developed the azelastine nasal spray, did Asta Pharma AG have any nasal sprays on the market for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold? If so, what was the product and what was its active ingredients?

3.    Is your azelastine nasal spray formulation the first nasal spray developed and offered by Asta Pharma AG or related companies for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?

4.    Is your azelastine eye drop formulation the first eye drop formulation developed and offered by Asta Pharma AG or related companies for the treatment of allergy-related rhinitis, normal common colds and the vasomotor cold?

34

# EXHIBIT E

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Anne Toker
To Call Writer Directly:
212 446-4901
atoker@kirkland.com

212 446-4800

www.kirkland.com

Facsimile:
212 446-4900
Dir. Fax: 212 446-6460

April 27, 2007

**BY ELECTRONIC MAIL**
**AND FIRST CLASS MAIL**

Hartwell P. Morse, III, Esq.
Welsh & Katz, Ltd.
Suite 2200
120 S. Riverside Plaza
Chicago, Illinois 60606

Re:    *MedPointe Healthcare Inc. v. Apotex Inc. and Apotex Corp.,*
       *Civil Action No. 06-164-SLR (D. Del.)*

Dear Hartwell:

I write regarding the scope of discovery sought in Apotex's motion for judicial assistance in obtaining testimony from Dr. Juergen Engel pursuant to the Hague Convention.

MedPointe has the following objections to the questions intended for Dr. Engel that you sent to us on April 25, 2007:

1.    MedPointe objects to all questions that call for legal conclusions, including questions E1, F12, F14, F22, G1, H5, H8, I7-9;

2.    MedPointe objects to all questions that call for an expert opinion, including questions F11, F15, F22, F23, I7, I9, J1, Q1; and

3.    MedPointe objects to all questions that invite Dr. Hettche to reveal privileged information, including D3, E1, F12, F14, F22, G1, H2-5, H8, I4-9.

Chicago        Hong Kong        London        Los Angeles        Munich        San Francisco        Washington, D.C.

# KIRKLAND & ELLIS LLP

Hartwell P. Morse, III, Esq.
April 27, 2007
Page 2

Sincerely,

Anne S. Toker

cc:    Stephen P. Benson, Esq. (by E-mail)

# EXHIBIT F

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Anne Toker
To Call Writer Directly:
212 446-4901
atoker@kirkland.com

212 446-4800

www.kirkland.com

Facsimile:
212 446-4900
Dir. Fax: 212 446-6460

May 9, 2007

**BY ELECTRONIC MAIL
AND FIRST CLASS MAIL**

Hartwell P. Morse, III, Esq.
Welsh & Katz, Ltd.
Suite 2200
120 S. Riverside Plaza
Chicago, Illinois 60606

Re:    *MedPointe Healthcare Inc. v. Apotex Inc. and Apotex Corp.,*
       Civil Action No. 06-164-SLR (D. Del.)

Dear Hartwell:

I write regarding the scope of discovery sought in Apotex's motion for judicial assistance in obtaining testimony from Dr. Istvan Szelenyi pursuant to the Hague Convention.

MedPointe has the following objections to the questions intended for Dr. Szelenyi that you sent to us on May 8, 2007:

1.    MedPointe objects to all questions that call for legal conclusions, including questions D13, E4;

2.    MedPointe objects to all questions that call for an expert opinion, including questions D24, D41, D43, K1-2; and

3.    MedPointe objects to all questions that invite Dr. Hettche to reveal privileged information, including questions B1, C3-4, D4, D8-11, D12-13, D17-19, D21-22, D25-27, D32-38, E4-5, E7, E15-16, E19, E21, F1-2, G2, H2, H4-8, I2, I4.

MedPointe objects in particular to questions mischaracterizing the documents and deposition testimony in this action, including questions E17-18, F2, and H9.

Chicago        Hong Kong        London        Los Angeles        Munich        San Francisco        Washington, D.C.

KIRKLAND & ELLIS LLP

Hartwell P. Morse, III, Esq.
May 9, 2007
Page 2

Sincerely,

Anne S. Toker

cc:    Stephen P. Benson, Esq. (by E-mail)